Mark Frankel
Backenroth Frankel & Krinsky, LLP
800 Third Avenue, Floor 11
New York, New York  10022
(212) 593-1100

*Proposed Counsel to the Debtors and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
In re                                                                  Chapter 11


      203 W 107 Street LLC, *et al*,[1]              Case No.  20-12960 (SCC)
                                      Jointly Administration Requested


                            Debtors.              **LOCAL RULE 1007-2 AFFIDAVIT**


--------------------------------------------------------x
STATE OF NEW YORK        )
                            ) ss:
COUNTY OF NEW YORK   )

              Ephraim Diamond, as Chief Restructuring Officer of 203 W 107 Street LLC, 210 W

107 Street LLC, 220 W 107 Street LLC and 230 W 107 Street LLC (the "107 Debtors"), and 124-

136 East 117 LLC, 215 East 117 LLC, 231 East 117 LLC, 235 East 117 LLC, 244 East 117 LLC,

---

[1]     The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: 203 W 107 Street LLC (8429); 210 W 107 Street LLC (3364), 220 W 107 Street LLC (0461), 230 W 107 Street LLC (3686), 124-136 East 117 LLC (6631), 215 East 117 LLC (6961), 231 East 117 LLC (0105), 235 East 117 LLC (8762), 244 East 117 LLC (1142), East 117 Realty LLC (1721) and 1661 PA Realty LLC (5280).

East 117 Realty LLC and 1661 PA Realty LLC (the "117 Debtors," collectively with the 107 Debtors, the "Debtors") deposes and says under penalty of perjury, as follows:

1.      I am submitting this affidavit under the local rules of this Court in support of each Debtors' chapter 11 filing.

2.      On December 28, 2020, the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. 101 et seq. (the "Bankruptcy Code").

3.      The 107 Debtors own the properties at 203 West 107th Street, New York, New York; 210 West 107th Street, New York, New York; 220 West 107th Street, New York, New York; and 230 West 107th Street, New York, New York (collectively, the "107 Properties").  The 117 Debtors own the properties at 124-136 East 117th Street, New York, New York; 215 East 117th Street, New York, New York; 231 East 117th Street, New York, New York; 235 East 117th Street, New York, New York; 244 East 117th Street, New York, New York; 316, 322 and 326 East 117th Street, New York, New York; and 1661 Park Avenue New York, New York (collectively, the "117 Properties," with the 107 Properties, the "Properties.

4.      The 107 Debtors purchased the 107 Properties in December 2016 to effectuate condominium conversions.  The 117 Debtors purchased the 117 Properties in March 2018 to renovate vacant apartments to increase the rent rolls.  Both well-laid plans were stymied by the passage of the New York Housing Stability and Tenant Protection Act of 2019 ("HSTPA").

5.      Under the HSTPA the number of tenants in a building that must consent to a condominium conversion was greatly increased from 15% to 51%, effectively blocking all

2

condominium conversions in the city, including the 107 Debtors' planned conversions. The HSTPA also reduced the allowable increase in rents based on apartment and building improvements effectively making the 117 Debtors' planned renovations similarly unprofitable.

6.      Unfortunately, by the time the new law was passed, the Debtors had already sunk significant, borrowed money into the Debtors including through initiating construction and tenant buyouts to implement their business plans. These actions, necessarily involve affirmatively increasing apartment vacancies, decreasing current income.

7.      Meanwhile, many tenants opposed the Debtors' plans for the Properties, with some taking active measures to hamper the Debtors' plans, including by being uncooperative regarding necessary, building-wide maintenance items, and joining in a rent strike. Collectively, over $500,000 is apparently being held by tenants' counsel.

8.      Making matters worse, the advent and continuation of the pandemic and the economic hardship it placed on many people has caused rent collections to significantly drop even further. Not surprisingly, the Debtors have been struggling.

9.      LoanCore Capital Credit REIT LLC (the "Lender") holds two mortgage loans in the total principal amount of $95,000,000 against the 107 Debtors (the "107 Mortgage") secured by the 107 Properties, and two mortgage loans in the total principal amount of $89,685,000 against the 117 Debtors (the "117 Mortgage," together with the 107 Mortgage, the "LoanCore Mortgage") secured by the 117 Properties.

3

10.     The Debtors are in default under the LoanCore Mortgage. On November 22, 2019, the Lender sent notices to the Debtors accelerating the LoanCore Mortgage making the LoanCore Mortgage immediately due and payable to the Lender.

11.     As of the Petition Date, the 107 Debtors owe the Lender not less than $102,830,141.91, including principal, interest, fees and costs plus attorneys' fees and expenses and 117 Debtors owe the Lender not less than $100,245,624.57, including principal, interest, fees and costs plus attorneys' fees and expenses.

12.     The Debtors entered into a restructuring agreement with the Lender, a copy of which is annexed hereto as Exhibit A (the "Restructuring Agreement").

13.     Under and subject to the Restructuring Agreement, the Debtors agreed to a consensual Chapter 11 plan ("Plan") that will transfer the Properties to the Lender's designee to satisfy Lender's secured and unsecured claims against the Debtors.  Under and subject to the Plan, the Debtors' project that all creditors holding allowed claims (other than LoanCore and insiders) will receive payment in full in cash on the effective date of the Plan, provided, however, that general unsecured claimants will not receive pre-petition interest or post-petition interest on their allowed claims.  Further, pursuant to the Plan, the aggregate amount of consideration to be distributed by the Successor Owners[2] on account of Allowed General Unsecured Claims shall not exceed $670,000.00. If the aggregate of Allowed General Unsecured Claims exceeds $670,000.00, holders of Allowed

_____

[2] Capitalized terms used but not defined in this Affidavit shall have the meanings ascribed to them in the Plan.

4

General Unsecured Claims will receive their pro rata share of $670,000.00. The Plan and a disclosure statement ("Disclosure Statement") are being filed contemporaneously herewith, and the Debtors are seeking a hearing to consider approval of the Disclosure Statement.

14.     The Debtors are controlled by Emerald Equity Group, LLC ("Emerald"). Emerald retained Arbel Capital Advisors LLC ("Arbel") and Ephraim Diamond ("Diamond"), its managing member, to assist in complying with the Debtors and Emerald's obligations under the Restructuring Agreement including, but not limited to, filing and managing these chapter 11 cases, and implementing the Plan. Emerald is solely responsible for fees and expenses incurred by Arbel and Diamond for services performed prior to and during these chapter 11 cases. For the avoidance of doubt, without limiting Diamond's rights as Chief Restructuring Officer under the Debtors' organizational documents, under no circumstances shall the Debtors or any of its creditors or lenders have any liability to Arbel and/or Diamond in respect of compensation, indemnity, or other obligations for services performed by Arbel and/or Diamond as the Debtors' Chief Restructuring Officer in these chapter 11 cases. Emerald has agreed to pay Arbel a monthly fee plus a per diem fee for court appearances at court hearings, plus reimbursement for out of pocket expenses. A copy of the agreement between Emerald and Arbel is available to parties-in-interest upon request made to the undersigned.

15.     The schedule of the 20 largest unsecured creditors for each Debtor is attached to such Debtor's petition.

16.     The schedule of secured creditors for each Debtor is attached to such Debtor's petition.

17.     Third-party property management companies, Tri-Hill Management LLC and Bronstein Properties, are being engaged by the Debtors as of the Petition Date to manage the Properties. Prior to the Petition Date, the Properties were managed by Archrock LLC ("Archrock"), an affiliate of the Debtors.

18.     No insiders shall be compensated for their services by the Debtors during this case.

19.     Pursuant to Local Rule 1007(a)(3), no committees were formed prior to the filing of these chapter 11 cases.

20.     Pursuant to Local Rule 1007-2(a)(10), prior to the petition date, the Debtors books and records are maintained at Archrock, One Battery Park Plaza, 31st Floor, New York, New York, 10004.

21.     Pursuant to Local Rule 1007-2(a)(11), the Debtors have a number of pending nonpayment proceedings against tenants, each of which is identified in the respective Debtor's statements of financial affairs.  As noted above, tenants' Counsel Kellner Herlihy Getty & Friedman LLP appears to be in in possession of over five hundred thousand dollars of estate property consisting of rent owed to the Debtors.

6

22.     Pursuant to Local Rule 1007-2(a)(12), Isaac Kassirer as principal of Emerald
, has controlled the Debtors' decision making since their inception, and Archrock, an Emerald
affiliate, has managed the Properties.

23.     Local Rules 1007-2(a)(2), (7), (8) and (9) do not appear applicable to these
chapter 11 cases.

Dated: New York, New York
        December 28, 2020

                                        s/Ephraim Diamond, as Chief Restructuring Officer

Exhibit A

**RESTRUCTURING SUPPORT AGREEMENT**

   This RESTRUCTURING SUPPORT AGREEMENT (together with any Exhibits hereto, this "<u>Agreement</u>") is made and entered into as of December 28, 2020, by and among:

(a) LoanCore Capital Credit REIT LLC, a Delaware limited liability company ("<u>Lender</u>"), as holder of (i) that certain mortgage loan in the principal amount of $91,920,000 (the "<u>107 Senior Loan</u>") made by Lender to 107 Mortgage Borrowers (as defined below) and evidenced by that certain Amended and Restated Loan Agreement dated as of April 17, 2018 (the "<u>107 Senior Loan Agreement</u>"); (ii) that certain mortgage loan in the principal amount of $4,180,000 (the "<u>107 Building Loan</u>"; and together with the 107 Senior Loan, collectively, the "<u>107 Loans</u>") made by Lender to 107 Mortgage Borrowers and evidenced by that certain Building Loan Agreement dated as of April 17, 2018 (the "<u>107 Building Loan Agreement</u>"); (iii) that certain mortgage loan in the principal amount of $85,685,000 (the "<u>117 Senior Loan</u>") made by Lender to 117 Mortgage Borrowers (as defined below) and evidenced by that certain Senior Mortgage Loan Agreement dated as of December 13, 2018 (the "<u>117 Senior Loan Agreement</u>"); and (iv) that certain mortgage loan in the principal amount of $4,000,000 (the "<u>117 Building Loan</u>"; and together with the 117 Senior Loan, collectively, the "<u>117 Loans</u>"; the 117 Loans, together with the 107 Loans, collectively, the "<u>Loans</u>") made by Lender to 117 Mortgage Borrowers and evidenced by that certain Building Loan Agreement dated as of December 13, 2018 (the "<u>117 Building Loan Agreement</u>"; and together with the 107 Senior Loan Agreement, the 107  Building Loan Agreement and the 117 Senior Loan Agreement, as each of the same may have been amended, modified, supplemented, replaced or assigned from time to time, collectively, the "<u>Loan Agreements</u>"); any capitalized term used herein and not otherwise defined shall have the meaning attributed to such term in the Loan Agreements);

(b) Lender, as holder of (i) that certain mezzanine loan in the principal amount of $15,000,000 (the "<u>107 Mezzanine Loan</u>") made by Lender to 107 Mezzanine Borrower (as defined below) and evidenced by that certain Mezzanine Loan Agreement dated as of March 6, 2018 (the "<u>107 Mezzanine Loan Agreement</u>"); and (ii) that certain mezzanine loan in the principal amount of $10,000,000 (the "<u>117 Mezzanine Loan</u>"; and together with the 107 Mezzanine Loan, collectively, the "<u>Mezzanine Loans</u>") made by Lender to 117 Mezzanine Borrower (as defined below) and evidenced by that certain Mezzanine Loan Agreement dated as of December 13, 2018 (the "<u>117 Mezzanine Loan Agreement</u>"; and together with the 107 Mezzanine Loan Agreement, as each of the same may have been amended, modified, supplemented, replaced or assigned from time to time, collectively, the "<u>Mezzanine Loan Agreements</u>");

(c) 203 W 107 Street LLC, 210 W 107 Street LLC, 220 W 107 Street LLC and 230 W 107 Street LLC, each a Delaware limited liability company (collectively, "<u>107 Mortgage Borrowers</u>");

(d)  124-136 East 117 LLC, 215 East 117 LLC, 231 East 117 LLC, 235 East 117 LLC, 244 East 117 LLC, East 117 Realty LLC and 1661 PA Realty LLC, each a Delaware limited liability company (collectively, "117 Mortgage Borrowers"; and together with 107 Mortgage Borrowers, collectively, "Borrowers");

(e)  West 107 Mezz LLC, a Delaware limited liability company ("107 Mezzanine Borrower")

(f)  EEG HGI LLC, a Delaware limited liability company ("117 Mezzanine Borrower"; and together with 107 Mezzanine Borrower, collectively, "Mezzanine Borrowers"); and

(g)  Isaac Kassirer ("Guarantor"; and together with Borrowers and Mezzanine Borrowers, collectively, the "Borrower Parties"), who has delivered to Lender in connection with the Loans and the Mezzanine Loans (i) in connection with the 107 Loans, that certain Amended and Restated Guaranty of Recourse Obligations dated as of April 17, 2018, (ii) in connection with the 117 Loans, that certain Guaranty of Recourse Obligations dated as of December 13, 2018, (iii) in connection with the 117 Loans, that certain Guaranty of Completion dated as of December 13, 2018, (iv) in connection with the 107 Mezzanine Loan, that certain Mezzanine Guaranty of Recourse Obligations and Limited Payment Guaranty dated as of March 6, 2018, and (v) in connection with the 117 Mezzanine Loan, that certain Mezzanine Guaranty of Recourse Obligations dated as of December 13, 2018 (the foregoing, as each of the same may have been amended, modified, supplemented or replaced from time to time, collectively, the "Guaranties").

"Parties" is defined collectively to include Lender, Borrowers, Mezzanine Borrowers and Guarantor.

As of the execution date of this Agreement, neither the Borrowers nor the Mezzanine Borrowers have commenced a case under title 11 of the United States Code (the "Bankruptcy Code"). The Restructuring (as defined below) contemplated in this Agreement, which is supported by Lender and Guarantor, shall be implemented through a chapter 11 plan process involving Borrowers consistent with the Restructuring (as defined below) as described in the Chapter 11 Plan (as defined below).

## RECITALS

**WHEREAS,** on November 12, 2019, (i) pursuant to that certain notice from Lender to 107 Mortgage Borrowers, Lender accelerated the 107 Loans and declared the 107 Loans immediately due and payable, (ii) pursuant to that certain notice from Lender to 117 Mortgage Borrowers, Lender accelerated the 117 Loans and declared the 117 Loans immediately due and payable, (iii) pursuant to that certain notice from Lender to 107 Mezzanine Borrower, Lender accelerated the 107 Mezzanine Loan and declared the 107 Mezzanine Loan immediately due and payable and (iv) pursuant to that certain notice from Lender to 117 Mezzanine Borrower, Lender accelerated the 117 Mezzanine Loan and declared the 117 Mezzanine Loan immediately due and payable;

**WHEREAS,** the Parties have engaged in good faith and arm's-length negotiations regarding a restructuring of each of the Borrowers;

2

**WHEREAS,** on the date hereof, pursuant to the terms hereof, the Parties have agreed to implement a proposed restructuring of Borrowers (the "Restructuring") pursuant to that certain Joint Plan of Liquidation of the Debtors, attached hereto as Exhibit A (as such plan may be amended or modified with the written agreement of the Lender, the "Chapter 11 Plan")[1] to be filed by Borrowers in connection with cases (the "Chapter 11 Cases") to be commenced in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under chapter 11 of the Bankruptcy Code;

**WHEREAS,** the Parties have agreed to support the Restructuring subject to and in accordance with the terms of this Agreement and desire to work together to complete the negotiation of the terms of the documents and completion of each of the actions necessary or desirable to effect the Restructuring and the Chapter 11 Plan; and

**NOW, THEREFORE,** in consideration of the promises and mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the Parties, intending to be legally bound, hereby agrees as follows:

The Chapter 11 Plan and each of the other exhibits hereto are fully incorporated by reference herein and are made part of this Agreement as if fully set forth herein and all references to this Agreement shall include and incorporate such exhibits, including the Chapter 11 Plan. The general terms and conditions of the Restructuring are set forth in the Chapter 11 Plan; provided however, that (i) the Chapter 11 Plan is supplemented by the terms and conditions of this Agreement and (ii) to the extent there is a conflict between this Agreement, on the one hand, and the Restructuring Documents (as defined below), on the other hand, the terms and provisions of the Restructuring Documents shall govern.

In this Agreement, unless the context otherwise requires:

(a) words importing the singular also include the plural, and references to one gender include all genders;

(b) the headings in this Agreement are inserted for convenience only and do not affect the construction of this Agreement and shall not be taken into consideration in its interpretation;

(c) the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement;

(d) the words "include," "includes," and "including" shall be deemed to be followed by the phrase "without limitation." The word "or" is not exclusive; and

---

[1] Any terms used but not defined herein shall have the meaning ascribed to such term in the Chapter 11 Plan.

(e) references to any governmental entity or any governmental department, commission, board, bureau, agency, regulatory authority, instrumentality, or judicial or administrative body, in any jurisdiction shall include any successor to such entity.

**Section 1.**     **Conditions to Effectiveness of this Agreement.**

This Agreement shall become effective and binding on each of the Parties upon the execution and delivery of this Agreement by Lender, Borrowers and Guarantor (the "RSA Effective Date").

**Section 2.**     **Timeline.**

Until the earlier of the Termination Date and the Effective Date (as defined herein), the Parties agree to take any and all reasonably necessary or appropriate actions in furtherance of the Restructuring contemplated by this Agreement and the Chapter 11 Plan, including the occurrence of the following milestones (the "Milestones"):

(a) The RSA Effective Date shall have occurred by December 28, 2020;

(b) Borrowers shall have filed the Chapter 11 Cases no later than December 28, 2020 (the "Petition Date") and shall have designated such filings as related bankruptcy cases;

(c) The Bankruptcy Court shall have entered the order approving the motion seeking authority to use cash collateral and grant adequate protection to Lender (the "Cash Collateral Order") on an interim basis within one (1) business days of the Petition Date, or such later date to which the Parties agree in writing, which Cash Collateral Order shall be substantially in the form attached hereto as Exhibit B, together with such changes agreed to by Lender in its sole discretion;

(d) Borrowers shall have filed the Chapter 11 Plan and the disclosure statement with respect to the Chapter 11 Plan substantially in the form attached hereto as Exhibit C (the "Disclosure Statement") within one (1) business day of the Petition Date, or such later date to which the Parties agree in writing;

(e) The Bankruptcy Court shall have entered the Cash Collateral Order on a final basis within thirty (30) days of the Petition Date, or such later date to which the Parties agree in writing;

(f) The Bankruptcy Court shall have approved the Disclosure Statement within forty-five (45) days of the Petition Date, or such later date to which the Parties agree in writing;

(g) The Bankruptcy Court shall have entered the order confirming the Chapter 11 Plan within ninety (90) days of the Petition Date, or such other date to which the Parties agree in writing;

(h) Borrowers shall have, no later than three (3) days of the Petition Date, or such other

4

date to which the Parties agree in writing, appointed (x) Tri-Hill Management LLC as the property manager for the Properties owned by 107 Mortgage Borrowers and (y) Bronstein Properties, LLC as the property manager for the Properties owned by 117 Mortgage Borrowers (the "Property Managers"), in each such case pursuant to property management agreements acceptable to Lender (the "Property Management Agreements") to manage the Properties; and

(i)    The effective date of the Chapter 11 Plan (the "Effective Date") shall have occurred within one-hundred and four (104) days of the Petition Date, or such other date to which the Parties agree in writing.

Notwithstanding the foregoing, each of the Milestones set forth in Sections 2(e), (f), (g) and (i) shall be subject to an extension of up to twenty-one (21) days if Borrower Parties are using commercially reasonable efforts to meet such Milestone and they are unable to meet such Milestone due to no fault of Borrower Parties.

Section 3.    **Commitment of Lender.**

Subject to the terms and conditions of this Agreement and the Chapter 11 Plan, Lender agrees with Borrowers and Guarantor that it shall:

(a)    use commercially reasonable efforts to consummate and complete the Restructuring, including taking reasonably necessary actions in furtherance of the Restructuring and this Agreement;

(b)    negotiate in good faith all documentation relating to the Restructuring, including, without limitation, those documents specifically contemplated in the Chapter 11 Plan and any documents relating thereto or contemplated thereby, including, without limitation, (i) the Disclosure Statement, (ii) the Chapter 11 Plan, (iii) any supplement to the Chapter 11 Plan, (iv) any documents ancillary to any of the foregoing, and (v) any amendments or modifications to any of the foregoing (each of (i)-(v) together with any other definitive documentation relating to the Restructuring, the "Restructuring Documents").    Each of the Restructuring Documents shall contain provisions consistent in all material respects with this Agreement and the Chapter 11 Plan;

(c)    not take, nor encourage any other person or entity to take, any action that directly or indirectly interferes with or delays the acceptance or implementation of the transactions contemplated by the Restructuring and this Agreement, including, without limitation, initiating or joining any legal proceeding, objecting, directly or indirectly, to the Chapter 11 Plan or the Restructuring Documents, or directly or indirectly negotiating or soliciting any other plan, sale, proposal or offer of dissolution, winding up, liquidation, reorganization, merger, or restructuring of each of the Borrowers that is inconsistent with or that would be reasonably likely to prevent, delay, or impede the consummation of the Restructuring (an "Alternative Restructuring");

(d)    timely vote all of its claims against Borrowers (including, without limitation and as applicable, its Loans) (together, the "Covered Claims"), to accept the Chapter 11 Plan

5

in accordance with the applicable procedures set forth in the Disclosure Statement and any other solicitation materials, and timely return a duly-executed ballot in connection therewith (it being understood that such votes will be irrevocable during the term of this Agreement, except as otherwise provided herein);

(e) not withdraw, amend, or revoke (or cause to be withdrawn, amended or revoked) its vote with respect to the Covered Claims with respect to the Chapter 11 Plan; *provided*, *however*, that such vote shall, without any further action by Lender, be deemed automatically revoked (and, upon such revocation, deemed void *ab initio*) by Lender upon the Termination Date;

(f) consistent with <u>Section 19</u> of this Agreement, consent to the Releases (as defined below); *provided*, *however*, that consent by Lender to the Releases shall, without any further action by Lender, be deemed automatically revoked (and, upon such revocation, deemed void *ab initio*) by Lender upon the Termination Date;

(g) provide prompt written notice to the Borrower Parties between the date hereof and the Effective Date of the Chapter 11 Plan of (i) the occurrence, or failure to occur, of any event of which the occurrence or failure to occur would be reasonably likely to cause (A) any representation or warranty of Lender contained in this Agreement to be untrue or inaccurate in any material respect, (B) any material covenant of Lender contained in this Agreement not to be satisfied in any material respect, or (C) any condition precedent contained in the Chapter 11 Plan or this Agreement not to occur or become impossible to satisfy, (ii) receipt of any written notice from any third party alleging that the consent of such party is or may be required as a condition precedent to consummation of the transactions contemplated by the Restructuring, (iii) receipt of any written notice from any governmental body that is material to the consummation of the transactions contemplated by the Restructuring, (iv) receipt of any written notice of any proceeding commenced or threatened against any Party that would otherwise affect in any material respect the transactions contemplated by the Restructuring, and (v) any failure of Lender to comply, in any material respect, with or satisfy any covenant, condition or agreement to be complied with or satisfied by them hereunder as a condition precedent to the consummation of the transactions contemplated by the Restructuring; and

(h) without Guarantor's prior written consent, not release (nor allow any affiliate to release, nor provide any information with respect to) any news releases, publicity or other advertising with respect to the Borrower, the Guarantor, the Loan or the Restructuring or any documents or agreements entered into in connection thereto, through any media intended to reach the general public, this clause (h) shall survive the Effective Date.

Notwithstanding anything contained in this Agreement, Lender shall not be:

(a) obligated to deliver a consent or vote to accept the Chapter 11 Plan, or prohibited from withdrawing such consent or vote, in each case, upon the termination of this

6

Agreement;

(b) prohibited, limited, or restricted from contesting (in a proceeding or otherwise) whether any matter, fact or thing, is a breach of, or inconsistent with, this Agreement;

(c) prohibited, limited, or restricted from asserting or raising any objection expressly permitted under this Agreement in connection with any hearing in the Bankruptcy Court, including, without limitation, any hearing on confirmation of the Chapter 11 Plan;

(d) prohibited, limited, or restricted from asserting any rights, claims, and/or defenses under the Loan Agreements, the Mortgages (as defined in the Loan Agreements), and any related documents or agreements that are not inconsistent with this agreement;

(e) prohibited, limited or restricted from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases or asserting or raising any objection permitted under this Agreement in connection with any hearing on confirmation of the Chapter 11 Plan or any other matter so long as such appearance, objection, and the positions advocated in connection therewith are not for the purpose of hindering, delaying, or preventing the consummation of the Restructuring in a manner inconsistent with this Agreement; or

(f) prohibited, limited or restricted from engaging in discussions with or among any or all of the Borrower Parties, officers, representatives, or advisors, any affiliate of Lender, or any of their respective officers, representatives or advisors, or any other party; <u>provided</u>, <u>however</u>, that such discussions shall not be for the purpose of hindering, delaying, or preventing the consummation of the Restructuring in a manner inconsistent with this Agreement.

### Section 4.    Commitment of Guarantor and Mezzanine Borrowers.

Subject to the terms and conditions of this Agreement and the Chapter 11 Plan, Guarantor and Mezzanine Borrowers agree with Borrowers that it shall and it shall cause each of its respective affiliates during the period beginning on the RSA Effective Date and ending on the Termination Date (as defined below)(unless otherwise expressly set forth below); *provided however*, that none of the Guarantor, Mezzanine Borrowers and Borrowers shall be obligated to contribute funds except the Borrower's cash collateral and any other proceeds of the Borrowers' real and personal property:

(a) use commercially reasonable efforts to cause Borrowers to consummate and complete the Restructuring, including taking all necessary and appropriate actions in furtherance of the Restructuring, the Chapter 11 Plan and this Agreement;

(b) consistent with Section 19 of this Agreement, consent to the Releases (as defined below); provided, however, that consent by Guarantor and Mezzanine Borrowers to the Releases shall, without any further action by Guarantor or Mezzanine Borrowers, be deemed automatically revoked (and, upon such revocation, deemed void *ab initio*)

7

by Guarantor and Mezzanine Borrowers upon the Termination Date;

(c)   not take, nor encourage any other person or entity to take, any action that directly or indirectly interferes with or delays the acceptance or implementation of the transactions contemplated by the Restructuring or this Agreement, including, without limitation, initiating or joining any legal proceeding, objecting, directly or indirectly, to the Chapter 11 Plan or the Restructuring Documents, or directly or indirectly negotiating or soliciting any other plan, sale, proposal or offer of dissolution, winding up, liquidation, reorganization, merger, or restructuring of Borrowers or any of its subsidiaries that is inconsistent with or that would be reasonably likely to prevent, delay, or impede the consummation of the Restructuring;

(d)   support, and take all actions necessary or reasonably requested by Lender to facilitate, and to cause Borrowers to facilitate, the confirmation and consummation of the Chapter 11 Plan and the Restructuring;

(e)   not assert any claims or any kind of priority against Borrowers in the Chapter 11 Cases;

(f)   in connection with any governmental investigation, litigation, proceeding or similar causes of action relating to the Properties or the Borrowers, (x) provide promptly to Lender copies of all information provided to any governmental authority in connection with such governmental action and (y) keep Lender reasonably informed on the status of such governmental actions, *provided that*, notwithstanding anything to the contrary contained herein, this clause (f) shall survive the Termination Date and the Effective Date, as applicable;

(g)   use good faith effort to provide promptly to Lender all information received by Guarantor (or any affiliate of Guarantor) regarding the Properties, *provided that*, notwithstanding anything to the contrary contained herein, this clause (g) shall survive the Termination Date and the Effective Date, as applicable;

(h)   use good faith effort to provide promptly to Lender all historical information needed to support capital improvements and historical regulatory filings, including, without limitation, true, correct and complete copies of any IAI agreements, together with all documents and information related to such IAI agreements as requested by Lender, in each case in Guarantor's or Borrowers' possession (collectively, the "Required IAI Agreements"), *provided that*, notwithstanding anything to the contrary contained herein, this clause (h) shall survive the Termination Date and the Effective Date, as applicable;

(i)   without Lender's prior written consent, not release (nor allow any affiliate or any Borrower to release, nor provide any information with respect to) any news releases, publicity or other advertising with respect to the Borrower, the Property, the Loan, the Lender or the Restructuring or any documents or agreements entered into in connection thereto, through any media intended to reach the general public; this clause

8

(i) shall survive the Termination Date and the Effective Date, as applicable;

(j) negotiate in good faith all documentation relating to the Restructuring, including, without limitation, those documents specifically contemplated in the Chapter 11 Plan and any documents relating thereto or contemplated thereby, including, without limitation, the Restructuring Documents. Each of the Restructuring Documents shall contain provisions consistent in all material respects with this Agreement and the Chapter 11 Plan;

(k) provide prompt written notice to Lender between the date hereof and the Effective Date of the Chapter 11 Plan of (i) the occurrence, or failure to occur, of any event of which the occurrence or failure to occur would be reasonably likely to cause (A) any representation or warranty of Mezzanine Borrower or Guarantor contained in this Agreement to be untrue or inaccurate in any material respect, (B) any material covenant of Mezzanine Borrower or Guarantor contained in this Agreement not to be satisfied in any material respect, or (C) any condition precedent contained in the Chapter 11 Plan or this Agreement not to occur or become impossible to satisfy, (ii) receipt of any written notice from any third party alleging that the consent of such party is or may be required as a condition precedent to consummation of the transactions contemplated by the Restructuring, (iii) receipt of any written notice from any governmental body that is material to the consummation of the transactions contemplated by the Restructuring, (iv) receipt of any written notice of any proceeding commenced or threatened against any Party that would otherwise affect in any material respect the transactions contemplated by the Restructuring, and (v) any failure of Mezzanine Borrower or Guarantor to comply, in any material respect, with or satisfy any covenant, condition or agreement to be complied with or satisfied by them hereunder as a condition precedent to the consummation of the transactions contemplated by the Restructuring; and

(l) prior to the Petition Date, pay to Lender an amount equal to One Hundred Thousand Dollars ($100,000) by wire transfer of immediately available funds to an account specified by Lender, which amount shall be applied by Lender to the repayment of the outstanding principal balance of the Loans (as allocated by Lender in its sole discretion).

**Section 5.    Commitment of Borrowers.**

Subject to the terms hereof (including the *proviso* at the end of the first paragraph of <u>Section 4</u>), Borrowers shall, jointly and severally:

(a) use commercially reasonable efforts to consummate and complete the Restructuring, including taking all necessary and appropriate actions in furtherance of the Restructuring, the Chapter 11 Plan and this Agreement;

(b) use commercially reasonable efforts to meet all Milestones;

(c) use commercially reasonable efforts to obtain any and all required regulatory

9

approvals for the Restructuring embodied in the Restructuring Documents, including the Chapter 11 Plan;

(d)  provide draft copies of any motions, applications, pleadings and briefs including those contemplated by the Milestones (collectively, the "Motions") Borrowers intend to file in the Chapter 11 Cases to Lender (via email to counsel Arnold & Porter Kaye Scholer LLP) at least two (2) days prior to filing with the Bankruptcy Court, and consult in good faith with such counsel regarding the form and substance of any such proposed filing with the Bankruptcy Court; provided that if the notice required by this Section 5(d) with respect to Other Motions is not reasonably practicable with respect to any document, the Debtors may provide notice, prior to the expiration of such deadline, that such deadline cannot be met to Lender (via email to counsel Arnold & Porter Kaye Scholer LLP) and, if such document is provided to Lender as soon as reasonably practicable, no Termination Event shall occur as a result of such failure to comply with the terms of this Section 5(d) with respect thereto;

(e)  file the Motions, all of which shall be consistent with the Restructuring and shall be in form and substance reasonably acceptable to Lender (unless such document is subject to a higher standard of review and approval by Lender, in which case such higher standard of review and approval shall apply) and Borrower Parties, and seek interim and final (to the extent applicable and/or necessary) orders, in form and substance reasonably acceptable to Lender and Borrower Parties, from the Bankruptcy Court approving the relief requested in such documents;

(f)  subject to Section 11 of this Agreement, not directly or indirectly (A) join in or support any alternative plan or transaction lacking the Lender's support other than the Chapter 11 Plan; or (B) take any action lacking Lender's written support to alter in any material respect, unreasonably delay, interfere with, or impede the approval or ratification, as applicable, of the Restructuring, the Disclosure Statement, the solicitation and solicitation procedures or the confirmation and consummation of the Chapter 11 Plan;

(g)  subject to Section 11 of this Agreement, not, nor encourage any other person or entity to, take any action that would, or would reasonably be expected to, breach or be inconsistent with this Agreement or, directly or indirectly, interfere with the acceptance, confirmation or consummation of the Chapter 11 Plan or implementation of the Restructuring;

(h)  cooperate with, and not interfere with, the Property Managers in the operation of the Properties and otherwise continue to operate each Borrower's business in the ordinary course in accordance with its reasonable business judgment and, subject to applicable laws, use commercially reasonable efforts to, consistent with the pursuit and consummation of the Restructuring and the transactions contemplated thereby, preserve intact in all material respects the current business operations of each Borrower;

(i)  not commence an avoidance action or other legal proceeding that challenges the

10

validity, enforceability, or priority of the Loans or obligations under the Loan Agreements, or any liens securing the same;

(j)    cause, prior to the Effective Date, any Borrower, Mezzanine Borrower, Guarantor or any affiliate thereof (including, without limitation, Archrock LLC, a New York limited liability company, the property manager of the Properties (the "Affiliated Property Manager")) occupying space at the Properties, to vacate the Properties and deliver for the benefit of the applicable Successor Owner a surrender agreement in form and substance reasonably acceptable to Lender;

(k)    not take any action inconsistent with, or omit to take any action required by the Loan Agreements, except to the extent that any such action or inaction is expressly contemplated or permitted by this Agreement, the Chapter 11 Plan or any of the other Restructuring Documents;

(l)    in connection with any governmental investigation, litigation, proceeding or similar causes of action relating to the Properties or the Borrowers, (x) provide promptly to Lender copies of all information provided to any governmental authority in connection with such governmental action and (y) keep Lender reasonably informed on the status of such governmental actions, *provided that*, notwithstanding anything to the contrary contained herein, this clause (l) shall survive the Termination Date and the Effective Date, as applicable;

(m)    use good faith effort to provide promptly to Lender all information received by Borrowers (or any affiliate of Borrowers) regarding the Properties, *provided that*, notwithstanding anything to the contrary contained herein, this clause (m) shall survive the Termination Date and the Effective Date, as applicable;

(n)    use good faith effort to provide promptly to Lender all historical information needed to support capital improvements and historical regulatory filings, including, without limitation, true, correct and complete copies of the Required IAI Agreement, *provided that*, notwithstanding anything to the contrary contained herein, this clause (n) shall survive the Termination Date and the Effective Date, as applicable;

(o)    without Lender's prior written consent, not release (nor allow any affiliate or any Borrower to release, nor provide any information with respect to) any news releases, publicity or other advertising with respect to the Borrower, the Property, the Loan, the Lender or the Restructuring or any documents or agreements entered into in connection thereto, through any media intended to reach the general public; this clause (o) shall survive the Termination Date and the Effective Date, as applicable;

(p)    negotiate in good faith all documentation relating to the Restructuring, including, without limitation, those documents specifically contemplated in the Chapter 11 Plan and any documents relating thereto or contemplated thereby, including, without limitation, the Restructuring Documents. Each of the Restructuring Documents shall contain provisions consistent in all material respects with this Agreement and the

Chapter 11 Plan;

(q) provide prompt written notice to Lender between the date hereof and the Effective Date of the Chapter 11 Plan of (i) the occurrence, or failure to occur, of any event of which the occurrence or failure to occur would be reasonably likely to cause (A) any representation or warranty of Borrowers contained in this Agreement to be untrue or inaccurate in any material respect, (B) any material covenant of Borrowers contained in this Agreement not to be satisfied in any material respect, or (C) any condition precedent contained in the Chapter 11 Plan or this Agreement not to occur or become impossible to satisfy, (ii) receipt of any written notice from any third party alleging that the consent of such party is or may be required as a condition precedent to consummation of the transactions contemplated by the Restructuring, (iii) receipt of any written notice from any governmental body that is material to the consummation of the transactions contemplated by the Restructuring, (iv) receipt of any written notice of any proceeding commenced or threatened against any Party that would otherwise affect in any material respect the transactions contemplated by the Restructuring, and (v) any failure of Borrowers to comply, in any material respect, with or satisfy any covenant, condition or agreement to be complied with or satisfied by them hereunder as a condition precedent to the consummation of the transactions contemplated by the Restructuring;

(r) without Lender's prior written consent, enters into any lease or agreement for the occupancy of space at the Property; and

(s) without Lender's prior written consent, hire or engage a chief restructuring officer with respect to the Restructuring or the transactions contemplated by the Restructuring.

Borrowers acknowledge and agree and shall not dispute that after the commencement of the Chapter 11 Cases, the giving of notice of termination by any Party pursuant to this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and Borrowers hereby waive, to the greatest extent possible, the applicability of the automatic stay to the giving of such notice); provided that nothing herein shall prejudice any Party's rights to argue that the giving of notice of default or termination was not proper under the terms of this Agreement.

Notwithstanding anything to the contrary in Sections 4 or 5 of this Agreement, each of Borrowers' officers and directors, in such capacities, is not, by virtue of Borrowers' or Guarantor's or Mezzanine Borrowers' obligations under this Agreement, prohibited from taking, or from refraining to take, any actions that are consistent with, and not in violation of, Section 11 of this Agreement, and no Borrower, Mezzanine Borrower nor Guarantor that is affiliated with such officer or director shall be in violation of this Agreement by virtue of such individual taking, or refraining from taking, any such action, so long as any such action is consistent with the fiduciary obligations of Borrowers under applicable law (as reasonably determined by Borrowers after consultation with counsel).

**Section 6.      Lender Termination Event.**

This Agreement and the obligations hereunder may be terminated by Lender upon the giving of notice thereof to Borrower Parties (except as otherwise expressly provided herein), at any time after the occurrence, and during the continuation of, any of the following events (each, a "Lender Termination Event"):

(a) the breach in any material respect by any Borrower Party, of any of the material undertakings or covenants of such Borrower Party set forth herein and, to the extent such breach is susceptible to cure, such breach remains uncured for a period of five (5) business days after the receipt of notice of such breach; *provided, further,* that to the extent such breach is not susceptible to cure within five (5) business days, that such Borrower Party commence such cure within five (5) business days.

(b) any representation or warranty in this Agreement made by any Borrower Party shall have been untrue in any material respect when made or shall have become untrue in any material respect and, if such breach is susceptible to cure, such breach remains uncured for a period of five (5) business days following such Borrower Party's receipt of notice thereof; *provided, further,* that to the extent such breach is not susceptible to cure within five (5) business days, that such Borrower Party commence such cure within five (5) business days.

(c) the failure of Borrower Parties to meet any Milestone;

(d) the Restructuring Documents and any amendments, modifications, or supplements thereto filed by Borrowers include terms that are materially inconsistent with the Chapter 11 Plan and are not otherwise reasonably acceptable in all respects to Lender, and such event remains uncured for a period of five (5) business days following Borrowers' receipt of notice thereof;

(e) a Restructuring Document materially alters the treatment of Lender specified in the Chapter 11 Plan and Lender has not consented to such material alteration, and such breach remains uncured for a period of two (2) business days following Borrowers' receipt of notice thereof;

(f) the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling or order enjoining the consummation of a material portion of the Restructuring, and such ruling, judgment or order has not been stayed, reversed, or vacated within twenty-five (25) calendar days after such issuance;

(g) the conversion of one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code;

(h) the dismissal of one or more of the Chapter 11 Cases;

13

(i) the appointment of a trustee, receiver, or examiner with expanded powers in one or more of the Chapter 11 Cases;

(j) the commencement of an involuntary bankruptcy case against any Borrower Party under the Bankruptcy Code, if such involuntary case is not dismissed within sixty (60) calendar days after the filing thereof, or if a court order grants the relief sought in such involuntary case;

(k) the preparation and/or filing of a motion, by any Borrower Party or if any Borrower Party supports such motion, to the Bankruptcy Court seeking to reject or otherwise not perform under this Agreement;

(l) the Bankruptcy Court enters an order modifying or terminating Borrowers' exclusive right to file and/or solicit acceptances of a plan of reorganization;

(m) denial by the Bankruptcy Court of confirmation of the Chapter 11 Plan;

(n) the order confirming the Chapter 11 Plan is reversed, vacated, or otherwise modified in a manner materially inconsistent with this Agreement;

(o) any court of competent jurisdiction has entered a judgment or order declaring the Restructuring, this Agreement or any material portion hereof to be unenforceable or illegal and such judgment or order is not stayed, dismissed, vacated or modified within twenty-five (25) calendar days following the entry thereof;

(p) any Borrower Party (A) publicly announces its intention not to support the Restructuring, (B) files a motion with the Bankruptcy Court seeking the approval of an Alternative Restructuring, or (C) agrees to pursue or publicly announces its intent to pursue an Alternative Restructuring;

(q) if either (i) any Borrower Party files a motion, application or adversary proceeding (or supports or fails to timely object to such a filing) (A) challenging the validity, enforceability, perfection or priority of, or seeking invalidation, avoidance, disallowance, recharacterization or subordination of, the obligations or Covered Claims arising under or relating to the Loan Agreements, or (2) challenging the seniority of the obligations or Covered Claims arising under or relating to the Loan Agreements, or (ii) the Bankruptcy Court (or any court with jurisdiction over the Chapter 11 Cases) enters an order providing relief against the interests of Lender with respect to any of the foregoing causes of action or proceedings, including, but not limited to, invalidating, avoiding, disallowing, recharacterizing, subordinating, or limiting the enforceability of any of the obligations or Covered Claims arising under or related to the Loan Agreements;

(r) any Borrower makes an assignment for the benefit of creditors;

(s) on or after the RSA Effective Date, unless agreed in writing by Lender, any Borrower engages in any merger, consolidation, disposition, acquisition, investment, dividend,

14

incurrence of indebtedness or other similar transaction outside the ordinary course of business, other than: (i) the commencement of the Chapter 11 Cases or other bankruptcy or similar proceeding; or (ii) as permitted or contemplated by the Restructuring;

(t)    the occurrence of a Termination Event (as defined in the Cash Collateral Order); and

(u)    the terms of any entered Cash Collateral Order are not reasonably acceptable to Lender;

(v)    if the Cash Collateral Order is reversed, vacated or otherwise not in full force and effect;

(w)    the Property Managers (or any one of them) shall have been terminated or otherwise fail to manage the Properties in accordance with the applicable Property Management Agreement, or any Property Management Agreement shall have been modified, in either case without the consent of the Lender;

provided, that notwithstanding the foregoing, unless waived by Lender, if a Lender Termination Event of the type specified in clauses (g), (h), (i), (k), (l), (m), (o), (p), (q), (r) or (t) of this Section 6 occurs, this Agreement and the obligations hereunder shall be terminated automatically and without the need for any notice thereof.

### Section 7.    **Borrower Parties Termination Events.**

This Agreement and the obligations hereunder may be terminated by Borrower Parties upon the giving of notice thereof to Lender upon the occurrence of any of the following events (each, a "Borrower Parties Termination Event"):

(a)    the breach in any material respect by Lender of any of the undertakings, representations, warranties, or covenants of Lender set forth herein in any material respect which (x) remains uncured for a period of five (5) business days after the receipt of written notice of such breach by Lender; and (y) could reasonably be expected to impair the ability to consummate the Restructuring in accordance with the terms of the Chapter 11 Plan;

(b)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling or order enjoining the consummation of a material portion of the Restructuring or this Agreement or any material portion hereof, and such ruling, judgment or order has not been stayed, reversed, or vacated within twenty-five (25) calendar days after such issuance;

(c)    the conversion of one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code;

(d)    the dismissal of one or more of the Chapter 11 Cases;

15

(e) the appointment of a trustee, receiver, or examiner with expanded powers in one or more of the Chapter 11 Cases;

(f) denial by the Bankruptcy Court of confirmation of the Chapter 11 Plan;

(g) the order confirming the Chapter 11 Plan is reversed, vacated, or otherwise modified in a manner materially inconsistent with this Agreement, including if such order is in anyway inconsistent with <u>Section 19</u> of this Agreement;

(h) any court of competent jurisdiction has entered a judgment or order declaring the Restructuring, this Agreement or any material portion hereof, to be unenforceable or illegal and such judgment or order is not stayed, dismissed, vacated or modified within twenty-five (25) calendar days following the entry thereof; and

(i) receipt by Lender of Borrowers' Fiduciary Decision (as defined herein) made in accordance with <u>Section 11</u> herein.

### Section 8.    <u>Mutual Termination.</u>

This Agreement, and the obligations of all Parties hereunder may be terminated by a mutual written agreement among Lender, on the one hand, and Borrower Parties, on the other hand.

### Section 9.    <u>Effect of Termination.</u>

The date on which this Agreement is terminated in accordance with <u>Sections 6</u>, <u>7</u> or <u>8</u> of this Agreement shall be referred to as the "<u>Termination Date</u>".  Upon the earlier to occur of the Termination Date or the Effective Date, termination of this Agreement shall be effective immediately and all obligations hereunder (other than obligations that expressly survive pursuant to <u>Section 13</u>) shall terminate, each Party hereto shall be released from its commitments, undertakings, and agreements, and this Agreement shall be of no further force and effect and shall have all the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement, including all rights and remedies available to it under applicable law, the Loan Agreements and any ancillary documents or agreements thereto; <u>provided</u>, <u>however</u>, that any claim for breach of this Agreement that occurs prior to the Termination Date shall survive such termination and all rights and remedies with respect to such claims shall not be prejudiced in any way. Upon the termination of this Agreement, each vote or any consents given by Lender prior to such termination shall be deemed, for all purposes, to be null and void *ab initio* and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring and this Agreement, in each case, without further confirmation or other action by Lender.  If this Agreement has been terminated by Lender at a time when permission of the Bankruptcy Court shall be required for Lender to change or withdraw (or cause to change or withdraw) its vote to accept the Chapter 11 Plan, Borrowers shall not oppose any attempt by Lender to change or withdraw (or cause to change or withdraw) such vote at such time, subject to all remedies available to Borrowers at law, equity, or otherwise, including those remedies set forth in <u>Section 15</u> hereof; <u>provided</u> that nothing herein shall prevent Borrowers from contesting whether or not the applicable Lender Termination Events have actually occurred.  Lender shall have no liability to any Borrower

16

Party in respect of any termination of this Agreement in accordance with the terms of this <u>Section 9</u> and <u>Sections 6</u> and <u>22</u> hereof (unless such termination is determined by a court of competent jurisdiction to have been invalid).

Notwithstanding anything to the contrary contained herein, upon the occurrence of the Effective Date of the Chapter 11 Plan, this Agreement shall no longer be subject to termination other than pursuant to <u>Section 8</u> hereof.

**Section 10.**   **Acknowledgment.**

This Agreement is not and shall not be deemed to be a solicitation for consents to the Chapter 11 Plan or an offer of debt or equity in the Successor Owners.  The acceptance of the Chapter 11 Plan by Lender will be subject to proper solicitation pursuant to sections 1125, 1126, and 1127 of the Bankruptcy Code.

**Section 11.**   **Fiduciary Duties.**

Nothing in the Chapter 11 Plan or this Agreement shall require any Borrower Party to take any action, or to refrain from taking any action, if doing so would be inconsistent with its fiduciary obligations under applicable law (as reasonably determined by it after consultation with counsel) (any such determination, a "<u>Fiduciary Decision</u>"); <u>provided</u>, that such Borrower Party shall provide notice of any such Fiduciary Decision to counsel to Lender via email within one (1) day of the date of such determination.

**Section 12.**   **Representations and Warranties.**

(a)   Lender hereby represents and warrants for itself and not any other person or entity, that the following statements are true, correct, and complete as of the date hereof:

(1)   it has the requisite corporate or other organizational power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement;

(2)   the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate or other organizational action on its part;

(3)   the execution, delivery, and performance by it of this Agreement does not and shall not (i) violate any provision of law, rule, or regulation applicable to it, or its certificate of incorporation or bylaws or other organizational documents or those of any of its affiliates, or (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it is a party;

(4)   the execution, delivery, and performance by it of this Agreement does not and shall not require any registration or filing with, the consent or approval of,

17

notice to, or any other action with any federal, state, or other governmental authority or regulatory body; and

(5) subject to the provisions of sections 1125 and 1126 of the Bankruptcy Code, this Agreement is the legally valid and binding obligation of it, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally, or by equitable principles relating to enforceability.

(b) Each Borrower hereby represents and warrants for itself and not any other person or entity that the following statements are true, correct, and complete as of the date hereof:

(1) it has the requisite corporate power and authority to enter into this Agreement and (upon entry of an order of the Bankruptcy Court) to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement;

(2) the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate or other organizational action on its part;

(3) the execution, delivery, and, subject to Bankruptcy Court approval, performance of this Agreement and the consummation of the transactions contemplated hereby did not and will not (a) result in any violation of its certificate of incorporation or bylaws (or equivalent governing documents), (b) (other than any proceedings in a Bankruptcy Court) conflict with, result in the breach or violation of, or constitute a breach or violation of any material contractual obligations of it, or (c) result in the violation of any law (statutory or common), statute, Order, ruling, rule or regulation, code, ordinance, writ, assessment, award, injunction, judgment, or decree enacted, adopted, issued, or promulgated by any government or governmental court, agency, or body, having jurisdiction over it;

(4) each Borrower has reviewed the petitions for relief to be filed by such Borrower under Chapter 11 of Title 11 of the United States Code and the schedules and statements of financial affairs attached thereto, and to the best of each Borrower's knowledge, the same are true, correct and complete in all respects;

(5) to the best of each Borrower's knowledge, attached as Exhibit E is a true and correct budget of all anticipated costs and expenses anticipated to be incurred with respect to the Property during the pendency of the Chapter 11 Cases; and

(6) subject to the provisions of sections 1125 and 1126 of the Bankruptcy Code, this Agreement is the legally valid and binding obligation of it, enforceable

18

against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally, or by equitable principles relating to enforceability.

(c)  Each Mezzanine Borrower hereby represents and warrants for itself and not any other person or entity that the following statements are true, correct, and complete as of the date hereof:

(1)  it has the requisite corporate power and authority to enter into this Agreement and (upon entry of an order of the Bankruptcy Court) to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement;

(2)  the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate or other organizational action on its part;

(3)  the execution, delivery, and, subject to Bankruptcy Court approval, performance of this Agreement and the consummation of the transactions contemplated hereby did not and will not (a) result in any violation of its certificate of incorporation or bylaws (or equivalent governing documents), (b) (other than any proceedings in a Bankruptcy Court) conflict with, result in the breach or violation of, or constitute a breach or violation of any material contractual obligations of it, or (c) result in the violation of any law (statutory or common), statute, Order, ruling, rule or regulation, code, ordinance, writ, assessment, award, injunction, judgment, or decree enacted, adopted, issued, or promulgated by any government or governmental court, agency, or body, having jurisdiction over it.  Nothing in this Agreement shall be deemed to violate the Loan Agreements; and

(4)  subject to the provisions of sections 1125 and 1126 of the Bankruptcy Code, this Agreement is the legally valid and binding obligation of it, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally, or by equitable principles relating to enforceability.

(d)  Guarantor hereby represents and warrants for itself and not any other person or entity that the following statements are true, correct, and complete as of the date hereof:

(1)  the execution, delivery, and, subject to Bankruptcy Court approval, performance of this Agreement and the consummation of the transactions contemplated hereby did not and will not (a) (other than any proceedings in a Bankruptcy Court) conflict with, result in the breach or violation of, or constitute a breach or violation of any material contractual obligations of

Guarantor or any of Guarantor's affiliates, or (b) result in the violation of any law (statutory or common), statute, Order, ruling, rule or regulation, code, ordinance, writ, assessment, award, injunction, judgment, or decree enacted, adopted, issued, or promulgated by any government or governmental court, agency, or body, having jurisdiction over of Guarantor or any of Guarantor's affiliates;

(2)   Guarantor has reviewed the petitions for relief to be filed by each Borrower under Chapter 11 of Title 11 of the United States Code and the schedules and statements of financial affairs attached thereto, and to the best of Guarantor's knowledge, the same are true, correct and complete in all respects; and

(3)   subject to the provisions of sections 1125 and 1126 of the Bankruptcy Code, this Agreement is the legally valid and binding obligation of Guarantor, enforceable against Guarantor in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally, or by equitable principles relating to enforceability.

**Section 13.    Survival of Agreement.**

Notwithstanding the termination of this Agreement in accordance with its terms, the agreements, and obligations of the Parties in Sections 9, 11, 13, 14, 15, 16, 17, 18, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, and 30, shall survive such termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof.

**Section 14.    Waiver.**

This Agreement is part of a proposed settlement of a dispute among the Parties. If the transactions contemplated herein are not consummated following the occurrence of the Termination Date, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights and the Parties expressly reserve any and all of their respective rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

**Section 15.    Specific Performance.**

It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder without the requirement to post a bond or other security.

20

**Section 16.**    **Governing Law.**

This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.  By its execution and delivery of this Agreement, each of the Parties irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter arising under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit, or proceeding, may be brought in the courts of the state of New York, and by execution and delivery of this Agreement, each of the Parties irrevocably accepts and submits itself to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit, or proceeding. Notwithstanding the foregoing consent to New York jurisdiction, if the Chapter 11 Cases are commenced, each Party agrees that the Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of or in connection with this Agreement.

**Section 17.**    **Waiver of Right to Trial by Jury.**

Each of the Parties waives any right to have a jury participate in resolving any dispute, whether sounding in contract, tort, or otherwise, between any of them arising out of, connected with, relating to or incidental to the relationship established between any of them in connection with this Agreement.  Instead, any disputes resolved in court shall be resolved in a bench trial without a jury.

**Section 18.**    **Personal Jurisdiction.**

By execution and delivery of this Agreement, and for purposes of any action, suit or proceeding or other contested matter arising out of or relating to this Agreement, or for recognition or enforcement of any judgment rendered or order entered in any such action, suit, proceeding, or other contested matter, each of the Parties irrevocably and unconditionally submits to the personal jurisdiction of (a) the courts of the state of New York, or (b) the Bankruptcy Court, if such Bankruptcy Court has jurisdiction.

**Section 19.**    **Releases.**

The Chapter 11 Plan and the order confirming the Chapter 11 Plan will provide, effective as of the Effective Date of the Chapter 11 Plan, full releases (the "Releases") and exculpation provisions for the benefit of Borrowers, Mezzanine Borrowers, Guarantor, Affiliated Property Manager, the Successor Owners, Lender and each of such entities' respective current and former affiliates, and such entities' and their current and former affiliates' current and former officers, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, principals, members, employees, agents, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.  Notwithstanding anything to the contrary herein, any Chapter 11 Plan that LoanCore supports shall provide that, on the Effective Date of the Chapter 11 Plan, LoanCore and each Successor Owner shall be deemed to have unconditionally released the Debtors, the Mezzanine Borrowers, the Guarantor, the Affiliated Property Manager and their respective affiliates of and from any and all Lender's claims,

21

obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event or other occurrence taking place or existing on or before the Effective Date.

**Section 20.**   **Successors and Assigns.**

Except as otherwise provided in this Agreement, this Agreement is intended to bind and inure to the benefit of each of the Parties and each of their respective successors, assigns, heirs, executors, administrators and representatives.

**Section 21.**   **No Third-Party Beneficiaries.**

Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary of this Agreement.

**Section 22.**   **Notices.**

All notices (including, without limitation, any notice of termination) and other communications from any Party hereunder shall be in writing and shall be deemed to have been duly given if personally delivered by courier service, messenger, or facsimile to the other Parties at the applicable addresses below, or such other addresses as may be furnished hereafter by notice in writing:

(a)  If to Lender:

> c/o LoanCore Capital
> 55 Railroad Avenue, Suite 100
> Greenwich, Connecticut  06830
> Attention:  Brett Kaplan
> Facsimile No.:  (203) 861-6006
> E-mail:  BKaplan@LoanCore.com

> with a copy to:

> LoanCore Capital Credit REIT LLC
> c/o LoanCore Capital
> 55 Railroad Avenue, Suite 100
> Greenwich, Connecticut  06830
> Attention:  Notices
> E-mail:  notices@loancore.com

> with a copy to:

> Arnold & Porter Kaye Scholer LLP
> 250 West 55th Street

New York, New York 10019-9710
Attention:  Stephen Gliatta, Esq.
    Benjamin Mintz, Esq.
Email: steve.gliatta@arnoldporter.com
    benjamin.mintz@arnoldporter.com

(b)  If to any Borrower Party:

1 Battery Park Plaza, Suite 3100
New York, New York 10004
Attention: Isaac Kassirer
E-mail:  isaac@emeraldequitygrp.com

with a copy to:

Sukenik, Segal & Graff, P.C.
450 Seventh Avenue, 42nd floor
New York, New York, 10123
Attention:  David C. Segal, Esq.
E-mail:  davidsegal@ssglaw.com

with a copy to:

Backenroth Frankel & Krinsky LLP
800 Third Avenue – 11th Floor
New York, New York 10022
Attention:  Abraham Backenroth, Esq.
E-mail:  abackenroth@bfklaw.com

## Section 23. **Entire Agreement.**

This Agreement, including the exhibits, schedules, and annexes hereto constitutes the entire agreement of the Parties with respect to the subject matter of this Agreement, and supersedes all other prior negotiations, agreements, and understandings, whether written or oral, among the Parties with respect to the subject matter of this Agreement.

## Section 24. **Amendments.**

Except as otherwise provided herein, this Agreement may not be modified, amended or supplemented without prior written consent of Lender, Borrowers, Mezzanine Borrowers and Guarantor.  No waiver of any term or provision of this Agreement or of the Chapter 11 Plan or of any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by Lender (except in the case of a Borrower Parties Termination Event, the waiver of which shall be in a writing signed by Borrowers, Mezzanine Borrowers and Guarantor), nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder

or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation, or breach of warranty or covenant. The failure of any Party to exercise any right, power or remedy provided under this Agreement or otherwise available in respect hereof at law or in equity, or to insist upon compliance by any other Party with its obligations hereunder shall not constitute a waiver by such Party of its right to exercise any such or other right, power or remedy or to demand such compliance.

### Section 25.   **Counterparts.**

This Agreement may be executed in one or more counterparts, each of which, when so executed, shall constitute the same instrument and the counterparts may be delivered by facsimile transmission or by electronic mail in portable document format (.pdf).

### Section 26.   **Independent Analysis.**

Each of Borrowers, Mezzanine Borrowers, Guarantor and Lender hereby confirms that it has made its own decision to execute this Agreement based upon its own independent assessment of documents and information available to it, as it has deemed appropriate.

### Section 27.   **Representation by Counsel.**

Each Party acknowledges that it has had the opportunity to be represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel, shall have no application and is expressly waived.

### Section 28.   **No Admissions.**

This Agreement shall in no event be construed as, or deemed to be evidence of, an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever. Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims and defenses which it has asserted or could assert. No Party shall have, by reason of this Agreement, a fiduciary relationship in respect of any other Party or any person or entity, or any Borrower Party, and nothing in this Agreement, expressed or implied, is intended to, or shall be construed as to, impose upon any Party any obligation in respect of this Agreement except as expressly set forth herein.

### Section 29.   **Headings.**

The section headings of this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement.

### Section 30.   **Interpretation.**

This Agreement is the product of negotiations among the Parties, and the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to

24

interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement or any portion hereof, shall not be effective in regard to the interpretation hereof.

[SIGNATURE PAGES FOLLOW]

**Accepted as of the date first written above:**

**BORROWERS, each in their capacity as
Borrower for the applicable Loan**:

**203 W 107 STREET LLC**
**210 W 107 STREET LLC**
**220 W 107 STREET LLC**
**230 W 107 STREET LLC**
**124-136 EAST 117 LLC**
**215 EAST 117 LLC**
**235 EAST 117 LL**
**244 EAST 117 LLC**
**231 EAST 117 LLC**
**EAST 117 REALTY LLC**
**1661 PA REALTY LLC**,
each a Delaware limited liability company


By:     s/ Isaac Kassirer_____
         Name:  Isaac Kassirer
         Title: Authorized Signatory

[Signature Page to Restructuring Support Agreement]

**Accepted as of the date first written above:**

**MEZZANINE BORROWERS, each in their capacity as Mezzanine Borrower for the applicable Mezzanine Loan**:

**WEST 107 MEZZ LLC**,
a Delaware limited liability company

By:    s/ Isaac Kassirer_____
            Name:  Isaac Kassirer
            Title: Authorized Signatory

**EEG HGI LLC**,
a Delaware limited liability company

By:    s/ Isaac Kassirer_____
            Name:  Isaac Kassirer
            Title: Authorized Signatory

[Signature Page to Restructuring Support Agreement]

**Accepted as of the date first written above:**

**GUARANTOR, in its capacity as Guarantor for
each of the Loans**:


By:    <u>Isaac Kassirer</u>
       Isaac Kassirer, an Individual

[Signature Page to Restructuring Support Agreement]

**Accepted as of the date first written above:**

**LENDER, in its capacity as Lender for each of the Loans**:

**LOANCORE CAPITAL CREDIT REIT LLC**, a
Delaware limited liability company


By:    s/Brett Kaplan_____
         Name:  Brett Kaplan
         Title:  Managing Director

**EXHIBIT A TO THE RESTRUCTURING SUPPORT AGREEMENT**

## **Chapter 11 Plan**

(attached hereto)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x

In re

203 W 107 Street LLC, *et al.*,

                                        Debtors.[1]

-----------------------------------------------------------------x

Chapter 11

Case No. [_]
through [__] ([_])
(Joint Administration Requested)


# JOINT PLAN OF LIQUIDATION OF THE DEBTORS


**Dated: December 28, 2020**

---

[1]    The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: 203 W 107 Street LLC (8429); 210 W 107 Street LLC (3364), 220 W 107 Street LLC (0461), 230 W 107 Street LLC (3686), 124-136 East 117 LLC (6631), 215 East 117 LLC (6961), 231 East 117 LLC (0105), 235 East 117 LLC (8762), 244 East 117 LLC (1142), East 117 Realty LLC (1721) and 1661 PA Realty LLC (5280). The location of the Debtors' service address is: 1 Battery Park Plaza, Suite 3100, New York, New York 10004, Attention: Ephraim Diamond, as Chief Restructuring Officer.

# TABLE OF CONTENTS

Page

ARTICLE 1 DEFINITIONS; RULES OF INTERPRETATION .................................................... 1

ARTICLE 2 CONSOLIDATION OF DEBTORS FOR VOTING AND DISTRIBUTION
PURPOSES ................................................................................................ 13

ARTICLE 3 UNCLASSIFIED CLAIMS ................................................................. 14

ARTICLE 4 CLASSIFICATION AND TREATMENT OF CLAIMS ....................................... 16

ARTICLE 5 ACCEPTANCE OR REJECTION OF THE PLAN ................................................ 18

ARTICLE 6 MEANS FOR IMPLEMENTATION OF THE PLAN ........................................... 19

ARTICLE 7 CAUSES OF ACTION .......................................................................... 21

ARTICLE 8 PROVISIONS GOVERNING DISTRIBUTIONS, RESOLUTION OF
DISPUTED CLAIMS AND OBJECTIONS TO PROOFS OF CLAIM ......................... 21

ARTICLE 9 EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............................... 24

ARTICLE 10 RELEASES AND EXCULPATION .................................................... 25

ARTICLE 11 CONFIRMATION AND CONSUMMATION OF THE PLAN ........................... 29

ARTICLE 12 EFFECT OF CONFIRMATION ......................................................... 31

ARTICLE 13 RETENTION OF JURISDICTION ...................................................... 31

ARTICLE 14 GENERAL PROVISIONS ................................................................. 33

ARTICLE 15 MODIFICATIONS ........................................................................... 39

ARTICLE 16 CLOSING THE CASE ....................................................................... 40

203 W 107 Street LLC, 210 W 107 Street LLC, 220 W 107 Street LLC, 230 W 107 Street LLC, 124-136 East 117 LLC, 215 East 117 LLC, 231 East 117 LLC, 235 East 117 LLC, 244 East 117 LLC, East 117 Realty LLC and 1661 PA Realty LLC (collectively, the "Debtors") propose this joint plan of liquidation for the Debtors.  **UPON CONFIRMATION, THIS PLAN SHALL BE A BINDING OBLIGATION BETWEEN AND AMONG EACH OF THE DEBTORS, EACH CLAIMANT, THE INTEREST HOLDERS AND EACH OF THEIR RELATED PERSONS (AS ALL SUCH TERMS ARE DEFINED BELOW).**

## ARTICLE 1

## DEFINITIONS; RULES OF INTERPRETATION

As used in this Plan, the following terms will have the meanings hereinafter set forth:

1.1    "**107th Street Debtors**" shall mean 203 W 107 Street LLC, 210 W 107 Street LLC, 220 W 107 Street LLC, and 230 W 107 Street LLC.

1.2    "**107 Mortgage Claim**" shall mean the Secured Claim of LoanCore on account of indebtedness and obligations owed by the 107th Street Debtors pursuant to the LoanCore Mortgage and all loan documents related thereto, and secured by the 107 Properties.  The 107 Mortgage Claim is in an amount not less than $102,830,141.91 as of the Petition Date.

1.3    "**107 Properties**" shall mean the Debtors' real property located at 203 West 107th Street, New York, New York; 210 West 107th Street, New York, New York; 220 West 107th Street, New York, New York; and 230 West 107th Street, New York, New York.

1.4    "**117 Street Debtors**" shall mean 124-136 East 117 LLC, 215 East 117 LLC, 231 East 117 LLC, 235 East 117 LLC, 244 East 117 LLC, East 117 Realty LLC and 1661 PA Realty LLC.

1.5    "**117 Mortgage Claim**" shall mean the Secured Claim of LoanCore on account of indebtedness and obligations owed by the 117 Street Debtors pursuant to the LoanCore Mortgage

and all loan documents related thereto, and secured by the 117 Properties.  The 117 Mortgage

Claim is in an amount not less than $100,245,624.57 as of the Petition Date.

1.6    "**117 Properties**" shall mean the Debtors' real property located at 124-136 East

117th Street, New York, New York; 215 East 117th Street, New York, New York; 231 East 117th

Street, New York, New York; 235 East 117th Street, New York, New York; 244 East 117th Street,

New York, New York; 316, 322 and 326 East 117th Street, New York, New York; and 1661 Park

Avenue New York, New York.

1.7    "**Administrative Expense Claim**" shall mean a Claim for costs and expenses of

administration of the Bankruptcy Case asserted to be entitled to priority under section 507(a)(2) or

section 507(b) of the Bankruptcy Code or any fees and charges assessed against the Debtors'

Estates under section 1930, chapter 123, of title 28 of the United States Code.

1.8    "**Administrative Expense Claims Bar Date**" shall mean a date sixty (60) days

after the Effective Date.

1.9    "**Affiliated Property Manager**" shall mean Archrock LLC, a New York limited

liability company and former property manager of the Properties.

1.10   "**Allowed Administrative Expense Claim**" shall mean an Administrative Expense

Claim to the extent such Administrative Expense Claim is an Allowed Claim entitled to priority

under section 507(a)(2) or section 507(b) of the Bankruptcy Code and allowed under sections 328,

330, 363, 364(c)(1), 365, 503(b) or 507(b) of the Bankruptcy Code

1.11   "**Allowed Claim**" shall mean, with respect to a Claim, or any portion thereof, in

any Class or category specified, a Claim (a) to the extent that a Proof of Claim is filed timely or,

with leave of the Court late filed as to which (i) no party in interest files an objection pursuant to

the terms of the Plan or (ii) is allowed by a Final Order; or (b) is listed on the Debtors' schedules

2

or any amendments thereto but which is not listed therein as disputed, unliquidated or contingent, and is not otherwise subject to a timely objection. For the avoidance of doubt, to the extent a Claim is not an Allowed Claim, such Claim is still subject to objection based upon potentially applicable rights of avoidance, setoff, subordination, and any other defenses, all of which rights and defenses are fully preserved in favor of the Debtors, as applicable.

1.12    "**Allowed Priority Non-Tax Claim**" shall mean a Priority Non-Tax Claim to the extent such Priority Non-Tax Claim is an Allowed Claim.

1.13    "**Allowed Priority Tax Claim**" shall mean a Priority Tax Claim to the extent such Priority Tax Claim is an Allowed Claim.

1.14    "**Allowed Professional Fee Claim**" shall mean a Professional Fee Claim to the extent such Professional Fee Claim is an Allowed Claim.

1.15    "**Allowed Other Secured Claim**" shall mean an Other Secured Claim to the extent such Other Secured Claim is an Allowed Claim.

1.16    "**Allowed Unsecured Claim**" shall mean an Unsecured Claim to the extent such Unsecured Claim is an Allowed Claim.

1.17    "**Allowed LoanCore Mortgage Claim**" shall mean the LoanCore Mortgage Claim.

1.18    "**Assets**" shall mean with respect to any and all of the Debtors, all of the right, title and interest in and to property of whatever type or nature owned by the Debtors or subsequently acquired by the Debtors, including any property of the Estates for purposes of section 541 of the Bankruptcy Code, including Cash, Causes of Action, and Tenant Leases as of the Confirmation Date.

1.19   "**Assignment Documents**" shall have the meaning ascribed to such term in Section 4.5 of this Plan.

1.20   "**Avoidance Actions**" shall mean all claims and causes of action which a Debtor has or had the power to assert pursuant to any or all of section 510, 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code.

1.21   "**Bankruptcy Case**" shall mean these Chapter 11 bankruptcy cases of the Debtors.

1.22   "**Bankruptcy Code**" shall mean Title 11 of the United States Code (11 U.S.C. § 101 et. seq.), as in effect on the Petition Date and as amended during the Bankruptcy Case.

1.23   "**Bankruptcy Court**" shall mean the Court as defined below.

1.24   "**Bankruptcy Rules**" shall mean the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code and any local rules of the Bankruptcy Court, as in effect on the Petition Date, together with any and all amendments and modifications thereto that were subsequently made applicable to the Bankruptcy Case.

1.25   "**Cash**" shall mean all cash and cash equivalents which evidence immediately available funds in United States dollars.

1.26   "**Causes of Action**" shall mean, with respect to any or all of the Debtors, any and all actions, proceedings, causes of action (including, without limitation, any causes of action of a debtor or debtor in possession under chapter 5 of the Bankruptcy Code), suits, reckonings, covenants, contracts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and claims, variances, trespasses, damages, judgments, executions, claims and demands whatsoever, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed,

4

undisputed, secured or unsecured or whether asserted or assertable directly or derivatively, in law, equity or otherwise, and all rights thereunder or attendant thereto.

1.27   "**Claim**" shall mean a right to payment against any of the Debtors as set forth in  § 101(5) of the Bankruptcy Code.

1.28   "**Claimant**" shall mean the holder of a Claim.

1.29   "**Class**" shall mean a category of Claims or Interests set forth in Article 3 of this Plan, as such term is used and described in section 1122 and section 1123(a)(1) of the Bankruptcy Code.

1.30   "**Confirmation Date**" shall mean the date of the entry of the Confirmation Order.

1.31   "**Confirmation Hearing**" shall mean the hearing held pursuant to section 1128 the Bankruptcy Code before the Bankruptcy Court regarding the proposed confirmation of the Plan.

1.32   "**Confirmation Order**" shall mean the order of the Court confirming the Plan.

1.33   "**Court**" shall mean the United States Bankruptcy Court for the Southern District of New York.

1.34   "**Cure**" shall mean the obligations required to be paid in connection with the assumption and assignment of an Executory Contract pursuant to section 365 of the Bankruptcy Code, including (a) the cure of any non-monetary defaults to the extent required, if at all, pursuant to section 365 of the Bankruptcy Code, and (b) with respect to monetary defaults, the payment, within a reasonable period of time following the Effective Date, of Cash, with respect to the assumption and assignment of such Executory Contract,  pursuant to section 365(b) of the Bankruptcy Code, in an amount equal to all unpaid monetary obligations or such other amount as may be determined by the Bankruptcy Court or as agreed upon by the parties, under such

Executory Contract, to the extent such obligations are enforceable under the Bankruptcy Code and applicable non-bankruptcy law

1.35    "**Debtors**" shall mean the 107th Street Debtors and the 117th Street Debtors.

1.36    "**Disallowed Claim**" shall mean all or such part of a Claim that is disallowed by a Final Order.

1.37    "**Disbursing Agent**" shall mean the entity in its capacity as disbursing agent responsible for making all distributions required to be made under this Plan.  Pursuant to Section 6.1.2 of this Plan, the Successor Owners shall be the Disbursing Agent under the Plan.

1.38    "**Disclosure Statement**" shall mean that certain disclosure statement relating to this Plan, including, without limitation, all exhibits and schedules thereto, as the same may be amended, supplemented or otherwise modified from time to time, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

1.39    "**Disputed Claim**" shall mean the whole or any portion of a Claim (a) that is neither an Allowed Claim nor a Disallowed Claim, (b) that is listed as disputed, contingent or unliquidated on the Debtors' schedules or that is otherwise subject to a timely objection or (c) for which a Proof of Claim has been timely filed with the Bankruptcy Court to which an objection is timely filed as to which a Final Order has not been entered allowing or disallowing such Claim or any portion thereof.

1.40    "**Distribution Date**" shall mean any of (i) the Effective Date for all Allowed Claims, or promptly following such date or (ii) subsequent to the Effective Date, a date promptly after a Claim is deemed an Allowed Claim.

1.41    "**Distribution Record Date**" shall mean the Confirmation Date or such other date as may be designated in the Confirmation Order.

6

1.42    "**Effective Date**" shall mean 3 business days after the Confirmation Order is a Final Order, or such earlier date or later date as may be practical, but in no event later than 10 business days after the Confirmation Order is a Final Order.

1.43    "**Estate**" shall mean the estate of a Debtor created upon the commencement of the Bankruptcy Case pursuant to section 541 of the Bankruptcy Code.

1.44    "**Executory Contracts**" shall mean "executory contracts" and "unexpired leases" as such terms are used within section 365 of the Bankruptcy Code.

1.45    "**Final Order**" shall mean an order or judgment of the Court (or other court of competent jurisdiction) entered on the docket in the Bankruptcy Case (or on the docket of any other court of competent jurisdiction), which has not been reversed, modified, amended, vacated or stayed and as to which (a) the time to appeal or to seek review, petition for certiorari or move for a new trial, re-argument or rehearing has expired and as to which no appeal, review, rehearing, petition for certiorari or other proceedings for a new trial, re-argument or rehearing shall then be pending, or (b) if an appeal, writ of certiorari, new trial, re-argument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied or a new trial, re-argument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, re-argument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause such order not to be a Final Order.

1.46    "**Guarantor**" shall mean Isaac Kassirer, an individual, as guarantor under the LoanCore Mortgages.

7

1.47    "**Impaired**" shall mean "impaired" within the meaning of section 1124 of the Bankruptcy Code.

1.48    "**Interest**" shall mean an existing ownership interest in a Debtor.

1.49    "**Interest Holder**" shall mean a holder and owner of an existing Interest in a Debtor.

1.50    "**Lien**" shall mean a charge against or interest in property to secure payment of a debt or performance of an obligation, including but not limited to valid and enforceable liens, mortgages, security interests, pledges, charges, encumbrances, or other legally cognizable security devices of any kind.

1.51    "**LoanCore**" shall mean LoanCore Capital Credit REIT LLC.

1.52    "**LoanCore Mortgage**" shall mean the first mortgages held by LoanCore on the Debtors' Properties pursuant to (i) that certain Consolidated, Amended and Restated Mortgage, Assignment of Leases and Rents and Security Agreement dated March 6, 2018, for the benefit of LoanCore and recorded on March 13, 2018 in  the City Register of New York County, New York (the "Register's Office") as CRFN 2018000086032, as re-recorded on May 3, 2018 in the City Register of New York County, New York as CRFN 2018000148285, in the Register's Office, (ii) that certain Building Loan Mortgage, Assignment of Leases and Rents and Security Agreement dated April 17, 2018 by for the benefit  of LoanCore, and recorded on April 26, 2018 in the Register's Office as CRFN 2018000138878, (iii) that certain Consolidated, Amended and Restated Senior Mortgage Loan Mortgage, Assignment of Leases and Rents and Security Agreement dated December 13, 2018, for the benefit  of LoanCore and recorded on January 30, 2019 in  the Register's Office as CRFN 2019000034853, and (iv) that certain Building Loan Mortgage, Assignment of Leases and Rents and Security Agreement dated December 13, 2018,

for the benefit of LoanCore and recorded on January 30, 2019 in the Register's Office as CRFN 2019000192282.

1.53    "**LoanCore Mortgage Claim**" shall mean the 107 Mortgage Claim together with the 117 Mortgage Claim.

1.54    "**Mezzanine Borrowers**" shall mean West 107 Mezz LLC and EEG HGI LLC.

1.55    "**New Mortgages**" shall mean the mortgages against the Properties from and after the Effective Date which New Mortgages shall be acceptable to LoanCore (or such designee) and the Successor Owners.

1.56    "**New Mortgage Lender**" shall mean the lender(s) under the New Mortgages.

1.57    "**Other Secured Claim**" shall mean any Claim, other than the LoanCore Mortgage Claim, to the extent reflected in the Schedules or a Proof of Claim as being secured and properly perfected, which is secured by a timely perfected Lien on Collateral, to the extent of the value of the Estate's interest in such Collateral, as determined as of the relevant determination date.

1.58    "**Permitted Exceptions**" shall mean (i) the Tenant Leases and (ii) normal and customary covenants and easements, excluding Liens for the payment of money; provided, however, that Permitted Exceptions shall not include any covenant or easement which shall, in the reasonable judgment of LoanCore, interfere with the use, operation or ownership of the Properties or otherwise adversely affect their value, ability to be financed or marketability.

1.59    "**Person**" shall mean an individual, corporation, partnership, association, joint stock company, joint venture, limited liability company, limited liability partnership, trust, estate, unincorporated organization or other entity, or any government, governmental agency or any subdivision, department or other instrumentality thereof.

1.60    "**Petition Date**" shall mean December 28, 2020, the date of the filing of the Bankruptcy Case by the Debtors.

1.61    "**Plan**" shall mean this Joint Plan of Liquidation of the Debtors, and any and all modifications and/or amendments hereto.

1.62    "**Plan Supplement**" shall mean the compilation of documents, if any, relating to the Plan not included herewith, that the Debtors shall file with the Bankruptcy Court ten (10) days prior to the voting deadline for the Plan (or such later date as approved by the Bankruptcy Court), which documents and exhibits shall be acceptable to LoanCore.

1.63    "**Priority Non-Tax Claim**" shall mean any Claim against the Debtors asserted to be entitled to priority in right of payment under section 507(a) of the Bankruptcy Code other than an Administrative Expense Claim or a Priority Tax Claim.

1.64    "**Priority Tax Claim**" shall mean any Claim against the Debtors asserted to be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code.

1.65    "**Professional Fee Claim**" shall mean a claim under sections 327, 330(a), 503 or 1103 of the Bankruptcy Code for the compensation of the Debtors' counsel for services rendered or reimbursement of expenses incurred in the Bankruptcy Case on or prior to the Effective Date.

1.66    "**Proof of Claim**" shall mean any Secured Claim or Unsecured Claim that must be filed by a Claimant or Interest Holder by the date(s) designated by the Bankruptcy Court as the last date(s) for filing proofs of claim against the Debtors, or as is otherwise permitted to be filed against any of the Debtors pursuant to a Final Order of the Bankruptcy Court.

1.67    "**Properties**" shall mean the 107 Properties together with the 117 Properties.

1.68    "**Property Management Agreements**" shall mean that certain management agreement among the 107 Debtors and Tri-Hill Management LLC wherein Tri-Hill Management

10

LLC agrees to manage the 107 Properties, together with that certain management agreement among the 117 Debtors and Bronstein Properties, LLC wherein Bronstein Properties, LLC agrees to manage the 117 Properties.

1.69    "**Property    Managers**" shall mean Tri-Hill Management LLC together with Bronstein Properties, LLC in their capacities as property managers under the respective Property Management Agreements.

1.70    "**Property Transfer**" shall have the meaning ascribed to such term in Section 4.5 of this Plan.

1.71    "**Related Person**" shall mean, with respect to any Person, its Affiliates (as such term is used in section 101(2) of the Bankruptcy Code), its predecessors, successors and assigns (whether by operation of law or otherwise), and with respect to any of the foregoing, each of their respective present and former Affiliates and each of their respective current and former officers, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, principals, members, employees, agents, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each acting in such capacity, and any Person claiming by or through any of them (including their respective officers, directors, employees, managers, advisors and professionals).

1.72    "**Releasing Creditors**" shall mean the holders of all Claims in Class 4 of the Plan who do not elect to opt out of granting the releases contained in Section 10.2 of the Plan.

1.73    "**Restructuring Support Agreement**" shall mean that certain Restructuring Support Agreement among LoanCore, the 107th Street Debtors, the 117 Street Debtors, the Mezzanine Borrowers, and the Guarantor dated December 28, 2020.

11

1.74    "**Secured Claim**" shall mean a Claim secured by a Lien on property included within a Debtor's Estate.

1.75    "**Successor Owners**" shall mean such entities as designated by LoanCore, and owned and/or controlled by LoanCore.

1.76    "**Tenant Leases**" shall mean the Debtors' unexpired leases of residential real property with tenants.

1.77    "**Unimpaired**" shall mean, with respect to a Claimant or Interest Holder, that such Claimant or Interest Holder is not Impaired.

1.78    "**Unsecured Claim**" shall mean a Claim for which the Claimant does not hold (a) a valid, perfected and enforceable Lien, security interest or other interest in or encumbrance against property of a Debtor or a Debtor's Estate or (b) a right to setoff to secure the payment of such Claim.  An Unsecured Claim includes, but is not limited to, a Claim for damages resulting from rejection of any Executory Contract pursuant to section 365 of the Bankruptcy Code, and does not include Administrative Expense Claims, Professional Fee Claims, Priority Tax Claims, Priority Non-Tax Claims, the LoanCore Mortgage Claim or Other Secured Claims.

1.79    **Rules of Interpretation**.  For purposes of this Plan, unless otherwise provided herein: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (b) any reference in this Plan to an existing document, schedule or exhibit filed or to be filed means such document, schedule or exhibit, as it may have been or may be amended, modified, or supplemented pursuant to this Plan; (c) any reference to a Claimant includes that Claimant's successors and assigns; (d) all references in this Plan to Sections and Articles are references to Sections and Articles of or to this Plan, as the same may be amended, waived or modified from time to time; (e) the words "herein," "hereof,"

"hereto," "hereunder" and other words of similar import refer to this Plan as a whole and not to any particular Section, subsection or clause contained in this Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (g) subject to <u>Section 14.10</u> of this Plan and the provisions of any contract or other agreements or documents entered into in connection with this Plan, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules; (h) the rules of construction set forth in section 102 of the Bankruptcy Code will apply; and (i) the term "including" shall be construed to mean "including, but not limited to," "including, without limitation," or words of similar import.

<div align="center">

**ARTICLE 2**

**<u>CONSOLIDATION OF DEBTORS FOR VOTING AND DISTRIBUTION PURPOSES</u>**

</div>

2.1      **<u>Limited Substantive Consolidation</u>**.  The Plan provides for the limited substantive consolidation of the Debtors' Estates, but solely for purposes of voting on this Plan by Claimants, making distributions to holders of Allowed Claims under this Plan, and confirmation of this Plan. On the Effective Date, (i) all assets and liabilities of the Debtors will, solely for voting and distribution purposes, be treated as if they were merged, (ii) each Claim against the Debtors will be deemed a single Claim against and a single obligation of the Debtors, (iii) any Claims filed or to be filed in the Bankruptcy Case will be deemed single Claims against all of the Debtors, (iv) all transfers, disbursements, and distributions to Claimants made by any Debtor hereunder will be deemed to be made to satisfy the Claims against all of the Debtors, and (v) any obligation of the Debtors as to Claims will be deemed to be one obligation of all of the Debtors.  Holders of Allowed Claims shall be entitled to their share of assets available for distribution to such Class without regard to which Debtor originally was liable for such Claim.  Except as set forth in this

<div align="center">13</div>

Article, such limited consolidation shall not, other than for purposes related to this Plan, (x) affect the legal and corporate structures of the Debtors, (y) cause any Debtor to be liable for any Claim or Interest under this Plan for which it otherwise is not liable, and the liability of any Debtor for any such Claim or Interest shall not be affected by such limited consolidation, and (z) affect any Interest in the Debtors.  The Debtors respectfully submit that such limited consolidation will cause no prejudice to any Claimant or Interest Holder and will instead result in greater convenience for purposes of voting on the Plan and distributions made on Allowed Claims.

## ARTICLE 3

## UNCLASSIFIED CLAIMS

3.1    **Administrative Expense Claims**.  Allowed Administrative Expense Claims shall be paid in full in Cash on the Distribution Date, except to the extent that the holder of an Allowed Administrative Expense Claim agrees to a different treatment; provided, however, that Allowed Administrative Expense Claims representing non-tort obligations of the Properties incurred in the ordinary course of business shall be paid in full or performed by Successor Owners in the ordinary course of business or pursuant to the terms and conditions of the particular transaction.

3.2    **Professional Fee Claims**.  Final fee applications for expenses authorized pursuant to section 330 of the Bankruptcy Code shall be filed with the Bankruptcy Court and served on all parties in interest within fifteen (15) days of the Effective Date.  The Successor Owners shall pay the amount of the Allowed Professional Fee Claims.

3.3    **Priority Tax Claims**.  Allowed Priority Tax Claims shall be paid in full in Cash with pre-petition interest and post-petition interest at the statutory rate on the Distribution Date, except to the extent that the holder of an Allowed Priority Tax Claim agrees to a different treatment.

14

3.4    **United States Trustee Fees**.  Any outstanding United States Trustee fees shall be paid in full in Cash on the Effective Date.

3.5    **Bar Date for Administrative Expense Claims**.  Unless otherwise ordered by the Bankruptcy Court, requests for the payment of Administrative Expense Claims (other than non-tort obligations incurred in the ordinary course of business) must be filed with the Bankruptcy Court and served on Successor Owners and its counsel at the address for notices listed in <u>Section 14.9</u> of this Plan no later than the Administrative Expense Claims Bar Date.  Any Person that is required to file and serve a request for payment of an Administrative Expense Claim and fails to timely file and serve such request, shall be forever barred, estopped and enjoined from asserting such Administrative Expense Claim or participating in distributions under this Plan on account thereof.  Objections to requests for payment of an Administrative Expense Claim must be filed with the Bankruptcy Court and served on Successor Owners and its counsel at the address for notices listed in <u>Section 14.9</u> of this Plan no later than ninety (90) days following the Effective Date.

3.6    **Procedure for Substantive Consolidation**.  This Plan shall serve as, and shall be deemed to be, a request for entry of an order substantively consolidating the Debtors' Estates, but solely for purposes of this Plan, including voting on this Plan, making distributions to Claimants under this Plan, and confirmation of this Plan.  If no objection to the limited substantive consolidation of the Debtors' Estates is timely filed and served on or before the deadline for objections to confirmation of the Plan, the Confirmation Order shall serve as the order approving the limited substantive consolidation of the Debtors' Estates, but solely for purposes of this Plan, including voting on this Plan, making distributions to holders of Allowed Claims under this Plan, and confirmation of this Plan.

15

# ARTICLE 4

## CLASSIFICATION AND TREATMENT OF CLAIMS

### Class 1: Other Secured Claims

4.1    **Classification** – Allowed Other Secured Claims.

4.2    **Treatment** – Each holder of an Allowed Other Secured Claim, in full and final satisfaction, release and settlement of such Claim, shall receive one of the following alternative treatments, at the election of the Successor Owners: (a) payment in full in Available Cash by the Successor Owners on or as soon as reasonably practicable after the later of (i) the Effective Date and (ii) the date the Claim becomes an Allowed Claim; (b) the legal, equitable and contractual rights to which such Claim entitles the holder, unaltered by the Plan; (c) the treatment described in section 1124(2) of the Bankruptcy Code; or (d) the possession of all collateral securing such Claim, without representation or warranty by, or recourse against the Debtors or the Successor Owners.  In the case of clause (d), to the extent that the value of the collateral securing any Allowed Other Secured Claim is less than the amount of such Allowed Other Secured Claim, the undersecured portion of such Claim shall be treated for all purposes under the Plan as a General Unsecured Claim in Class 4 and shall be classified as such.

4.3    **Voting** – Unimpaired and deemed to accept the Plan.

### Class 2: LoanCore Mortgage Claim

4.4    **Classification** – Allowed LoanCore Mortgage Claim.

4.5    **Treatment** – On the Effective Date, on account of and in satisfaction of the Allowed LoanCore Mortgage Claim, the Successor Owners shall receive title to the Properties and the Assets, pursuant to transfer, conveyance and assignment documents in favor of the Successor Owners in a form satisfactory to Successor Owners (the "Assignment Documents"), free and clear

16

of all Claims, Liens, charges, interests and encumbrances, other than Permitted Exceptions and the New Mortgages (collectively, the "Property Transfer").

4.6     **Voting** – Impaired and entitled to vote to accept or reject the Plan.

### Class 3: Priority Non-Tax Claims

4.7     **Classification** – Priority Non-Tax Claims.

4.8     **Treatment** – In full satisfaction, settlement, release and discharge of and in exchange for the Priority Non-Tax Claims, the amount of the Allowed Priority Non-Tax Claims shall be paid in full in Cash with pre-petition interest and post-petition interest at the statutory rate on the Distribution Date.

4.9     **Voting** – Unimpaired and deemed to accept the Plan.

### Class 4: Unsecured Claims

4.10    **Classification** – Unsecured Claims.

4.11    **Treatment** – Allowed Unsecured Claims shall be paid in full in Cash on the Distribution Date, without any pre-petition interest or post-petition interest, provided, however, that the aggregate amount of consideration to be distributed to Class 4 of the Plan will not exceed $670,000.00. If the aggregate Allowed Claims in Class 4 of the Plan exceed $670,000.00, holders of Allowed Unsecured Claims will receive their pro rata share of $670,000.00.

4.12    **Voting** – Impaired and entitled to vote to accept or reject the Plan.

### Class 5: Interest Holders

4.13    **Classification** – Interest Holders.

4.14    **Treatment** – No distribution shall be made or property of the Estates retained by the Interest Holders.  Each Interest Holder's Interest shall be deemed cancelled and extinguished on the Effective Date.

4.15     **Voting** – Impaired and conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Not entitled to vote to accept or reject the Plan.

## ARTICLE 5

## ACCEPTANCE OR REJECTION OF THE PLAN

5.1     **Impaired Classes of Claims and Interests Entitled to Vote**.  Claimants in each Impaired Class of Claims that receive or retain property pursuant to this Plan shall be entitled to vote to accept or reject this Plan.

5.2     **Acceptance by an Impaired Class of Claims**.

5.2.1     Pursuant to section 1126(c) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if, after excluding any Claimant designated pursuant to section 1126(e) of the Bankruptcy Code, (a) Claimants holding at least two-thirds in dollar amount of the Allowed Claims actually voting in such Class have voted to accept such Plan, and (b) more than one-half in number of such Allowed Claims actually voting in such Class have voted to accept the Plan.

5.2.2     Except for Claimants and Interest Holders in Classes that are deemed or presumed to have accepted or rejected this Plan pursuant to the terms of this Plan, if Claimants in a particular Impaired Class of Claims were given the opportunity to vote to accept or reject this Plan and notified that a failure of any Claimant in such Impaired Class of Claims to vote to accept or reject this Plan would result in such Impaired Class of Claims being deemed to have accepted this Plan, but no Claimant in such Impaired Class of Claims voted to accept or reject this Plan, then such Class of Claims shall be deemed to have accepted this Plan.

5.3     **Presumed Acceptances by Unimpaired Classes**.  Classes of Claims designated as Unimpaired are conclusively presumed to have voted to accept this Plan pursuant to section 1126(f) of the Bankruptcy Code, and the votes of such Claims will not be solicited.

18

5.4     **Presumed Rejection of the Plan**.  Impaired Classes of Claims or Interests that do not receive or retain property under the Plan are conclusively presumed to have voted to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code, and the votes of Claimants or Interest Holders in such Classes will not be solicited.

5.5     **Consensual Confirmation**. The confirmation requirements of section 1129(a) of the Bankruptcy Code must be satisfied jointly with respect to the Debtors.  This Plan shall be deemed one joint chapter 11 plan for all of the Debtors.

5.6     **Reservation of Rights**. Subject to <u>Section 14.11</u> of this Plan, the Debtors reserve the right to modify or withdraw this Plan, in its entirety or in part, for any reason, including, without limitation, in the event that the Plan is not confirmed.

## ARTICLE 6

## MEANS FOR IMPLEMENTATION OF THE PLAN

6.1     **Funding and Administration of Plan**.

6.1.1     On or promptly following the Effective Date, the Successor Owners shall pay the amounts to be paid to Claimants under the Plan.  To the extent necessary, LoanCore will contribute sufficient funds to the Successor Owners to pay such amounts.

6.1.2     The Successor Owners shall be the Disbursing Agent under the Plan without a bond and will generally administer and take all actions in furtherance of the Plan.

6.1.3     The Debtors shall execute and deliver the Assignment Documents in a form satisfactory to the Successor Owners on the Effective Date.

6.1.4     On the Effective Date, the Successor Owners shall enter into the New Mortgages.

6.2     **Release of Liens**.  On the Effective Date and except as expressly set forth in this Plan, all mortgages, deeds of trust, Liens or other security interests or encumbrances against the

19

Properties shall be released and forever discharged, and all the right, title, and interest of any holder of such mortgages, deeds of trust, Liens or other security interests shall revert to LoanCore and its successors and assigns.

6.3    **Property Transfer**.  On the Effective Date, the Debtors shall effect the Property Transfer and thereby transfer and convey to the Successor Owners (as applicable) title to each of the Properties, the Causes of Action and the other Assets free and clear of all Claims, Liens, charges, interests and encumbrances, other than Permitted Exceptions and the New Mortgages.

6.4    **Preservation of Insurance**.    This Plan shall not diminish or impair the enforceability of any insurance policy, right or claim that may cover Claims against the Debtors (including without limitation, the Debtors' Related Persons) or any other person or entity. Likewise, this Plan and the Confirmation Order shall not impair any insurance carrier's rights, claims, defenses or disputes under any policy and shall not act to increase or extend any rights of the Debtors or the insurance carriers.

6.5    **Dissolution of Debtors**.  The Debtors' principals shall take all actions necessary to dissolve the Debtors in accordance with state law promptly following the Effective Date.

6.6    **Modification of LoanCore Treatment**.  At any time prior to the tenth (10th) day before the voting deadline for the Plan (or such later date as approved by the Bankruptcy Court), LoanCore shall have the right, in its sole and absolute discretion, to elect to modify the means of the Property Transfer, such that, *inter alia*, (i) the Debtors (as reorganized pursuant to such modified Plan) shall retain the Properties and the Assets, (ii) the Successor Owners shall receive 100% of the equity in each of the Debtors, and (iii) the Debtors shall be discharged to the fullest extent permitted by section 1141 of the Bankruptcy Code.  Upon such election by LoanCore, the

Debtors shall file a modification of this Plan, in form and substance acceptable to LoanCore, to reflect such election.

## ARTICLE 7

## CAUSES OF ACTION

7.1     The Debtors waive and release the right to pursue preference claims under section 547 of the Bankruptcy Code.  All other Causes of Action are fully preserved and reserved.  All rights pursuant to section 502, 544, 545, and 546 of the Bankruptcy Code and all Avoidance Actions (except those brought pursuant to section 547 of the Bankruptcy Code) shall be preserved, provided, however, that in connection with the Property Transfer, the Debtors shall transfer the Causes of Action, including the Avoidance Actions (other than those brought pursuant to section 547 of the Bankruptcy Code), to the Successor Owners.

## ARTICLE 8

## PROVISIONS GOVERNING DISTRIBUTIONS, RESOLUTION OF DISPUTED CLAIMS AND OBJECTIONS TO PROOFS OF CLAIM

8.1     **General**.  Unless a Claimant holding an Allowed Claim against any of the Debtors agrees to a different distribution date or except as otherwise provided herein or as ordered by the Bankruptcy Court, distributions to be made on account of Claims that are Allowed Claims shall be made on the applicable Distribution Date.  Any Claims that are Disputed Claims will be paid promptly after a Claim is deemed an Allowed Claim.

8.2     **Interest on Claims**.  Except as otherwise expressly provided for in this Plan, the Confirmation Order, other order of the Bankruptcy Court, or required by applicable bankruptcy law, interest accruing after the Petition Date shall not be paid on any Claims, and no Claimant shall be entitled to be paid interest accruing on or after the Petition Date on any Claim.

21

8.3     **Distribution Record Date**.  As of the close of business on the Distribution Record Date, the Claims register for each of the Classes of Claims or Interests as maintained by the Debtors, its agents or the Bankruptcy Court shall be deemed closed, and there shall be no further changes in the record holders of any of the Claims or Interests.  Neither the Debtors nor the Disbursing Agent shall have any obligation to recognize any transfer of any Claims or Interests occurring on or after the Distribution Record Date.  The Debtors or the Disbursing Agent, as applicable, shall be entitled to recognize and deal for all purposes hereunder only with those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date.

8.4     **Delivery of Distributions and Undeliverable or Unclaimed Distributions**.

8.4.1     <u>Delivery of Distributions in General</u>.  Distributions on Allowed Claims shall be made at the addresses on the Proofs of Claim filed in this Bankruptcy Case.

8.4.2     <u>Undeliverable and Unclaimed Distributions</u>.

(a)     <u>General</u>.  If the distribution on any Allowed Claim is returned to the Disbursing Agent as undeliverable or is otherwise unclaimed, no further distributions shall be made on such Allowed Claim unless the Disbursing Agent is notified in writing within ninety (90) calendar days of the Distribution Date of the then-current address of the Claimant holding the Allowed Claim.

(b)     <u>Non-Negotiated Checks</u>.  Checks issued on account of Allowed Claims shall be null and void if not negotiated within ninety (90) calendar days from and after the date of issuance thereof.  Requests for reissuance of any check must be made directly and in writing to the Disbursing Agent by the Claimant of the relevant Allowed Claim within the 90-calendar-day period.  After such date, such Allowed Claim (and any claim for reissuance of the original

check) shall be automatically discharged and forever barred, and such funds shall revert to the Successor Owners, notwithstanding any federal or state escheat laws to the contrary.

8.5    **Withholding and Reporting Requirements**.  In connection with this Plan and all distributions hereunder, the Disbursing Agent shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements. The Disbursing Agent shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.  All Claimants holding Allowed Claims shall be required to provide any information necessary to effect information reporting and the withholding of such taxes.  Notwithstanding any other provision of this Plan, (a) each Claimant holding an Allowed Claim that is to receive a distribution pursuant to this Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution and (b) no distribution shall be made to or on behalf of such Claimant's Allowed Claim pursuant to this Plan unless and until such Claimant has made arrangements satisfactory to the Disbursing Agent for the payment and satisfaction of such tax obligations.

8.6    **Objections to Claims**.  The Successor Owners may file objections to Claims for a period of 90 days after the Effective Date, with the right to move the Court for cause for an extension of the date it may file objections to Claims.  No partial distributions will be made with respect to a Disputed Claim or a Claim that is contingent or unliquidated.  To the extent that a Disputed Claim becomes an Allowed Claim, such Allowed Claims shall be paid promptly by the Successor Owners.

# ARTICLE 9

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

9.1     **Rejection of all Executory Contracts other than Tenant Leases**.    On the

Effective Date, all Executory Contracts other than Tenant Leases will be deemed rejected in

accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the

Bankruptcy Code, underline such Executory Contract (i) was previously assumed or rejected by the

Debtors pursuant to an order of the Bankruptcy Court, (ii) previously expired or terminated

pursuant to its own terms or (iii) is an Executory Contract or unexpired lease that is included in a

pending motion to assume such Executory Contract or unexpired lease.    Entry of the Confirmation

Order by the Bankruptcy Court shall constitute approval of such rejections pursuant to sections

365(a) and 1123 of the Bankruptcy Code.

9.2     **Claims Upon Rejection**.    In the event of a rejection of any Executory Contract

which results in damage to the other party or parties to the Executory Contract, a Proof of Claim

for such damages must be filed by the damaged party with the Bankruptcy Court within thirty (30)

days after the Confirmation Date.    Any Allowed Claim arising from the rejection of any Executory

Contract shall be treated as an Unsecured Claim.

9.3     **Failure to File**.    Any Claim arising from the rejection of any Executory Contract

not filed with the Court within the time period provided in the preceding paragraph above shall be

deemed forever barred and shall not be entitled to participate in any distribution under the Plan.

9.4     **Tenant Leases**.    The existing claims of the tenants under the Tenant Leases shall

be addressed and paid through the Cure process associated with the Debtors' assumption of the

Tenant Leases and assignment thereof to the Successor Owners.    The tenants under the Tenant

Leases shall not have any continuing obligations to the Debtors following the assumption and

assignment of the Tenant Leases to the Successor Owners pursuant to a Property Transfer.    Any

24

Claims of the tenants against the Debtors which are not addressed through the Cure process shall be treated in accordance with the terms of the Plan. The Successor Owners (as applicable) shall assume all benefits and obligations of the Debtors as landlord under all assigned Tenant Leases from and after the Effective Date and shall pay any Cure costs that may be due.

## ARTICLE 10

## RELEASES AND EXCULPATION

10.1   **Exculpation**. To the fullest extent permitted under applicable law, as of and following the Effective Date, the Debtors, the Property Managers, the Affiliated Property Manager, and each of their Related Persons (to the extent a claim arises from actions taken by such Related Person in its capacity as a Related Person of such Entity) shall not incur any liability to any Person for any act or omission in connection with, relating to, or arising out of the Bankruptcy Case, including this Plan, pursuit of confirmation of any plans of reorganization or liquidation, including this Plan, the administration, consummation and implementation of the Plan or the property to be distributed under the Plan or the Disclosure Statement. Any of the Debtors, the Property Managers, the Affiliated Property Manager, and each of their Related Persons shall be entitled to rely upon the advice of counsel and financial advisors with respect to their duties and responsibilities under, or in connection with, the Bankruptcy Case, the Plan, and the administration thereof.

10.2   **Releases by Releasing Creditors**. Except as otherwise expressly provided in this Plan or the Confirmation Order, on the Effective Date and effective simultaneously with the effectiveness of this Plan, the Releasing Creditors shall be deemed to have unconditionally released the Debtors, LoanCore, the Successor Owners, the New Mortgage Lender, the Property Managers, the Affiliated Property Manager, and their respective Related Persons of and from any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action and

25

liabilities of any nature whatsoever, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event or other occurrence taking place or existing on or before the Effective Date that are in connection with the Debtors or any of them, or their respective assets, property and Estates, the Bankruptcy Case or the Plan, or Disclosure Statement; provided, however, that nothing in this Section 10.2 shall release the Successor Owners from their obligations under this Plan including in respect of the payment of Allowed Claims, obligations arising under the Tenant Leases from and after the Effective Date and in respect of the Cure, and obligations relating to the New Mortgages.

10.3     **Confirmation Injunction**.   Other than such liabilities and obligations provided under the Plan, (a) the rights afforded herein and the treatment of all Claims and Interests herein shall be in exchange for and in complete satisfaction and release of all Claims and Interests of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, against the Debtors, or any of the Debtors' Related Persons or any of their assets and properties, (b) on the Distribution Date, all such Claims against the Debtors and each of the Debtors' Related Persons shall be satisfied and released in full, and (c) all Persons shall be precluded from asserting and shall be permanently enjoined from commencing or continuing in any manner any action or proceeding (whether directly, indirectly, derivatively, or otherwise) against the Debtors, the Successor Owners, LoanCore, the New Mortgage Lender, the Property Managers, the Affiliated Property Manager, or any of their respective Related Persons or their assets or properties, including the Properties and Assets, based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date; provided, however, that nothing in this Section 10.3 shall enjoin or otherwise limit any claims against the Successor Owners in respect of

their obligations under this Plan including in respect of the payment of Allowed Claims, obligations arising under the Tenant Leases from and after the Effective Date and in respect of the Cure, and obligations relating to the New Mortgages.

10.4   **Injunction Against Interference with Plan**. Upon entry of the Confirmation Order, all holders of Claims against or Interests in the Debtors and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan; *provided*, that nothing herein or in the Confirmation Order shall preclude, limit, restrict or prohibit any party in interest from seeking to enforce the terms of the Plan, the Confirmation Order, or any other agreement or instrument entered into or effectuated in connection with the consummation of the Plan.

10.5   **Release by LoanCore, the Successor Owners, and the New Mortgage Lender of Debtors, Mezzanine Borrowers, Guarantor, and Affiliated Property Manager**. Except as otherwise expressly provided in this Plan or the Confirmation Order, on the Effective Date and effective simultaneously with the effectiveness of this Plan, each of LoanCore, each Successor Owner, and the New Mortgage Lender shall be deemed to have unconditionally released the Debtors, the Mezzanine Borrowers, the Guarantor, the Affiliated Property Manager, and their respective Related Persons of and from any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action (including, but not limited to, the Avoidance Actions) and liabilities of any nature whatsoever, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event or other occurrence taking place or existing on or before the Effective Date that are in connection

27

with the Debtors, the Mezzanine Borrowers, the Guarantor, the Affiliated Property Manager or any of them, or their respective assets, property and Estates, the Bankruptcy Case or the Plan, or Disclosure Statement.  For the avoidance of doubt, nothing contained in this Section 10.5 shall in any way be construed to relieve the Debtors, the Mezzanine Borrowers, or the Guarantor from their post-Effective Date specific-performance obligations to LoanCore under the Restructuring Support Agreement, but in no event shall a claim be made for damages.

10.6   **Release by Debtors, Mezzanine Borrowers, Guarantor, and Affiliated Property Manager of LoanCore, the Successor Owners, and the New Mortgage Lender**.  Except as otherwise expressly provided in this Plan or the Confirmation Order, on the Effective Date and effective simultaneously with the effectiveness of this Plan, each of the Debtors, the Mezzanine Borrowers, the Guarantor, the Affiliated Property Manager, and their respective Related Persons shall be deemed to have unconditionally released LoanCore, each Successor Owner, the New Mortgage Lender, and their respective Related Persons of and from any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event or other occurrence taking place or existing on or before the Effective Date that are in connection with LoanCore and Successor Owners or any of them, or their respective assets, property and Estates, the Bankruptcy Case or the Plan, or Disclosure Statement; provided, however, that nothing in this Section 10.6 shall release each Successor Owner from its obligations under this Plan including in respect of the payment of Allowed Claims, obligations arising under the Tenant

28

Leases from and after the Effective Date and in respect of the Cure, and obligations relating to the New Mortgages.

10.7    **Release by Mezzanine Borrowers, Guarantor, and Affiliated Property Manager of Debtors**.  Except as otherwise expressly provided in this Plan or the Confirmation Order, on the Effective Date and effective simultaneously with the effectiveness of this Plan, each of the Mezzanine Borrowers, the Guarantor, the Affiliated Property Manager, and their and each Debtor's respective Related Persons shall be deemed to have unconditionally released the Debtors and their respective Related Persons of and from any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event or other occurrence taking place or existing on or before the Effective Date that are in connection with the Debtors or any of them, or their respective assets, property and Estates, the Bankruptcy Case or the Plan, or Disclosure Statement.  Further, no claims of the Mezzanine Borrowers, the Guarantor, the Affiliated Property Manager, or their and each Debtor's respective Related Persons shall be entitled to any distribution or payment under the Plan.

## ARTICLE 11

## CONFIRMATION AND CONSUMMATION OF THE PLAN

11.1    **Condition to Confirmation**.    The Bankruptcy Court shall have entered a Confirmation Order in form and substance satisfactory to the Debtors and LoanCore.

11.2    **Conditions To Effective Date**.  This Plan shall not become effective and the Effective Date shall not occur unless and until the Debtors and LoanCore are satisfied that:

(a) the Confirmation Order has become a Final Order;

29

(b) the aggregate amount of: (i) Administrative Expense Claims (other than Professional Fee Claims and U.S. Trustee fees); (ii) Priority Non-Tax Claims; (iii) Priority Tax Claims; (iv) Cure costs, and (v) Unsecured Claims shall not exceed $1,500,000.00;

(c) all documents and agreements necessary to implement this Plan on the Effective Date shall have been executed and delivered in form and substance satisfactory to LoanCore and all transactions and other actions required to be taken in connection with the Effective Date shall have occurred;

(d) for each Debtor, the Debtors shall have delivered to LoanCore monthly financial statements from January 1, 2020 through and including the date the Property Management Agreements are executed installing the Property Managers to manage the Properties; and

(e) to the extent in their possession, for each Debtor, the Debtors and the Guarantor shall have delivered to LoanCore any financial and/or operating information addressing rental payment arrears, current rental payment delinquencies, and all other rent collection information from October 1, 2020 through and including the date the Property Management Agreements are executed installing the Property Manager to manage the Properties.

     11.3   **Waiver of Conditions**.  Each of the conditions set forth in Sections 11.1, 11.2(a), and 11.2(c) of this Plan may be waived in whole or in part solely by the Debtors and LoanCore without the need for notice or a hearing (other than any condition the waiver of which is proscribed by law).  Each of the conditions set forth in Sections 11.2(b) and 11.2(d)-(e) may be waived in whole or in part by LoanCore in its sole discretion without the need for notice or a hearing.

11.4   **Consequence if Confirmation Order is Vacated**.  If the Confirmation Order is vacated, this Plan shall be null and void in all respects.

## ARTICLE 12

## EFFECT OF CONFIRMATION

12.1   **Binding Effect**.  Subject to the occurrence of the Effective Date, on and after the entry of the Confirmation Order, the provisions of this Plan shall bind every holder of a Claim against or Interest in any Debtor and inure to the benefit of and be binding on such holder's respective successors and assigns, regardless of whether the Claim or Interest of such holder is Impaired under this Plan and whether such holder has accepted this Plan.

12.2   **Transfer and Vesting of Assets**.  Upon the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all assets and property of the Debtors (including the Properties and the insurance policies and any rights thereunder) shall be transferred to and vest in the Successors Owners, in accordance with Section 4.5 of this Plan, free and clear of all Claims, Liens, charges, and other interests, except as otherwise provided herein.  Upon the Effective Date, the Successors Owners may operate the Properties and use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code, except as otherwise provided herein.

## ARTICLE 13

## RETENTION OF JURISDICTION

13.1   **Retention of Jurisdiction**.  Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising under, arising

in or out of, or relating to the Debtors' Bankruptcy Case and this Plan to the fullest extent permitted by law, including, but not limited to, among other things, jurisdiction to:

13.1.1    allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim, the resolution of any objections to the allowance or priority of Claims or Interests, and the determination of any Cure amount;

13.1.2    resolve any matters related to the rejection of any Executory Contract and to hear, determine, and, if necessary, liquidate any Claims arising therefrom;

13.1.3    hear and determine all applications for compensation and reimbursement of expenses of professionals under section 330, 331, 363, 503(b), 1103 and 1129(c)(9) of the Bankruptcy Code;

13.1.4    ensure that distributions to Claimants holding Allowed Claims are accomplished pursuant to the provisions of this Plan;

13.1.5    decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

13.1.6    enter such orders as may be necessary or appropriate to implement, enforce, or consummate the provisions of this Plan and all contracts, instruments, releases and other agreements or documents created in connection with this Plan, the Disclosure Statement or the Confirmation Order;

13.1.7    resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation, or enforcement of this Plan or any contract, instrument, release or other agreement or document that is executed or created pursuant to this

32

Plan, or any entity's rights arising from or obligations incurred in connection with this Plan or such documents;

13.1.8    consider any modification of the Plan under section 1127 of the Bankruptcy Code or approve any modification of the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with this Plan or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, this Plan, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with this Plan or the Confirmation Order, or enter any order in aid of the Confirmation Order pursuant to section 1142 of the Bankruptcy Code, in such manner as may be necessary or appropriate to consummate this Plan;

13.1.9    issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation, implementation or enforcement of this Plan or the Confirmation Order;

13.1.10    hear and determine all Causes of Action to the full extent permitted under 28 U.S.C. §1334 and 28 U.S.C. §157;

13.1.11    enter an order concluding and terminating the Bankruptcy Case;

13.1.12    enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Bankruptcy Case; and

13.1.13    hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under the Bankruptcy Code.

## ARTICLE 14

## **GENERAL PROVISIONS**

14.1    **Headings**.  The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the meaning of the Plan.

33

14.2    **No Payment of Disputed Claims**.  This Plan contemplates the payment of Allowed Claims only.  No Disputed Claims shall be paid, nor shall distributions be made to a Claimant holding a Disputed Claim, until such Disputed Claim, or any part thereof, becomes an Allowed Claim, if ever.

14.3    **Exemption from Transfer Taxes**.

(a)    Pursuant to section 1146(a) of the Bankruptcy Code: (i) the issuance, transfer, or exchange of notes or equity securities under this Plan; (ii) the creation of any mortgage, deed of trust, lien, pledge, or other security interest including the New Mortgages; (iii) the making or assignment of any contract, lease or sublease; or (iv) the making or delivery of any deed or other instrument of transfer or other consideration under, in the furtherance of, or in connection with this Plan, including, without limitation, the Property Transfer, the Assignment Documents and any other payments and transfers pursuant to this Plan by the Debtors to the Successor Owners and (v) delivery of deeds, bills of sale, or other transfers of tangible property, are exempt from and will not be subject to any stamp tax, or other similar tax or any tax held to be a stamp tax or other similar tax by applicable law.

(b)    All filing officers (including without limitation, the City Register and/or County Clerk of New York County, City of New York) shall be, and hereby are directed to: (i) accept for recording and record, any and all deeds and other documents which are presented to them for recording, including the Assignment Documents and the New Mortgages, immediately upon presentation thereof, with regard to the transactions effectuated pursuant to this Plan, without the payment of any New York State Real Estate Transfer Tax imposed under Article 31 of the New York State Tax Law, any New York City Real Property Transfer Taxes under section 11-2102 of the New York City Administrative Code, any mortgage recording tax or any other tax within the

34

purview of section 1146(a) of the Bankruptcy Code including with respect to the New Mortgages, and without the requirement of presentation of any affidavit or form with respect to any tax imposed under Article 31 of the New York State Tax Law, any New York City Real Property Transfer Taxes under section 11-2102 of the New York City Administrative Code with respect to the transactions effectuated pursuant to this Plan; and (ii) except as otherwise provided in the Plan and the Confirmation Order, cancel and discharge of record all liens, encumbrances, claims and other adverse interests in or against the Assets.

(c)   All governmental authorities and any other taxing authorities shall be permanently enjoined from the commencement or continuation of any action to collect from the Properties, the Debtors, the Successor Owners, LoanCore or their Related Persons, any taxes from which the transactions effectuated pursuant to this Plan are exempt, pursuant to and in furtherance of section 1146(a) of the Bankruptcy Code, including but not limited to, New York State Real Estate Transfer Taxes, New York City Real Property Transfer Taxes, and applicable mortgage recording tax, and any penalties, interest, or additions to any tax related thereto.

(d)   The City Register and/or County Clerk of New York County office shall record the deed of each Property, and other similar conveyance documents required to be delivered under this Plan without the payment of any stamp tax, transfer tax, or similar tax, and without the presentation of affidavits, instruments, or returns otherwise required for recording or filing pursuant to section 1146(a) of the Bankruptcy Code.

14.4   **Calculation of Time Periods**.  Bankruptcy Rule 9006 is incorporated herein for purposes of calculating the dates set forth herein.

14.5   **Other Actions**.  Nothing contained herein shall prevent the Debtors from taking such actions as may be necessary to consummate the Plan, although such actions may not specifically be provided for within the Plan.

14.6   **Severability of Plan Provisions**.  Except for the releases in paragraph 10.4, if any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, solely at the request of the Debtors with the consent of LoanCore, will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration, or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

14.7   **Successors and Assigns**.  The rights, benefits and obligations of any entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, each of the Debtors, LoanCore, the Successor Owners, the Claimants, the tenants under the Tenant Leases, the Interest Holders and all Related Persons of such entities.

14.8   **Revocation, Withdrawal or Non-Consummation**.  The Debtors reserve the right to revoke or withdraw its support for this Plan as to any or all of the Debtors prior to the Confirmation Date and to file subsequent plans of liquidation or reorganization.  If the Debtors revoke or withdraw this Plan as to any or all of the Debtors, or if confirmation or consummation

as to any or all of the Debtors does not occur, then, with respect to such Debtors, (a) the Plan shall be null and void in all respects and (b) nothing contained in the Plan (i) shall prejudice in any manner the rights of the Debtors or (ii) constitute an admission of any sort by the Debtors.

14.9   **Notice**.  To be effective, all notices required or permitted to be provided under the Plan shall be in writing and served by either (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery or (c) reputable overnight courier service, freight prepaid, to be addressed as follows:

<div align="center">

Notice to the Debtors

203 W 107 Street LLC, 210 W 107 Street LLC, 220 W 107 Street LLC, 230 W 107 Street
LLC, 124-136 East 117 LLC , 215 East 117 LLC, 231 East 117 LLC, 235 East 117 LLC,
244 East 117 LLC, East 117 Realty LLC, and 1661 PA Realty LLC (5280
1 Battery Park Plaza, Suite 3100
New York, New York 10004
Attention: Ephraim Diamond, Chief Restructuring Officer
Email: ephraim@arbelcapital.com

with a copy to

Backenroth Frankel & Krinsky, LLP
Attention: Mark A. Frankel.
800 Third Avenue, 11th Floor
New York, New York 10022
Email: mfrankel@bfklaw.com

*Proposed Counsel to the Debtors and Debtors in Possession*

and

Notice to the Guarantor

Sukenik, Segal & Graff, P.C.
Attention: David C. Segal
450 Seventh Avenue, 42nd floor
New York, New York  10123
212-725-9300
Email: davidsegal@ssglaw.com

*Counsel to the Guarantor*

</div>

and

Notice to LoanCore and the Successor Owners

LoanCore Capital Credit REIT LLC
c/o LoanCore Capital
55 Railroad Avenue, Suite 100
Greenwich, Connecticut  06830
Attention:  Brett Kaplan
Facsimile No.:  (203) 861-600
E-mail:  BKaplan@LoanCore.com

with a copy to

LoanCore Capital Credit REIT LLC
c/o LoanCore Capital
55 Railroad Avenue, Suite 100
Greenwich, Connecticut  06830
Attention:  Notices
E-mail:  notices@loancore.com

with a copy to

Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, New York 10019-9710
Attention:  Stephen Gliatta, Esq. and Benjamin Mintz, Esq.
Email: steve.gliatta@arnoldporter.com and Benjamin.Mintz@arnoldporter.com

*Counsel to the LoanCore and the Successor Owners*

14.10  **Governing Law**.  Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that a relevant document provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflicts of law of such jurisdiction.

14.11  **Reservation of Rights**.  Except as expressly set forth herein, this Plan shall have no force and effect unless the Bankruptcy Court has entered the Confirmation Order.  The filing of this Plan, any statement or provision contained in this Plan, or the taking of any action by the

38

Debtors in furtherance of seeking confirmation of this Plan shall not be and shall not be deemed to be an admission or waiver of any rights of the Debtors with respect to the Claimants, Interest Holders or the Related Persons of such entities.

## ARTICLE 15

## **MODIFICATIONS**

15.1    **Modification of Plan**.  The Debtors may seek amendments or modifications to the Plan in accordance with section 1127 of the Bankruptcy Code at any time prior to the Confirmation Date.  After the Confirmation Date, the Debtors may seek to remedy any defect or omission or reconcile any inconsistencies in the Plan or in the Confirmation Order, in such manner as may be necessary to carry out the purposes and intent of the Plan.  A Claimant that has accepted this Plan shall be deemed to have accepted this Plan as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim.

# ARTICLE 16

## CLOSING THE CASE

16.1    Upon substantial consummation, the Debtors may move for a final decree to close

the Bankruptcy Case and to request such other orders as may be just.

Dated:    New York, New York
          December 28, 2020

**DEBTORS:**

**203 W 107 STREET LLC**
**210 W 107 STREET LLC**
**220 W 107 STREET LLC**
**230 W 107 STREET LLC**
**124-136 EAST 117 LLC**
**215 EAST 117 LLC**
**235 EAST 117 LLC**
**244 EAST 117 LLC**
**231 EAST 117 LLC**
**EAST 117 REALTY LLC**
**1661 PA REALTY LLC,**
each a Delaware limited liability company


By:    _____
       Name: Ephraim Diamond
       Title: Chief Restructuring Officer

**EXHIBIT B TO THE RESTRUCTURING SUPPORT AGREEMENT**

**<u>Cash Collateral Order</u>**

(attached hereto)

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| 203 W 107 Street LLC, *et al.*, | Case No. _____ |
| Debtors.[1] | (Jointly Administered) |

**INTERIM ORDER (A) AUTHORIZING USE OF CASH COLLATERAL
(B) GRANTING ADEQUATE PROTECTION, (C) SCHEDULING
A FINAL HEARING, AND (D) GRANTING RELATED RELIEF**

Upon the motion (the "**Motion**")[2] of the above-captioned debtors and debtors and debtors-in-possession (collectively, the "**Debtors**") for entry of an interim order and a final order, pursuant to sections 105, 361, 362, 363, 506(c), 507(b), 552 and 553 of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 4001-2 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**"), seeking, among other things:

(a)    authorization for the Debtors to use Cash Collateral (as defined herein), and any proceeds thereof, for the interim period pending entry of a final order approving the Motion (the "**Final Order**");

---

[1]    The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: 203 W 107 Street LLC (8429); 210 W 107 Street LLC (3364), 220 W 107 Street LLC (0461), 230 W 107 Street LLC (3686), 124-136 East 117 LLC (6631), 215 East 117 LLC (6961), 231 East 117 LLC (0105), 235 East 117 LLC (8762), 244 East 117 LLC (1142), East 117 Realty LLC (1721) and 1661 PA Realty LLC (5280).. The location of the Debtors' service address is: 1 Battery Park Plaza, Suite 3100, New York, New York 10004, Attention: Isaac Kassirer

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

(b)        authorization to grant, as of the Petition Date (as defined below), adequate

protection as provided herein including the Adequate Protection Superpriority Claims and

Adequate Protection Liens (each as defined below), to the extent of and as compensation for any

Diminution in Value (as defined below), and to pay the Adequate Protection Fees (as defined

below);

(c)        modification by the Court of the automatic stay imposed by section 362 of the

Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of

this Interim Order and the Final Order;

(d)        the scheduling of a final hearing (the "**Final Hearing**") to consider entry of the

Final Order; and

(e)        waiver of any applicable stay (including under Bankruptcy Rule 6004) and

providing for the immediate effectiveness of this Interim Order; and upon notice of the Motion and

the interim hearing held before the Court on _____, 2020 (the "**Interim Hearing**") having been

provided by the Debtors; and it appearing that no other or further notice need be provided under

the circumstances; and the Court having reviewed the Motion; and upon the record made by the

Debtors in the Motion, in the *Declaration of Ephraim Diamond, as Chief Restructuring Officer in*

*Support of Chapter 11 Petitions and First Day Motions* (the "**First Day Declaration**") [Docket

No. __], and at the Interim Hearing; and the relief requested in the Motion being reasonable,

appropriate and in the best interests of the Debtors, their creditors, their tenants, their estates and

all other parties in interest in these Chapter 11 Cases (as defined below); and the Court having

determined that the relief requested granted herein is necessary to avoid immediate and irreparable

harm to the Debtors and their estates; and the Court having determined that the legal and factual

bases set forth in the Motion establish just cause for the relief granted herein; and upon no

objections to the Motion having been filed on the Court's ECF system; and after due deliberation and sufficient cause appearing therefor.

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[3]**

A.    *Disposition*.  The relief requested in the Motion is hereby granted on an interim basis, on the terms set forth below.  Any objections to the Motion that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled on the merits.  This Interim Order shall become effective immediately upon its entry.

B.    *Petition Date*. On December 28, 2020 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with this Court commencing these chapter 11 cases (the "**Chapter 11 Cases**").

C.    *Debtors in Possession*. The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date hereof, no party has requested the appointment of a trustee or examiner in these Chapter 11 Cases, and no committees have been appointed.

D.    *Jurisdiction and Venue.*  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the Southern District of New York, dated January 31, 2012 (C.J. Preska).  Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).  The Court may enter a final order consistent with Article III of the United States Constitution.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The predicates for the relief sought are sections 105, 361,

---

[3]    In accordance with Bankruptcy Rule 7052, any proposed finding of fact more properly classified as a proposed legal conclusion shall be deemed as such, and any proposed conclusion of law more properly classified as a proposed factual finding shall also be deemed as such.

362, 363, 506, 507, 552 and 553 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003,

6004 and 9014, and Local Rule 4001-2.

E.    *Notice*.  Notice of the Interim Hearing was provided to: (a) the Office of the United

States Trustee for the Southern District of New York, (b) the holders of the twenty (20) largest

unsecured claims against the Debtors on a consolidated basis, (c) all parties asserting a lien on or

a security interest in the assets of the Debtors to the extent reasonably known to the Debtors,

(d)  New York State Department of Taxation and Finance, (e) New York State Office of the

Attorney General and (f) any other party that filed a notice of appearance and request for service

Given the nature of the relief granted herein, the Court concludes that the foregoing notice

constitutes due, sufficient and appropriate notice under the circumstances and complies with

section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002 and 4001(b) and (d), and the

Local Rules.

F.    *Debtors' Representations.*  Without prejudice to the rights of any other party, but

in each case subject to the limitations contained in Paragraph 4 below, the Debtors represent,

admit, stipulate, and agree (collectively, the "**Stipulations**") as follows:

(i)    *Loan Documents*.  LoanCore Capital Credit REIT LLC ("Lender") is the

holder of (a) that certain mortgage loan in the principal amount of $91,920,000 made by

Lender to Debtors 203 W 107 Street LLC, 210 W 107 Street LLC, 220 W 107 Street LLC

and 230 W 107 Street LLC (collectively, "**107 Debtors**") and evidenced by that certain

Amended and Restated Loan Agreement dated as of April 17, 2018 (the "**107 Senior Loan

Agreement**"); (b) that certain mortgage loan in the principal amount of $4,180,000 made

by Lender to the 107 Debtors and evidenced by that certain Building Loan Agreement

dated as of April 17, 2018 (the "107 Building Loan Agreement" and together with the 107

4

Senior Loan Agreement and the related documents and agreements delivered in connection therewith, as each of the same may have been amended, modified, supplemented, replaced or assigned from time to time, the "**107 Loan Documents**"); (c) that certain mortgage loan in the principal amount of $85,685,000 made by Lender to Debtors 124-136 East 117 LLC, 215 East 117 LLC, 231 East 117 LLC, 235 East 117 LLC, 244 East 117 LLC, East 117 Realty LLC and 1661 PA Realty LLC, each a Delaware limited liability company (collectively, "**117 Debtors**") and evidenced by that certain Senior Mortgage Loan Agreement dated as of December 13, 2018 (the "**117 Senior Loan Agreement**"); and (d) that certain mortgage loan in the principal amount of $4,000,000 made by Lender to the 117 Debtors and evidenced by that certain Building Loan Agreement dated as of December 13, 2018 (the "**117 Building Loan Agreement**" and together with the 117 Senior Loan Agreement and the other related documents and agreements delivered in connection therewith, as each of the same may have been amended, modified, supplemented, replaced or assigned from time to time, the "**117 Loan Documents**"; and together with the 107 Loan Documents, the "**Loan Documents**").  Each of the 107 Loan Documents is valid, binding, and, subject to applicable bankruptcy law, enforceable against the 107 Debtors and each of the 117 Loan Documents is valid, binding, and, subject to applicable bankruptcy law, enforceable against the 117 Debtors.

(ii)     *Loan Obligations*.  As of the Petition Date, the 107 Debtors were justly and lawfully indebted and liable under the 107 Loan Documents, without defense, counterclaim, reduction or offset of any kind, in the aggregate principal amount of not less than $102,830,141.91, plus accrued and unpaid interests, fees, costs and expenses (including counsel, financial advisors, consultants, accountants, to the extent applicable,

5

chargeable or reimbursable under the 107 Loan Documents) with respect to each of the foregoing (the "**107 Loan Obligations**").  As of the Petition Date, the 117 Debtors were justly and lawfully indebted and liable under the 117 Loan Documents, without defense, counterclaim, reduction or offset of any kind, in the aggregate principal amount of not less than $100,245,624.57, plus accrued and unpaid interests, fees, costs and expenses (including counsel, financial advisors, consultants, accountants, to the extent applicable, chargeable or reimbursable under the 117 Loan Documents) with respect to each of the foregoing (the "**117 Loan Obligations**" and together with the 107 Loan Obligations, the "**Loan Obligations**").

(iii)    *Prepetition Liens*.  Pursuant to and as more particularly described in the 107 Loan Documents, the 107 Loan Obligations are secured by first priority liens and mortgages on, security interests in, and assignments and pledges of (collectively, the "107 Prepetition Liens"), all of the 107 Debtors' right, title, and interest in the real property and buildings located at 203 West 107th Street, New York, New York; 210 West 107th Street, New York, New York; 220 West 107th Street, New York, New York; and 230 West 107th Street, New York, New York; including all rents, interest and profits relating thereto and all of 107 Debtors' assets wherever located (to the extent provided in and as more fully described in the 107 Loan Documents, the "**107 Prepetition Collateral**"), subject to any other valid, perfected and unavoidable lien or security interest otherwise existing as of the Petition Date that is senior to the security interest of the Lender, to the extent such liens or security interests are valid, perfected and unavoidable liens or security interests existing as of the Petition Date and otherwise senior to the 107 Prepetition Liens as of the Petition Date.  Pursuant to and as more particularly described in the 117 Loan Documents, the 117

Loan Obligations are secured by first priority liens and mortgages on, security interests in, and assignments and pledges of (collectively, the "117 Prepetition Liens" and together with the 107 Prepetition Liens, the "Prepetition Liens"), all of the 117 Debtors' right, title, and interest in the real property and buildings located at 124-136 East 117th Street, New York, New York; 215 East 117th Street, New York, New York; 231 East 117th Street, New York, New York; 235 East 117th Street, New York, New York; 244 East 117th Street, New York, New York; 316, 322 and 326 East 117th Street, New York, New York; and 1661 Park Avenue New York, New York; including all rents, interest and profits relating thereto and all of 107 Debtors' assets wherever located (to the extent provided in and as more fully described in the 117 Loan Documents, the "**117 Prepetition Collateral**" and together with the 107 Prepetition Collateral, the "**Prepetition Collateral**"), subject to any other valid, perfected and unavoidable lien or security interest otherwise existing as of the Petition Date that is senior to the security interest of the Lender, to the extent such liens or security interests are valid, perfected and unavoidable liens or security interests existing as of the Petition Date and otherwise senior to the Prepetition 117 Liens as of the Petition Date.

(iv)    *Validity of Prepetition Liens and Prepetition Obligations.*  The 107 Prepetition Liens are (a) valid, binding, perfected, duly recorded and enforceable liens on, and security interests in, all of the 107 Debtors' respective right, title, and interest in, and to, the 107 Prepetition Collateral, and (b) not subject to, pursuant to the Bankruptcy Code or other applicable law (foreign or domestic), avoidance, disallowance, reduction, recharacterization, recovery, subordination (whether equitable, contractual, or otherwise), attachment, offset, recoupment, counterclaim, defense, "claim" (as defined in the Bankruptcy Code), impairment, or any other challenge of any kind by any person or entity.

7

The 117 Prepetition Liens are (a) valid, binding, perfected, duly recorded and enforceable liens on, and security interests in, all of the 117 Debtors' respective right, title, and interest in, and to, the 117 Prepetition Collateral, and (b) not subject to, pursuant to the Bankruptcy Code or other applicable law (foreign or domestic), avoidance, disallowance, reduction, recharacterization, recovery, subordination (whether equitable, contractual, or otherwise), attachment, offset, recoupment, counterclaim, defense, "claim" (as defined in the Bankruptcy Code), impairment, or any other challenge of any kind by any person or entity. Each Debtor irrevocably releases and waives, for itself and its estate, any right to challenge or contest in any way the scope, extent, perfection, priority, validity, non-avoidability, or enforceability of the Prepetition Liens or the validity, or enforceability of the Loan Documents or the validity, enforceability, or priority of payment of the Loan Obligations, and forever releases and waives, any claims, objections, challenges, counterclaims, causes of action, defenses, setoff rights, obligations, rights to subordinate, or any other liabilities, whether arising in equity or under the Bankruptcy Code or applicable nonbankruptcy law, against the Lender, or any of its respective affiliates, agents, attorneys, consultants, advisors, professionals, officers, directors, and employees from the beginning of time through the Petition Date.  The Prepetition Liens were granted to the Lender for fair consideration and reasonably equivalent value, and were granted in consideration of the making and/or continued making of loans, commitments, and/or other financial accommodations under the Loan Documents.  No portion of the Loan Obligations or any payments made to the Lender or applied to or paid on account of the obligations owing under the Loan Documents prior to the Petition Date is subject to any contest, attack, rejection, recovery, recoupment, reduction, defense, counterclaim, offset, subordination,

recharacterization, avoidance, or other claim, cause of action, or other challenge of any nature under the Bankruptcy Code or applicable nonbankruptcy law.

G.     *Cash Collateral*.  For purposes of this Interim Order, the term "Cash Collateral" shall be deemed to include, without limitation, all of each Debtor's "Cash Collateral" as defined under section 363 of the Bankruptcy Code, in which the Lender has valid, perfected security interests, liens or mortgages, regardless of whether such security interests, liens, or mortgages existed as of the Petition Date or arise thereafter pursuant to this Interim Order.

H.     *Adequate Protection for the Lender*.  As a result of the authorization for the Debtors' use of Cash Collateral and use of the Prepetition Collateral, the Lender is entitled to receive adequate protection pursuant to sections 361, 362, and 363 of the Bankruptcy for any diminution in the value, from and after the Petition Date, of their interests in the Cash Collateral and the Prepetition Collateral resulting from the automatic stay and/or from the Debtors' use of the Cash Collateral and the Prepetition Collateral.  As adequate protection, the Lender will receive the adequate protection described in this Interim Order (including as set forth in Paragraph 3 hereof).  In light of such adequate protection, the Lender has consented to the Debtors' use of the Cash Collateral, solely on the terms and conditions set forth in this Interim Order. The adequate protection provided herein and other benefits and privileges contained herein are consistent with and authorized by the Bankruptcy Code and are necessary to obtain such consent.

I.     *Section 552(b); Section 506(c)*.  Subject to entry of the Final Order, the Lender is entitled to a waiver of (a) any "equities of the case" exception under section 552(b) of the Bankruptcy Code, and (b) the Debtors' right to surcharge the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code.

J.      *Necessity of Relief Requested*.  Good cause has been shown for the entry of this Interim Order.  The Debtors have an immediate need to continue to use Cash Collateral to, among other things, fund the orderly operation of their buildings and properties (the "**Properties**"), pay their operating expenses, and preserve their going-concern value, consistent with the Budget.  In the absence of the availability of such liquidity in accordance with the terms hereof, the continued operation of the Properties would not be possible, and serious and irreparable harm to the Debtors, their estates, their creditors and their tenants would occur. The terms for the Debtors' use of Cash Collateral pursuant to this Interim Order are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and constitute reasonably equivalent value and fair consideration.  The Debtors have requested entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2) and (d). Absent granting the relief sought herein, the Debtors' estates would be immediately and irreparably harmed. The continued use of Cash Collateral in accordance with this Interim Order is therefore in the best interest of the Debtors and their estates, their creditors, their tenants and other parties in interest.

K.      *Use of Cash Collateral*.  All Cash Collateral and all proceeds of the Prepetition Collateral shall be used only for: (i) the expenses of maintaining and operating the Properties; (ii) other general corporate purposes of the Debtors; and (iii) the satisfaction of the costs and expenses of administering the Chapter 11 Cases, including, without limitation, payment of the Professionals (as defined below) and the Adequate Protection Fees, in each case solely to the extent set forth in the forecast of cash receipts and disbursements of the 107 Debtors and of the 117 Debtors, in each case on a consolidated basis, attached hereto as Exhibit A (as modified and extended from time to time with the consent of the Lender, the "***Budgets***") and subject to the terms and conditions of this Interim Order.

10

L.    *Need for Immediate Entry of this Interim Order*.  The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2).  The permission granted herein to use Cash Collateral (and provide adequate protection therefor) is necessary, essential, and appropriate to avoid immediate and irreparable harm to the Debtors.  The Court concludes that entry of this Interim Order is in the best interests of the Debtors' estates and creditors as its implementation will, among other things, allow the Debtors to preserve and maintain the value of the Properties.

Based upon the foregoing findings and conclusions, and upon the record made before the Court at the Interim Hearing, and good and sufficient cause appearing therefor;

**IT IS HEREBY ADJUDGED AND ORDERED** that:

1.    *Motion Granted*.  The Motion is granted on an interim basis in accordance with the terms and conditions set forth in this Interim Order.  Any objections to the Motion with respect to entry of this Interim Order to the extent not withdrawn, waived or otherwise resolved, and all reservations of rights included therein, are hereby denied and overruled.

2.    *Authorization to Use Cash Collateral*.  The Debtors are authorized to use Cash Collateral as set forth in this Interim Order commencing from the date hereof through and including (but not beyond) any Termination Date (as defined herein), subject to the terms and conditions of this Interim Order and solely in accordance with the Budget.

3.    *Adequate Protection for the Lender.*

(a)    Subject only to the terms of this Interim Order, pursuant to sections 361, 362, 363(c)(2), and 363(e) of the Bankruptcy Code and in consideration of the Stipulations and consents set forth herein, as adequate protection (the "**Adequate Protection Obligations**") for and solely to the extent of any diminution in the value, from and after the Petition Date, of the Lender's

interests in the Cash Collateral and the Prepetition Collateral ("**Diminution in Value**"), the

Debtors hereby grant to the Lender, an additional and replacement valid, binding, enforceable,

non-avoidable, and automatically perfected as of the Petition Date, postpetition security interest in

and lien (the "**Adequate Protection Liens**") on all of the right, title and interest of the Debtors

and their estates in, to, and under all property and rights and interests in property of each of the

Debtors of any kind or nature whatsoever in existence as of the Petition Date as well as thereafter

created or acquired, and wherever located, including without limitation, (a) all Prepetition

Collateral, (b) all accounts and accounts receivable, inventory, chattel paper, equipment, fixtures,

machinery, commercial tort claims, deposit accounts, instruments, documents, cash and cash

equivalents, investment property, books and records, rights, rebates, refunds, other claims under

and with respect to insurance policies, tax refunds, deposits, rebates, contract rights and other

general intangibles, security deposits, money and intercompany claims or receivables (whether or

not evidenced by notes) at any time owing to each Debtor, all real property, leaseholds, rents and

profits and proceeds thereof, all causes of action whether pursuant to federal or applicable state

law, and the proceeds thereof and property received thereby whether by judgment, settlement, or

otherwise (including, as of the entry of the Final Order, proceeds of any claim or cause of action

arising under or pursuant to chapter 5 of the Bankruptcy Code or under any other similar provisions

of applicable state, federal, or foreign law (including any other avoidance actions under the

Bankruptcy Code), and as to all of the foregoing, all rents, issues, products, proceeds (including

insurance policies), and profits of, from, or generated by any of the foregoing (collectively, the

"**Collateral**"), without the necessity of the execution by the Debtors (or recordation or other filing)

of security agreements, control agreements, pledge agreements, financing statements, mortgages,

or other similar documents.  The Adequate Protection Liens are subject or subordinate only to the

12

Carve-Out (as defined below).  Moreover, the Adequate Protection Liens shall not be subject or

subordinate to or made pari passu with (x) any lien or security interest that is avoided and preserved

for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code, (y) any

intercompany claim, whether secured or unsecured, of any Debtor, or (z) any other lien or security

interest under Bankruptcy Code sections 361 or 363 or otherwise except as expressly provided in

this Interim Order.

>    (b)    *Adequate Protection Superpriority Claims*.  The Lender is hereby

granted, subject only to the Carve-Out, an allowed superpriority administrative expense claim (the

"**Adequate Protection Superpriority Claim**") as provided for in section 507(b) of the

Bankruptcy Code, payable from and having recourse to all prepetition and postpetition property

of the Debtors and all proceeds thereof, whether by judgment, settlement, or otherwise including

the Collateral.  Subject only to the Carve-Out, the Adequate Protection Superpriority Claims shall

have priority over any and all other administrative expenses pursuant to the Bankruptcy Code

(including the kinds specified in or arising or ordered pursuant to sections 105(a), 326, 328, 330,

331, 503(b), 506(c) (subject to entry of the Final Order), 507, 546(c), 552(b) (subject to entry of

the Final Order), 726, and 1114 of the Bankruptcy Code or otherwise, whether or not such expenses

or claims may become secured by a judgment lien or other nonconsensual lien, levy, or attachment)

and all other claims against the Debtors or their estates in any of the Chapter 11 Cases or any

subsequently converted bankruptcy case(s) of any Debtors (the "**Successor Cases**"), at any time

existing or arising, of any kind or nature whatsoever.  The Adequate Protection Superpriority

Claim shall be against each Debtor on a joint and several basis and shall be payable from and have

recourse to the Collateral.  Other than the Carve-Out, no cost or expense of administration of the

Chapter 11 Cases shall be senior to, or *pari passu* with, any of the Adequate Protection Superpriority Claims.

       (c)   *Payment of Fees and Expenses*.  As further adequate protection, the Debtors shall pay in cash, without the need for the filing of formal fee applications, the reasonable professional fees, expenses, and disbursements (including, but not limited to, the fees, expenses, and disbursements of counsel and third-party consultants, including financial advisors and auditors) incurred by the Lender under the Loan Documents whenever arising (the "**<u>Adequate Protection Fees</u>**").  With respect to payments of Adequate Protection Fees incurred after the Petition Date, payment shall be made within ten (10) days (the "**<u>Review Period</u>**") after receipt by the Debtors, any committee and the U.S. Trustee of invoices therefor (the "**<u>Invoiced Fees</u>**") and without the necessity of filing formal fee applications.  The invoices for such Invoiced Fees shall include the total aggregate number of hours billed and a summary description of services provided and the expenses incurred by the applicable professional; *provided*, *however*, that any such invoice may be redacted to protect privileged, confidential or proprietary information.  The Debtors, the Committee and the U.S. Trustee may object to any portion of the Invoiced Fees (the "**<u>Disputed Invoiced Fees</u>**") within the Review Period by filing with the Court a motion or other pleading, on at least ten (10) days' prior written notice to the Lender of any hearing on such motion or other pleading, setting forth the specific objections to the Disputed Invoiced Fees.  The Debtors shall pay (i) any Invoiced Fees that are not Disputed Invoiced Fees within two (2) business days after expiration of the Review Period; and (ii) any Disputed Invoiced Fees within two (2) business days after approval by the Court by a final order requiring payment of any previously Disputed Invoiced Fees.

14

(d)   *Adequate Protection Reservation.*   The receipt by the Lender of the adequate protection provided herein shall not be deemed an admission that the interests of the Lender are adequately protected.   Further, this Interim Order shall not prejudice or limit the rights of the Lender to seek additional relief with respect to the use of Cash Collateral or for additional adequate protection, without prejudice to the Debtors' rights to contest the seeking of such relief by the Lender.

4.   *Effect of Stipulations on Third Parties.*

(a)   *Generally.*   The Debtors have admitted, stipulated, and agreed to the various stipulations and admissions contained in this Interim Order, including, without limitation, the Stipulations, which are and shall be binding upon the Debtors and any successors thereto (other than with respect to a successor Trustee appointed before the expiration of the Challenge Period (as defined below), which successor Trustee shall be bound by the Stipulations upon expiration of the Challenge Period, as provided in this paragraph) in all circumstances.   The stipulations and admissions contained in this Interim Order, including without limitation, the Stipulations, shall also be binding upon the Debtors' estates and all other parties in interest, including any official committee of unsecured creditors (the "**Committee**") or any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors (a "**Trustee**"), for all purposes no later than the date that is the earlier of (x) 60 days after the entry of the Final Order (or if no Committee is appointed, 75 days after the entry of the Final Order) or (y) the entry of an order confirming a plan for the Debtors (such time period established by the foregoing clauses (x) and (y), the "**Challenge Period**").   Nothing contained herein shall confer standing on behalf of the Committee or any other party in interest.

15

(b)      *Binding Effect.*   If no challenge or motion for standing, as applicable, is timely filed prior to the expiration of the Challenge Period, without further order of the Court:  (1) the Stipulations shall be binding on all parties in interest, including the Debtors' estates, the Committee, and any subsequently appointed Trustee, case fiduciary, or successors and assigns; (2) the Loan Obligations shall constitute allowed claims, not subject to counterclaim, setoff, subordination, recharacterization, defense or avoidance, for all purposes in these Chapter 11 Cases and any Successor Cases; (3) the Prepetition Liens on the Prepetition Collateral shall be deemed to have been, as of the Petition Date, to be, legal, valid, binding, perfected, and with the priority specified in the Stipulations, not subject to defense, counterclaim, recharacterization, subordination or avoidance; and (4) the Lender (and its agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors) shall not be subject to any other or further challenge by any Committee or any other party in interest, and any such Committee or party in interest shall be enjoined from seeking to exercise the rights of the Debtors' estates, including without limitation, any successor thereto (including, without limitation, any estate representative or a Trustee, whether such Trustee is appointed or elected prior to or following the expiration of the Challenge Period); *provided*, that if the Chapter 11 Cases are converted to chapter 7 or a Trustee is appointed prior to the expiration of the Challenge Period, any such estate representative or Trustee shall receive the full benefit of the later of (a) the expiration of the Challenge Period and (b) thirty (30) days from the appointment of such estate representative or Trustee, subject to the limitations described herein.  If any challenge or motion for standing, as applicable, is timely and properly filed prior to the expiration of the Challenge Period, the releases, stipulations and admissions contained in this Interim Order, including without limitation, in the Stipulations, of this Interim Order, shall nonetheless remain binding and preclusive on any Committee and any

16

other person, including any Trustee appointed in any Chapter 11 Case(s) or Successor Cases, as applicable, except as to any such findings and admissions that were expressly challenged in the original complaint initiating the adversary proceeding and excluding any amended or additional claims that may or could have been asserted thereafter through an amended complaint under FRCP 15 or otherwise.  This Interim Order shall be binding upon the Debtors, their estates, all parties in interest in the Chapter 11 Cases and their respective successors and assigns, including any Trustee or other fiduciary appointed in the Chapter 11 Cases or any Successor Cases and shall inure to the benefit of the Lender and the Debtors and their respective successors and assigns.

5.      *Section 506(c) Claims and 552(b) Equities*.  Subject to entry of the Final Order, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any Successor Cases at any time shall be charged against the  Lender, the Loan Obligations or the Prepetition Collateral, pursuant to section 506(c) of the Bankruptcy Code without the prior written consent of the Lender (and no such consent shall be implied from any other action, inaction or acquiescence by the Lender).   Subject to entry of the Final Order, the Lender shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under Bankruptcy Code section 552(b) shall not apply to the Lender with respect to proceeds, products, offspring or profits of any of the Prepetition Collateral.

6.      *Budget; Reporting.* The Debtors shall provide the Lender with weekly reporting of their actual expenses against the Budget and shall update the Budget every four weeks subject to the consent of the Lender.

7.      *Carve-Out*.

(a)   The Adequate Protection Liens and Adequate Protection Superpriority Claims shall be subject only to the right of payment of the following expenses (collectively, the "**Carve-Out**"):

(i)      statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6) with respect to the Debtors; and

(ii)      the reasonable fees and expenses actually incurred on or after the Petition Date, with respect to services performed solely with respect to the Debtors and that are allowed and payable by order of the Court under Bankruptcy Code sections 328, 330, 331, or 363, (collectively, the "**Allowed Professional Fees**"), by the attorneys, accountants, property manager and other professionals retained by the Debtors or the Committee (collectively, the "**Professionals**"), in a cumulative, aggregate sum of: (i) for the period prior to the occurrence of a Termination Event, an amount not to exceed the amount of professional fees set forth in the Budget, and (ii) for the time period following a Termination Event, allowed fees and expenses incurred by the Professionals retained by the Debtors in an aggregate amount not to exceed $25,000 (the aggregate amount of clauses (i) and (ii), collectively, the "**Carve-Out Cap**").

(b)   For the avoidance of doubt, to the extent the budgeted amounts for a Professional for any Budget period exceed the actual fees and expenses incurred by such Professional for that period, the excess may be carried forward to later Budget periods or backward to prior Budget periods to be applied to any fees or expenses that exceeded the budgeted amounts for such prior or later periods.

(c)   Notwithstanding the foregoing, no more than $10,000 of the proceeds of the Cash Collateral may be used by any Committee in connection with the investigation of, but not litigation, or any objection or challenge to, the Prepetition Liens or the Prepetition Obligations.

18

8.      *Lien Perfection*.  This Interim Order shall be sufficient and conclusive evidence of the validity, perfection and priority of the Adequate Protection Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the Adequate Protection Liens or to entitle the Adequate Protection Liens to the priorities granted herein.  Notwithstanding the foregoing, the Lender may, in its sole discretion, file such financing statements, mortgages, security agreements, notices of liens and other similar documents, and is hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, mortgages, security agreements, notices and other agreements or documents shall be deemed to have been filed or recorded at the time and on the date of the commencement of the Chapter 11 Cases.  The Lender may, in its sole discretion, file a photocopy of this Interim Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which any Debtor has real or personal property and, in such event, the subject filing or recording officer shall be authorized to file or record such copy of this Interim Order.

9.      *Payment Free and Clear.*  Subject to and effective up entry of the Final Order except solely to the extent of the Carve-Out, any and all payments or proceeds remitted to the Lender pursuant to the provisions of this Interim Order or any subsequent order of the Court shall be irrevocable, received free and clear of any claim, charge, assessment, or other liability, including, without limitation and subject to entry of the Final Order, any such claim or charge arising out of or based on, sections 506(c) (whether asserted or assessed by, through or on behalf of the Debtors) or 552(b) of the Bankruptcy Code.

19

10.    *Termination Events*.  The Debtors' right to use Cash Collateral shall automatically terminate (the date of such termination, the "**Termination Date**"), without further notice or court proceeding, on the earliest to occur of any of the events set forth below (each such event, a "**Termination Event**"), in each case unless waived in writing by the Lender:

(a)   entry of an order of this Court terminating Debtors' right to use Cash Collateral;

(b)   this Interim Order ceasing to be in full force and effect;

(c)   failure of the Debtors to abide by the terms, covenants, and conditions of this Interim Order or the Budget;

(d)   the dismissal of any of these Chapter 11 Cases, the conversion of any of these Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or the appointment in any of these Chapter 11 Cases of a trustee or examiner;

(e)   an order of the Court is entered reversing, staying, vacating, or otherwise modifying the terms of this Interim Order;

(f)   The Court shall not have entered the Final Order within thirty (30) days of the Petition Date, or such later date to which the Lender agrees in writing;

(g)   the Restructuring Support Agreement (as defined in the Motion) is terminated;

(h)   The Court shall have not approved the Disclosure Statement (as defined in the Motion) within forty-five (45) days of the Petition Date, or such later date to which the Lender agrees in writing;

(i)   The Court shall not have entered the order confirming the Chapter 11 Plan within ninety (90) days of the Petition Date, or such other date to which the Lender agrees in writing;

20

(j)     The Debtors shall not have engaged, within three (3) days of the Petition Date, one or more property managers acceptable to the Lender (the "**Property Managers**"), pursuant to property management agreements acceptable to Lender (the "**Property Management Agreements**"), to manage the Properties;

(k)     The Property Managers shall have been terminated or otherwise fail to manage the Properties in accordance with the Property Management Agreements, or the Property Management Agreements shall have been modified, in either case without the consent of the Lender;

(l)     The failure by the Debtor to obtain Lender's prior consent or approval with respect to any material action taken or consent or approval given by Debtors under the Property Management Agreement (including, but not limited to, with respect to material repairs, entering into or enforcing contracts and leases, insurance claims and other Claims (as defined in the Property Management Agreements); or

(m)    The effective date of the Chapter 11 Plan shall not have occurred within one-hundred and four (104) days of the Petition Date, or such later date to which the Lender agrees in writing.

11.     *Exculpation*.   Nothing in this Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon the Lender of any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their business, or in connection with their liquidation efforts.   So long as the Lender complies with its obligations under this Interim Order and its obligations, if any, under applicable law (including the Bankruptcy Code), (a) the Lender shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the Prepetition Collateral, (ii) any loss or damage thereto occurring or arising in

21

any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person and (b) all risk of loss damage or destruction of the Prepetition Collateral shall be borne by the Debtors.

      12.    *Miscellaneous.*

      (a)  *Binding Effect*.  The provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in the Chapter 11 Cases, including, without limitation, the Lender, the Debtors, and their respective successors and assigns (including any trustee hereinafter appointed or elected for the estate of any Debtor, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the Lender and the Debtors and their respective successors or assigns.

      (b)  *Modification of Automatic Stay*.  The Debtors are authorized and directed to perform all acts and to make, execute and deliver any and all instruments as may be reasonably necessary to implement the terms and conditions of this Interim Order and the transactions contemplated hereby.  The automatic stay of section 362 of the Bankruptcy Code is hereby modified to permit the Debtors and the Lender to accomplish the transactions contemplated by this Interim Order.

      (c)  *Headings*.  The headings in this Interim Order are for purposes of reference only and shall not limit or otherwise affect the meaning of this Interim Order.

      (d)  *Effectiveness*.  This Interim Order shall constitute findings of fact and conclusions of law and shall take effect immediately upon entry hereof, and there shall be no stay

of execution of effectiveness of this Interim Order.  To the extent that any finding of fact shall be determined to be a conclusion of law, it shall be so deemed and vice versa.

(e)  *No Third Party Rights*.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third-party, creditor, equity holder or any direct, indirect, third-party or incidental beneficiary.

(f)  *Survival of Interim Order*. The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (i) confirming any chapter 11 plan of liquidation in the Chapter 11 Cases, (ii) converting any of the Chapter 11 Cases to a Successor Case, (iii) to the extent authorized by applicable law, dismissing any of the Chapter 11 Cases, (iv) withdrawing of the reference of any of the Chapter 11 Cases from the Court, or (v) providing for abstention from handling or retaining of jurisdiction of any of the Chapter 11 Cases in the Court.

(g)  *Controlling Effect of Interim Order*.  To the extent any provision of this Interim Order conflicts or is inconsistent with any provision of the Motion, the provisions of this Interim Order shall control to the extent of such conflict.

(h)  *Order Immediately Effective.* Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order are effective immediately and enforceable upon its entry.

(i)  *Debtor Authorization to Effectuate Relief*.  The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Interim Order in accordance with the Motion.

(j)    *Exclusive Jurisdiction*.  This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Interim Order.

13.    *Proofs of Claim*.  Notwithstanding the entry of an order establishing a bar date in any of these Chapter 11 Cases, or the conversion of these Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, the Lender shall not be required to file proofs of claim in any of the Chapter 11 Cases or any Successor Cases with respect to any of the Loan Obligations, Adequate Protection Obligations, Adequate Protection Liens, Adequate Protection Superpriority Claim, or any other claims or liens granted hereunder or created hereby.  The Lender is hereby authorized and entitled, in its sole and absolute discretion, but in no event is required, to file (and amend and/or supplement, as it sees fit) proofs of claim in each of the Chapter 11 Cases in respect of the Loan Obligations. Any order entered by the Bankruptcy Court in relation to the establishment of a bar date in any of the Chapter 11 Cases will so provide.

14.    *Controlling Effect of this Interim Order*.  To the extent any provision of this Interim Order conflicts or is inconsistent with any provision of the Motion, the provisions of this Interim Order shall control.

15.    *Final Hearing*.  The final hearing (the "**Final Hearing**") on the Motion shall be held on _____, 2020 at ___, prevailing Eastern Time.  The Debtors shall, on or before ___, 2020, cause to be mailed copies of a notice of the entry of this Interim Order, together with a copy of this Interim Order and a copy of the Motion, to the parties having been given notice of the Interim Hearings, to any party that has filed prior to such date a request for notices with this Court, and to counsel for the Committee, if any.  Any objections or responses to entry of a final order on the Motion shall be filed on or before 4:00 p.m., prevailing Eastern Time, on [_____], and shall

24

be served on: (a) proposed counsel to the Debtors, Backenroth Frankel & Krinsky, LLP, 800 Third

Avenue, Floor 11, New York, New York 10022, Attn: Mark Frankel, (b) counsel to the Lender,

Arnold & Porter Kaye Scholer LLP, 250 West 55th Street, New York, New York 10019, Attn:

Benjamin Mintz and (c) the Office of the United States Trustee, 201 Varick Street, Suite 1006,

New York, New York 10014, Attn: _____.


Dated: _____, 2020
         New York, New York                    _____
                                                UNITED STATES BANKRUPTCY JUDGE

## EXHIBIT A

BUDGET

**EXHIBIT C TO THE RESTRUCTURING SUPPORT AGREEMENT**

**<u>Disclosure Statement</u>**

(attached hereto)

THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE COURT.  THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| 203 W 107 Street LLC, *et al.*, | Case No. _____(__) |
| Debtors.[1] | (Joint Administration Pending) |

JOINT DISCLOSURE STATEMENT FOR THE
JOINT PLAN OF LIQUIDATION OF THE DEBTORS

THIS DISCLOSURE STATEMENT IS BEING SUBMITTED TO ALL CLAIMANTS AND PARTIES IN INTEREST OF THE CHAPTER 11 BANKRUPTCY ESTATES OF 203 W 107 STREET LLC, 210 W 107 STREET LLC, 220 W 107 STREET LLC, 230 W 107 STREET LLC, 124-136 EAST 117 LLC, 215 EAST 117 LLC, 231 EAST 117 LLC, 235 EAST 117 LLC, 244 EAST 117 LLC, EAST 117 REALTY LLC, AND 1661 PA REALTY LLC (EACH, A "**DEBTOR**" AND COLLECTIVELY, THE "**DEBTORS**"). THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY AFFECT CLAIMANTS' DECISIONS TO ACCEPT OR REJECT THE JOINT PLAN OF LIQUIDATION FOR THE DEBTORS.

ALL CLAIMANTS ARE URGED TO CAREFUULLY READ THIS DISCLOSURE STATEMENT.  ALL CAPITALIZED TERMS NOT DEFINED IN THIS DISCLOSURE STATEMENT SHALL HAVE THE SAME MEANINGS ASCRIBED TO THEM AS CAPITALIZED TERMS CONTAINED IN THE JOINT PLAN OF LIQUIDATION OF THE DEBTORS ANNEXED TO THIS DISCLOSURE STATEMENT AS EXHIBIT A (THE "**PLAN**").

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: 203 W 107 Street LLC (8429); 210 W 107 Street LLC (3364), 220 W 107 Street LLC (0461), 230 W 107 Street LLC (3686), 124-136 East 117 LLC (6631), 215 East 117 LLC (6961), 231 East 117 LLC (0105), 235 East 117 LLC (8762), 244 East 117 LLC (1142), East 117 Realty LLC (1721) and 1661 PA Realty LLC (5280).  The location of the Debtors' service address is: 1 Battery Park Plaza, Suite 3100, New York, New York 10004, Attention: Ephraim Diamond, as Chief Restructuring Officer.

**ALTHOUGH THESE CASES HAVE NOT BEEN SUBSTANTIVELY CONSOLIDATED AS OF THE DATE HEREOF, DEBTOR 203 W 107 STREET LLC IS PROPOSING THAT THE DEBTORS, ON A LIMITED BASIS, BE SUBSTANTIVELY CONSOLIDATED SOLELY FOR PURPOSES OF VOTING ON THE PLAN, MAKING DISTRIBUTIONS UNDER THE PLAN AND CONFIRMATION.  THIS DISCLOSURE STATEMENT COVERS ONE PLAN THAT WILL BE OPERATIVE FOR ALL OF THE DEBTORS.**

**THIS DISCLOSURE STATEMET FORMS PART OF THE DEBTORS' SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.  THIS DISCLOSURE STATEMENT WAS APPROVED BY ORDER OF THE BANKRUPTCY COURT DATED [_____].**

**COURT APPROVAL OF THE DISCLOSURE STATEMENT DOES NOT CONSTITUTE COURT APPROVAL OF THE TERMS OF THE PLAN.**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ............................................................................................... 1

II.     GENERAL INFORMATION REGARDING THE DEBTORS ....................................... 4

      A.     The Debtors' Properties ............................................................................. 4

      B.     Claims Against and Interests in the Debtors .............................................. 5

      C.     Filing of the Bankruptcy Case and Significant Events During the
            Bankruptcy Case ...................................................................................... 8

III.    SUMMARY OF THE PLAN ............................................................................... 9

      A.     General Summary ...................................................................................... 9

      B.     Limited Substantive Consolidation ........................................................... 9

      C.     Classification and Treatment Under the Plan ........................................... 10

      D.     Administrative Expense Claims, Priority Tax Claims, Professional Fee
            Claims, and U.S. Trustee Fees ............................................................... 14

      E.     Distributions And Means For Implementation Of The Plan ....................... 14

      F.     Treatment Of Unexpired Leases And Executory Contracts ....................... 15

      G.     Preference Claims and Other Causes of Action ....................................... 16

      H.     Other Significant Plan Provisions ........................................................... 17

      I.      Confirmation And Effectiveness of The Plan .......................................... 21

      J.      Confirmation Of The Plan ...................................................................... 24

      K.     Best Interests Test .................................................................................. 24

      L.     Confirmation Over The Objection of An Impaired Class ........................... 25

IV.     LIQUIDATION ANALYSIS ............................................................................ 25

V.      RISK FACTORS TO BE CONSIDERED .......................................................... 25

VI.     CERTAIN TAX CONSEQUENCES ................................................................. 26

VII.    RETENTION OF JURISDICTION .................................................................. 26

VIII.   VOTING INSTRUCTIONS AND PROCEDURES ............................................... 28

IX.     CONCLUSION ............................................................................................ 29

# I.    **INTRODUCTION**

The Debtors submit this Joint Disclosure Statement (the "<u>Disclosure Statement</u>") in connection with the solicitation of acceptances for the Plan under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>").  A copy of the Plan is attached hereto as Exhibit A.  All Claimants are urged to review the Plan, in addition to reviewing this Disclosure Statement.  All capitalized terms used but not defined in the Disclosure Statement shall have the meanings ascribed to them in the Plan.  The terms of the Plan shall govern in the event of any inconsistency with the summaries of the Plan set forth in this Disclosure Statement.

On December 28, 2020 (the "<u>Petition Date</u>"), the Debtors commenced these chapter 11 cases by filing voluntary petitions for relief in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>") under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date hereof, no party has requested the appointment of a trustee or examiner in these chapter 11 cases, and no committees have been appointed.

On account of indebtedness and obligations owed by the Debtors to LoanCore Capital Credit REIT LLC ("<u>LoanCore</u>") pursuant to the LoanCore Mortgage and all loan documents related thereto (the "<u>LoanCore Loan Documents</u>"), LoanCore holds a perfected first lien on the 107 Properties securing the 107 Mortgage Claim, which is in an amount of not less than $102,830,141.91 as of the Petition Date, an amount in excess of the value of the 107 Properties.

On account of indebtedness and obligations owed by the 117 Street Debtors to LoanCore pursuant to the LoanCore Mortgage and the LoanCore Loan Documents, LoanCore holds a perfected first lien on the 117 Properties securing the 117 Mortgage Claim, which is in an amount not less than $100,245,624.57 as of the Petition Date, an amount in excess of the value of the 117 Properties.

The Plan's key elements are as follows:

- The Successor Owners (entities designated, owned and controlled by LoanCore) shall receive title to the Properties and the Assets free and clear of all Claims, Liens, charges, interests and encumbrances other than the Permitted Encumbrances and the New Mortgages (collectively, the "<u>Property Transfer</u>").

- The Successor Owners shall pay the Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Claims, and Allowed General Unsecured Claims (without pre-petition interest or post-petition interest) provided, however, that the aggregate amount of consideration to be distributed by the Successor Owners on account of Allowed General Unsecured Claims shall not exceed $670,000.00.  If the aggregate of Allowed General Unsecured Claims exceeds $670,000.00, holders of Allowed General Unsecured Claims will receive their pro rata share of $670,000.00.  To the extent necessary, LoanCore will contribute sufficient funds to the Successor Owners to pay such amounts.

- The Debtors are assuming the Tenant Leases and assigning them to the Successor Owners. The Successor Owners are assuming all obligations of the Debtors as landlord under all of the assigned Tenant Leases from and after the Effective Date and shall pay all Cure costs that may be due in connection with the assumption and assignment of the Tenant Leases.

- Under Section 10.5 of the Plan, LoanCore, the Successor Owners, and the New Mortgage Lender are granting a release in favor of the Debtors, the Mezzanine Borrowers, the Guarantor, the Affiliated Property Manager, and their respective Related Persons. Under Section 10.6 of the Plan, the Debtors, the Mezzanine Borrowers, the Guarantor, and the Affiliated Property Manager are granting a release in favor of LoanCore, the Successor Owners, the New Mortgage Lender, and their respective Related Persons.

The Debtors believe that their Plan is confirmable and is in the best interests of all Claimants, who will likely receive a 100% cash recovery on their Allowed Claims (without pre-petition interest or post-petition interest on the Allowed Unsecured Claims) on or promptly following the Effective Date (or promptly following allowance of their Claim), provided, however, that the aggregate amount of consideration to be distributed by the Successor Owners on account of Allowed General Unsecured Claims shall not exceed $670,000.00. If the aggregate of Allowed General Unsecured Claims exceeds $670,000.00, holders of Allowed General Unsecured Claims will receive their pro rata share of $670,000.00. Additionally, all Tenant Leases are assumed and assigned to the Successor Owners under the Plan. Further, in the Debtors' view, the treatment of Claims under the Plan provides a greater and more certain recovery than that which is likely to be achieved under other reorganization or liquidation alternatives.

THE DEBTORS URGE YOU TO VOTE TO ACCEPT THE PLAN. THE DEBTORS' GOAL IS FOR ALL CREDITOR CLASSES TO ACCEPT THE PLAN. IF ALL CREDITOR CLASSES DO NOT ACCEPT THE PLAN, THE DEBTORS MAY SEEK TO CONFIRM THE PLAN OVER THE OBJECTION OF ANY CLASS UNDER SECTION 1129(b) OF THE BANKRUPTCY CODE AS MAY BE NECESSARY TO EFFECT CONFIRMATION OF THE PLAN.

This Disclosure Statement is not intended to replace a review and analysis of the Plan. Rather, it is submitted as a review of the Plan in an effort to explain the Plan. To the extent a Creditor has any questions, the Debtors urge you to contact Debtors' counsel, Mark Frankel, Esq. at (212) 593-1100 and every effort will be made to assist you. You should also consider consulting your own lawyer to obtain more specific advice on how the Plan may affect you and what is the best course of action for you.

On [_____], after notice and a hearing, the Bankruptcy Court entered an order approving this Disclosure Statement as containing information of a kind and in sufficient detail in light of the nature and history of the Debtors and the condition of the Debtors' books and records, to enable Claimants whose votes are being solicited to make an informed judgment whether to accept or reject the Plan.

EXCEPT AS SET FORTH IN THIS DISCLOSURE STATEMENT, NO REPRESENTATION CONCERNING THE DEBTORS, THEIR ASSETS, THEIR PAST OR FUTURE OPERATIONS, OR THE PLAN ARE AUTHORIZED, NOR ARE ANY SUCH REPRESENTATIONS TO BE RELIED UPON IN ARRIVING AT A DECISION WITH RESPECT TO THE PLAN.

CLAIMANTS SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN AND THE INSTRUCTIONS ACCOMPANYING THE VOTING BALLOTS IN THEIR ENTIRETY PRIOR TO VOTING ON THE PLAN IN THE BANKRUPTCY CASE.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFICED, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.  **ALL CLAIMANTS SHOULD CAREFULLY READ THE "RISK FACTORS" SECTION OF THIS DISCLOSURE STATEMENT LOCATED IN ARTICLE VI BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**  No solicitation of votes may be made except pursuant to this Disclosure Statement.

IMPORTANTLY, ALL HOLDERS OF CLAIMS IN CLASS 4 OF THE PLAN WHO DO NOT ELECT TO OPT OUT OF GRANTING THE RELEASES CONTAINED IN SECTION 10.2 OF THE PLAN ARE INCLUDED IN THE DEFINITION OF "RELEASING CREDITORS" AND WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS, LOANCORE, THE SUCCESSOR OWNERS, THE NEW MORTGAGE LENDER, THE PROPERTY MANAGERS, AND THE AFFILIATED PROPERTY MANAGER AND THEIR RESPECTIVE RELATED PERSONS.

This Disclosure Statement has been prepared in accordance with section 1125 of the Bankruptcy Code and Rule 3016 of the Federal Rules of Bankruptcy Procedure and not necessarily in accordance with other applicable laws.  Persons or entities trading in or otherwise purchasing, selling, or transferring Claims or Interests of the Debtors should evaluate this Disclosure Statement and the Plan in light of the purposes for which they were prepared.  The information in this Disclosure Statement is being provided solely for purposes of voting to accept or reject the Plan. It is the Debtors' position that nothing in this Disclosure Statement may be used by any entity for any other purpose. as to contested matters, existing litigation involving, or possible additional litigation to be brought by, or against, the Debtors and other actions or threatened actions.  This Disclosure Statement, Plan and any related documents thereto shall not constitute or be construed as an admission of any fact or liability, a stipulation, or a waiver, but rather as statements made without prejudice solely for settlement purposes, with full reservation of rights, and are not to be used for any litigation purpose whatsoever by any person, party, or entity.  As such, this Disclosure Statement, the Plan and any related documents thereto shall not be admissible in any non-bankruptcy proceeding involving the Debtors or any other party in interest, nor shall this Disclosure Statement, the Plan and any related documents thereto be construed to be conclusive advice on the tax, securities, financial, or other effects of the Plan as to holders of Claims against, or Interests in, the Debtors.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN SUPPLIED BY THE DEBTORS. THE DEBTORS' BOOKS AND RECORDS HAVE BEEN USED TO PROVIDE THE INFORMATION CONCERNING THE DEBTORS' FINANCIAL CONDITION AS SET FORTH IN THE DISCLOSURE STATEMENT. BASED UPON THE INFORMATION MADE AVAILABLE, DEBTORS' COUNSEL HAS NO INFORMATION TO INDICATE THAT THE INFORMATION DISCLOSED HEREIN IS INACCURATE. THE DEBTORS REASONABLY BELIEVE THAT THE INFORMATION CONTAINED HEREIN IS TRUE AND CORRECT. NEITHER THE DEBTORS NOR DEBTORS' COUNSEL, HOWEVER, IS ABLE TO STATE DEFINITIVELY THAT THERE IS NO INACCURACY HEREIN OR THAT FUTURE EVENTS MAY NOT RENDER THE INFORMATION CONTAINED HEREIN INACCURATE. TO THE EXTENT THAT SUCH INFORMATION IS DISCOVERED, THE DEBTORS SHALL MAKE SUPPLEMENTAL DISCLOSURES AS REQUIRED.

After reviewing this Disclosure Statement, please indicate your vote to accept or to reject the Plan on the enclosed ballot, and return the ballot: (i) by U.S. mail to Mark Frankel, 800 Third Avenue, Floor 11, New York, NY 10022; or (ii) by email to mfrankel@bfklaw.com so as to be received on or before ___ p.m. on _____, 2021.  LATE BALLOTS WILL NOT BE COUNTED.

The Bankruptcy Court has entered an Order fixing February ___, 2021 at ___ a.m./p.m., at the United States Bankruptcy Court, One Bowling Green, New York, NY 10004, as the date, time and place for the hearing on confirmation of the Plan and fixing ___ p.m. on _____ ___, 2021, as the last date for the filing and serving of any objections to confirmation of the Plan.  A copy of any objection to confirmation of the Plan must be filed with the Court, a copy delivered to Judge _____ chambers by email to _____, served on Debtors' counsel by email at mfrankel@bfklaw.com, counsel to LoanCore by email at benjamin.mintz@arnoldporter.com, and a copy delivered to counsel for the U.S. Trustee by email at _____ on or before such date.  UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY FILED AND SERVED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

## II.   GENERAL INFORMATION REGARDING THE DEBTORS

### A.   The Debtors' Properties

The Debtors own multi-family residential buildings on 107th Street and 117th Streets in Manhattan.  203 W 107 Street LLC, 210 W 107 Street LLC, 220 W 107 Street LLC and 230 W 107 Street LLC (collectively, the "107th Street Debtors") own the properties at 203 West 107th Street, New York, New York; 210 West 107th Street, New York, New York; 220 West 107th Street, New York, New York; and 230 West 107th Street, New York, New York (collectively, the "107 Properties").  124-136 East 117 LLC, 215 East 117 LLC, 231 East 117 LLC, 235 East 117 LLC, 244 East 117 LLC, East 117 Realty LLC and 1661 PA Realty LLC (collectively, the "117 Street Debtors") own the properties at 124-136 East 117th Street, New York, New York; 215 East 117th Street, New York, New York; 231 East 117th Street, New York, New York; 235 East 117th Street, New York, New York; 244 East 117th Street, New York, New York; 316, 322 and 326 East 117th Street, New York, New York; and 1661 Park Avenue New York, New York (collectively,

4

the "117 Properties," with the 107 Properties, the "Properties"). Currently, there are several hundred tenants residing in the Properties.

**B.**     **Claims Against and Interests in the Debtors**

         *1.     LoanCore Mortgage Claim*

         Pursuant to: (i) that certain Consolidated, Amended and Restated Mortgage, Assignment of Leases and Rents and Security Agreement dated March 6, 2018 for the benefit of Loan Core and recorded on March 13, 2018 in the City Register of New York County, New York (the "Register's Office") as CRFN 2018000086032, as re-recorded on May 3, 2018 in the City Register of New York County, New York as CRFN 2018000148285, in the Register's Office, (ii) that certain Building Loan Mortgage, Assignment of Leases and Rents and Security Agreement dated April 17, 2018 by for the benefit of LoanCore, and recorded on April 26, 2018 in the Register's Office as CRFN 2018000138878, (iii) that certain Consolidated, Amended and Restated Senior Mortgage Loan Mortgage, Assignment of Leases and Rents and Security Agreement dated December 13, 2018, for the benefit of LoanCore and recorded on January 30, 2019 in the Register's Office as CRFN 2019000034853, and (iv) that certain Building Loan Mortgage, Assignment of Leases and Rents and Security Agreement dated December 13, 2018, for the benefit of LoanCore and recorded on January 30, 2019 in the Register's Office as CRFN 2019000192282, LoanCore holds a first mortgage on the Debtors' Properties (the "LoanCore Mortgage"). In connection with the LoanCore Mortgage, LoanCore holds a perfected first lien on the Properties.

         LoanCore holds two mortgage loans in the total principal amount of $95,000,000 against the 107th Street Debtors secured by the 107 Properties (the "107 Mortgage Claim"), and two mortgage loans in the total principal amount of $89,685,000 against the 117 Street Debtors secured by the 117 Properties (the "117 Mortgage Claim," together with the 107 Mortgage Claim, the "LoanCore Mortgage Claim"). The Debtors are in default on the LoanCore Mortgage. On November 22, 2019, the Lender sent notices to the Debtors accelerating the LoanCore Mortgage making the LoanCore Mortgage Claim immediately due and payable to LoanCore.

         The 107 Mortgage Claim asserted by LoanCore against the 107th Street Debtors is in an amount not less than $102,830,141,91 as of the Petition Date plus post-petition interest calculated at the default rate under the LoanCore Mortgage from the Petition Date through the Effective Date plus LoanCore's out of pocket expenses, including LoanCore's reasonable professional fees and expenses.

         The 117 Mortgage Claim asserted by LoanCore against the 117 Street Debtors is in an amount not less than $100,245,624.57 as of the Petition Date plus post-petition interest calculated at the default rate under the LoanCore Mortgage from the Petition Date through the Effective Date plus LoanCore's out of pocket expenses, including LoanCore's reasonable professional fees and expenses.

2.      *Other Claims*

In addition to the 107th Street Debtors' indebtedness to LoanCore, upon information and belief, other Unsecured Claims asserted by Claimants against the 107th Street Debtors total approximately $376,295.48 (the "107 Unsecured Claims")..

In addition to the 117 Street Debtors' indebtedness to LoanCore, upon information and belief, other Unsecured Claims asserted by Claimants against the 117 Street Debtors total approximately $289,457.04 (the "117 Unsecured Claims").

Pursuant to the Plan, the Successor Owners will pay the Allowed 107 Unsecured Claims and the Allowed 117 Unsecured Claims in full (without pre-petition interest or postpetition interest), provided, however, that the aggregate amount of consideration to be distributed by the Successor Owners on account of Allowed General Unsecured Claims shall not exceed $670,000.00. If the aggregate of Allowed General Unsecured Claims exceeds $670,000.00, holders of Allowed General Unsecured Claims will receive their pro rata share of $670,00.00. For the avoidance of doubt, the Mezzanine Borrowers, the Guarantor, and their Related Persons are releasing all claims against the Debtors pursuant to section 10.7 of the Plan and thus will not receive any distribution or payment under the Plan.

3.      *The 107th Street Debtors' Corporate Structure*

A corporate structure chart for the 107th Street Debtors is attached to the Disclosure Statement as Exhibit B. West 107 Realty Holdings LLC, a New York limited liability company ("West 107 Realty"), is the parent holding company of West 107 Mezz LLC, a Delaware limited liability company ("West 107 Mezz"). West 107 Mezz is 100% owned by West 107 Realty and is a holding company that owns 100% of the 107th Street Debtors.

4.      *The 117 Street Debtors Corporate Structure*

A corporate structure chart for the 117 Street Debtors is attached to the Disclosure Statement as Exhibit C. 1661-1663 PA LLC, a New York limited liability company ("PA LLC"), is the parent holding company of EEG HGI LLC, a Delaware limited liability company ("EEG"). EEG is 100% owned by PA LLC and is a holding company that owns 100% of the 117 Street Debtors. Events Leading to the Filing of the Bankruptcy Case.

5.      *Conversion/Renovation Plans and Disputes with Tenants*

The 107th Street Debtors purchased the 107 Properties in December 2016 to effectuate condominium conversions. The 117th Street Debtors purchased the 117 Properties in March 2018 to make renovations to vacant apartments to increase the rent rolls. Both well-laid plans were stymied by the passage of the New York Housing Stability and Tenant Protection Act of 2019 ("HSTPA").

Under HSTPA, the number of tenants in a building that must consent to a condominium conversion was greatly increased from 15% to 51%. As a result, all condominium conversions in the city, including the 107th Street Debtors planned conversions, were effectively blocked. HSTPA also reduced the allowable increase in rents based on apartment and building

6

improvements effectively making the 117 Street Debtors' planned renovations similarly unprofitable.

Unfortunately, by the time HSTPA was enacted, the Debtors had already sunk significant borrowed money into the Debtors including through initiating construction and tenant buyouts to implement their business plans. These actions necessarily involved affirmatively increasing apartment vacancies thus decreasing current income. Meanwhile, many tenants opposed the Debtors' plans for the Properties, with some taking active measures to hamper the Debtors' plans, including by being uncooperative regarding necessary building-wide maintenance items, and a rent strike organized by tenants' counsel, Kellner Herlihy Getty & Friedman LLP ("KHGF"), ensued (the "Rent Strike"). In connection with the Rent Strike, beginning in summer 2019 and continuing thereafter, many tenants withheld their rent payments and instead paid their monthly rent into certain trust and/or IOLTA accounts managed by KHGF (the "Trust Accounts").

As of January 21, 2020, KHGF held in the Trust Accounts approximately $283,000.00 of rents owed by tenants residing at the Properties to the Debtors (the "Debtors' Rents"). Further, the Debtors know neither the status of the Debtors' Rents presently held in the Trust Accounts nor whether KHGF has collected any further additional Debtors' Rents (and if so, how much) (the "Additional Debtors' Rents," together with the Debtors' Rents, the "Withheld Rents"). None of the Withheld Rents have been released to the Debtors, although some of those funds were paid (without the Debtors' agreement) to KHGF or disbursed to the tenants. In addition to the Debtors' loss of income from the Rent Strike, to make matters worse, the pandemic struck and rent collections dropped further.

As of the Petition Date, the Debtors are in default on the LoanCore Mortgage and certain other obligations. Prior to commencing these Chapter 11 Cases, the Debtors entered into a restructuring agreement with LoanCore, a copy of which is annexed hereto as Exhibit D (the "Restructuring Support Agreement"). Under the Restructuring Support Agreement, the Debtors agreed to seek confirmation of the Plan.

    6.    *Chief Restructuring Officer*

Emerald Group, LLC ("Emerald") controls the Debtors. Emerald retained Arbel Capital Advisors LLC ("Arbel") and Ephraim Diamond ("Diamond"), its managing member, to assist Emerald and the Debtors in complying with their obligations under the Restructuring Support Agreement including, but not limited to, commencing and managing the Bankruptcy Case. Emerald is solely responsible for the fees incurred by Arbel and Diamond in connection with the Bankruptcy Case. For the avoidance of doubt, without limiting Diamond's rights as Chief Restructuring Officer under the Debtors' organizational documents, under no circumstances shall the Debtors or any of its creditors or lenders (including LoanCore) have any liability to Arbel and/or Diamond in respect of compensation, indemnity, or other obligations for services performed by Arbel and/or Diamond as the Debtors' Chief Restructuring Officer. Emerald has agreed to pay Arbel a monthly fee plus a per diem fee for court appearances at court hearings, plus reimbursement for out of pocket expenses. A copy of the agreement between Emerald and Arbel is available to parties-in-interest upon request to Debtors' counsel or Diamond.

**C.**     **Filing of the Bankruptcy Case and Significant Events During the Bankruptcy Case**

On December 28, 2020, the Debtors filed voluntary petitions (the "Petitions") for relief under chapter 11 of the Bankruptcy Code. Neither a trustee nor an examiner has been appointed in these Chapter 11 Cases. Additionally, the Bankruptcy Court has not appointed a creditors committee.

Contemporaneously with the Petitions, the Debtors filed the following "first day" motions and pleadings:

(i)     To provide background regarding the Debtors' businesses and the events leading to the commencement of these Chapter 11 Cases, and in accordance with Rule 1007-2 of the Local Rules for the United States Bankruptcy Court for the Southern District of New York, the Debtors filed the *Local Rule Affidavit of Ephraim Diamond, as Chief Restructuring Officer*;

(ii)     To facilitate a smooth and efficient administration of the Debtors' cases, the Debtors filed *Debtors' Motion for Entry of an Order (A) Directing Joint Administration of Chapter 11 Cases and (B) Granting Related Relief* requesting joint administration of the Chapter 11 Cases solely for procedural purposes;

(iii)     To preserve and protect the value of the Properties during the pendency of these Chapter 11 Cases, the Debtors filed *Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection, (C) Scheduling a Final Hearing, and (D) Granting Related Relief* requesting, among other things, authority to use cash collateral;

(iv)     To be in a position to confirm the Plan and know the extent of their liabilities, among other things, the Debtors filed *Debtors' Application for an Order Fixing Last Date for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof* (the "Bar Date Motion"). Pursuant to the Bar Date Motion, the Debtors request an order setting _____ as the last date for persons or entities (including, without limitation, individuals, partnerships, corporations, joint ventures, and trusts), to file a proof of claim against the Debtors that arose or is deemed to have arisen prior to the Petition Date. Additionally, the Bar Date Motion requests that _____ be set as the last date for governmental units to file a proof of claim against the Debtors that arose or is deemed to have arisen prior to the Petition Date;

(v)     To effectively prosecute these Chapter 11 Cases with the assistance of counsel familiar with restructurings and the Debtors' businesses, the Debtors filed *Application to Retain Backenroth Frankel & Krinsky, LLP as Debtors' Counsel*; and finally

(vi)     The Debtors filed this Disclosure Statement and the Plan attached, as Exhibit A hereto.

Contemporaneous with these chapter 11 filings, the Debtors engaged Tri-Hill Management LLC ("Tri-Hill") as the Property Manager for the 107 Properties and Bronstein Properties, LLC ("Bronstein" together with Tri-Hill, the "Property Managers") as the Property Manager for the 117 Properties.  The Property Managers are real estate management and acquisition companies with quality, income-producing properties throughout the boroughs of New York City.  Among other property management responsibilities, the Property Managers will supervise, maintain, repair, address tenant issues, address legal requirements, manage service providers and handle leasing for the Properties during the pendency of the chapter 11 cases.

Thereafter, on _____, the Bankruptcy Court entered an Order approving the Disclosure Statement as containing adequate information under section 1125 of the Bankruptcy Code, which, among other things, permitted the Debtors to begin solicitating acceptances of the Plan from Claimants.

### III.   SUMMARY OF THE PLAN

#### A.   General Summary

The Plan is in the best interests of all Claimants as well as the several hundred tenants at the Properties.  Under the Plan, all Allowed Claims, taxes, and other governmental charges levied on the Properties will be paid in full (without pre-petition interest or post-petition interest on the Allowed Unsecured Claims) by the Successor Owners on the Effective Date or promptly thereafter (or promptly following allowance of such Claim), provided, however, that the aggregate amount of consideration to be distributed on account of Allowed Unsecured Claims will not exceed $670,000.00.  If the aggregate amount of Allowed Unsecured Claims exceeds $670,000.00, holders of Allowed Unsecured Claims will receive their pro rata share of $670,000.00.

Under the Plan, on account of LoanCore's perfected first lien on the Properties securing a claim in an amount not less than $203,075,766.48 and the Successor Owners' payments to all creditors with Allowed Claims in the manner described in the Plan, the Properties and the Assets shall be transferred to the Successor Owners pursuant to the Property Transfer effectuated by execution of the Assignment Documents.

On the Effective Date: (i) the Debtors shall execute and deliver the Assignment Documents in a form satisfactory to the Successor Owners; and (ii) the Successor Owners shall enter into the New Mortgages.  Promptly following the Effective Date, the Debtors' principals shall take all actions necessary to dissolve the Debtors in accordance with state law.

The Debtors' Plan will not impact the Tenant Leases and tenants' rights under the Tenant Leases shall be preserved.

#### B.   Limited Substantive Consolidation

The Plan provides for the limited substantive consolidation of the Debtors' Estates, but solely for purposes of voting on this Plan by Claimants, making distributions to holders of Allowed Claims under this Plan, and confirmation of this Plan.  On the Effective Date, (i) all assets and liabilities of the Debtors will, solely for voting and distribution purposes, be treated as if they were merged, (ii) each Claim against the Debtors will be deemed a single Claim against and a single

obligation of the Debtors, (iii) any Claims filed or to be filed in the Bankruptcy Case will be deemed single Claims against all of the Debtors, (iv) all transfers, disbursements, and distributions to Claimants made by any Debtor hereunder will be deemed to be made to satisfy the Claims against all of the Debtors, and (v) any obligation of the Debtors as to Claims will be deemed to be one obligation of all of the Debtors.  Holders of Allowed Claims shall be entitled to their share of assets available for distribution to such Class without regard to which Debtor originally was liable for such Claim.  Except as set forth in this Article, such limited consolidation shall not, other than for purposes related to this Plan, (x) affect the legal and corporate structures of the Debtors, (y) cause any Debtor to be liable for any Claim or Interest under this Plan for which it otherwise is not liable, and the liability of any Debtor for any such Claim or Interest shall not be affected by such limited consolidation, and (z) affect any Interest in the Debtors.  The Debtors respectfully submit that such limited consolidation will cause no prejudice to any Claimant or Interest Holder and will instead result in greater convenience for purposes of voting on the Plan and distributions made on Allowed Claims.

The Plan shall serve as, and shall be deemed to be, a request for entry of an order substantively consolidating the Debtors' Estates, but solely for purposes of the Plan, including voting on the Plan, making distributions to holders of Claims under the Plan, and confirmation of the Plan.  If no objection to the limited substantive consolidation of the Debtors' Estates is timely filed and served by any holder of an impaired Claim affected by the Plan as provided herein on or before the deadline for objections to confirmation of the Plan, the Confirmation Order shall serve as the order approving the limited substantive consolidation of the Debtors' Estates, but solely for purposes of the Plan, including voting on the Plan, making distributions to holders of Allowed Claims under the Plan, and confirmation of the Plan. Any objections with respect to the limited substantive consolidation of the Debtors' Estates, solely for purposes of the Plan, that are filed and timely served shall be heard at the Confirmation Hearing.

Section 1123(a)(5) of the Bankruptcy Code permits substantive consolidation under a chapter 11 plan.  *See, e.g., In re WorldCom, Inc*., Case No. 02-13533 (AJG), 2003 WL 23861928, at *35 (Bankr. S.D.N.Y. 2003); *In re Stone & Webster, Inc.*, 286 B.R. 532, 541 (Bankr. D. Del. 2002).  Here, substantive consolidation is justified because the Debtors are jointly and severally liable to LoanCore, but none of the Debtors could pay the amount due on their own.  Such allocation is further complicated by the fact that the Properties have historically been operated on a consolidated basis and disentangling that accounting would be expensive and difficult.  Finally, all Claimants without regard to the particular Debtor against whom any Claimant asserts its Claim will be paid in full (except that Allowed Unsecured Claims will receive neither pre-petition interest nor post-petition interest) under the Plan.

The Debtors reserve their right to amend the Plan to, among other things, not provide for the limited substantive consolidation of the Debtors' Estates under the Plan.  That modification will not in any way affect the proposed treatment of creditors under the Plan.

## C.      Classification and Treatment Under the Plan

The Plan classifies Claims and Interest Holders into five (5) classes without regard to a specific Debtor.  Administrative Expense Claims, Priority Tax Claims, Professional Fee Claims, and United States Trustee Fees are unclassified.  The five (5) classes for each of the Debtors

10

consists of: Class 1 (Other Secured Claims), Class 2 (LoanCore Mortgage Claim), Class 3 (Priority Non-Tax Claims), Class 4 (Unsecured Claims), and Class 5 (Interest Holders).

| Class | Claim or Interest | Status | Voting Rights | Estimated Percentage Recovery of Allowed Claims or Description of Distributed Assets |
|-------|-------------------|--------|---------------|-------------------------------------------------------------------------------------|
| N/A | Administrative Expense Claims, Professional Fee Claims, Priority Tax Claims, and United States Trustee Fees | Not classified | Deemed to Accept | 100% |
| 1 | Other Secured Claims | Unimpaired | Deemed to Accept | 100% |
| 2 | Allowed LoanCore Mortgage Claim | Impaired | Entitled to Vote | Transfer of the Properties and the Assets to its designee, the Successor Owners |
| 3 | Priority Non-Tax Claims | Unimpaired | Deemed to Accept | 100% |
| 4 | Unsecured Claims | Impaired | Entitled to Vote | Anticipated at 100% (without any pre-petition interest or post-petition interest) provided, however, that the aggregate amount of consideration to be distributed on account of Allowed Unsecured Claims will not exceed $670,000.00.  If the aggregate |

| | | | | amount of Allowed Unsecured Claims exceeds $670,000.00, holders of Allowed Unsecured Claims will receive their pro rata share of $670,000.00. |
|---|---|---|---|---|
| 5 | Interest Holders | Impaired | | 0% |

### 1.     Class 1:  Other Secured Claims

Classification – any Claim, other than the LoanCore Mortgage Claim, to the extent reflected in the Schedules or a Proof of Claim as being secured and properly perfected, which is secured by a timely perfected Lien on Collateral, to the extent of the value of the Estate's interest in such Collateral, as determined as of the relevant determination date.

Treatment – Each holder of an Allowed Other Secured Claim, in full and final satisfaction, release and settlement of such Claim, shall receive one of the following alternative treatments, at the election of the LoanCore: (a) payment in full in Available Cash by the Successor Owners on or as soon as reasonably practicable after the later of (i) the Effective Date and (ii) the date the Claim becomes an Allowed Claim; (b) the legal, equitable and contractual rights to which such Claim entitles the holder, unaltered by the Plan; (c) the treatment described in section 1124(2) of the Bankruptcy Code; or (d) the possession of all collateral securing such Claim, without representation or warranty by, or recourse against the Debtors or the Successor Owners.   In the case of clause (d), to the extent that the value of the collateral securing any Allowed Other Secured Claim is less than the amount of such Allowed Other Secured Claim, the undersecured portion of such Claim shall be treated for all purposes under )the Plan as a General Unsecured Claim in Class 4 and shall be classified as such.

Voting – Unimpaired and deemed to have accepted the Plan.

Amount – Upon information and belief, total Allowed Other Secured Claims are estimated at $803,573.71.

### 2.     Class 2:  LoanCore Mortgage Claim

Classification – Allowed LoanCore Mortgage Claim.

Treatment –On the Effective Date, on account of and in satisfaction of the Allowed LoanCore Mortgage Claim, the Successor Owners shall receive title to the Properties and the

12

Assets pursuant to the Assignment Documents, free and clear of all Claim, Liens, charges, interests, and encumbrances, other than Permitted Exceptions and the New Mortgages.

<u>Voting</u> – Impaired and entitled to vote to accept or reject the Plan.

<u>Amount</u> – The total Allowed LoanCore Mortgage Claim is in an amount not less than $203,075,766.48 as of the Petition Date.

3.    *Class 3:  Priority Non-Tax Claims*

<u>Classification</u> – Priority Non-Tax Claims.

<u>Treatment</u> –  In full satisfaction, settlement, release and discharge of and in exchange for the Priority Non-Tax Claims, the amount of the Allowed Priority Non-Tax Claims shall be paid in full in Cash with pre-petition interest and post-petition interest at the statutory rate on the Distribution Date.

<u>Voting</u> – Unimpaired and deemed to accept the Plan.

<u>Amount</u> –Upon information and belief, there are no Claims in this Class.

4.    *Class 4:  Unsecured Claims*

<u>Classification</u> – Unsecured Claims.

<u>Treatment</u> – Allowed Unsecured Claims shall be paid in full in Cash on the Distribution Date, without any pre-petition interest or post-petition interest, <u>provided,</u> <u>however,</u> that the aggregate amount of consideration to be distributed to Class 4 of the Plan will not exceed $670,000.00.  If the aggregate Allowed Claims in Class 4 of the Plan exceed $670,000.00, holders of Allowed Unsecured Claims will receive their pro rata share of $670,000.00.

<u>Voting</u> – Impaired and entitled to vote to accept or reject the Plan.

<u>Amount</u> – Upon information and belief, total Unsecured Claims are estimated at $665,752.52.

5.    *Class 5:  Interest Holders*

<u>Classification</u> – Interest Holders.

<u>Treatment</u> – No distribution shall be made or property of the Estates retained by the Interest Holders.  Each Interest Holder's Interest shall be deemed cancelled and extinguished on the Effective Date.

<u>Voting</u> – Impaired and conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Not entitled to vote to accept or reject the Plan.

13

**D.**      **Administrative Expense Claims, Priority Tax Claims, Professional Fee Claims, and U.S. Trustee Fees**

Allowed Administrative Expense Claims shall be paid in full in Cash on the Distribution Date, except to the extent that the holder of an Allowed Administrative Expense Claim agrees to a different treatment; provided, however, that Allowed Administrative Expense Claims representing non-tort obligations of the Properties incurred in the ordinary course of business shall be paid in full or performed by the Successor Owners in the ordinary course of business or pursuant to the terms and conditions of the particular transaction.

Final fee applications for expenses authorized pursuant to section 330 of the Bankruptcy Code shall be filed with the Bankruptcy Court and served on all parties in interest within fifteen (15) days of the Effective Date.  The Successor Owners shall pay the amount of the Allowed Professional Fee Claims.

Allowed Priority Tax Claims under section 507(a)(8) of the Bankruptcy Code shall be paid on the Distribution Date in full in Cash with pre-petition interest and post-petition interest at the statutory rate as it accrues from the Petition Date through and including the date of payment, except to the extent that the holder of an Allowed Priority Tax Claim agrees to a different treatment.  Upon information and belief, the Debtors do not believe there are any  Allowed Priority Tax Claims against the Debtors' Estates.

The Debtors shall pay from Cash in the Estate all fees payable and due as of the Effective Date pursuant to section 1930 of title 28 of the United Sates Code.  Thereafter, the Successor Owners shall pay from Cash in the Estate all United States Trustee quarterly fees under 28 U.S.C. § 1930(a)(6), plus interest due under 31 U.S.C. § 3717, on all disbursements, including plan payments and disbursements in and outside of the ordinary course of business, until the earliest of the entry of a final decree closing the chapter 11 cases, dismissal of the chapter 11 case, or conversion of the chapter 11 cases to a cases under chapter 7 of the Bankruptcy Code.

**E.**      **Distributions And Means For Implementation Of The Plan**

*1.      Funding of the Plan*

On or promptly following the Effective Date, the Successor Owners shall pay the amounts to be paid to Claimants under the Plan.  To the extent necessary, LoanCore will contribute sufficient funds to the Successor Owners to pay such amounts.

*2.      Creditor Distributions*

Unless a Claimant holding an Allowed Claim against any of the Debtors agrees to a different distribution date or except as otherwise provided herein or as ordered by the Bankruptcy Court, distributions to be made on account of Claims that are Allowed Claims shall be made on the applicable Distribution Date.  Any Claims that are Disputed Claims will be paid promptly after a Claim is deemed an Allowed Claim.

14

3.    *Disbursing Agent*

The Disbursing Agent shall be the entity in its capacity as disbursing agent responsible for making all distributions required to be made under this Plan.  Pursuant to <u>Section 6.1.2</u> of this Plan, the Successor Owners shall be the Disbursing Agent under the Plan.

4.    *Property Transfer*

On the Effective Date, the Properties and the Assets shall be transferred by the Debtors to the Successor Owners pursuant to the Assignment Documents.  The Properties and the Assets will be transferred to the Successor Owners free and clear of all Lien, Claims, and encumbrances (other than the Permitted Encumbrances and the New Mortgages) and any and all Liens, Claims, and encumbrances that have not been expressly preserved under the Plan shall be deemed extinguished as of such date.

5.    *Dissolution of the Debtors*

Promptly following the Effective Date, the Debtors' principals shall take all actions necessary to dissolve the Debtors in accordance with state law.

6.    *Execution and Filing of Documents*

The Debtors shall be authorized to execute in the name of any necessary party, any notice of satisfaction, release or discharge of any Lien, Claim, or encumbrance not expressly preserved in the Plan and deliver such notices to any and all federal, state, and local governmental agencies or departments for filing and recordation.  On the Effective Date, the Debtors shall execute and deliver the Assignment Documents in a form satisfactory to the Successor Owners.  On the Effective Date, the Successor Owners shall enter into the New Mortgages.

Pursuant to sections 105 and 1142(b) of the Bankruptcy Code, each and every federal, state, and local governmental agency or department, shall be directed to accept and record any and all documents and instruments necessary, useful, or appropriate to effectuate, implement, and consummate the transactions contemplated by the Plan, and any and all notices of satisfaction, release, or discharge or assignment of any Lien, Claim, or encumbrance not expressly preserved by the Plan.

**F.    <u>Treatment Of Unexpired Leases And Executory Contracts</u>**

1.    *Rejection of Executory Contracts*

On the Effective Date, all Executory Contracts other than Tenant Leases will be deemed rejected in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract (i) was previously assumed or rejected by the Debtors pursuant to an order of the Bankruptcy Court, (ii) previously expired or terminated pursuant to its own terms or (iii) is an Executory Contract or unexpired lease that is included in a pending motion to assume such Executory Contract or unexpired lease.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

15

In the event of a rejection of any Executory Contract which results in damage to the other party or parties to the Executory Contract, a Proof of Claim for such damages must be filed by the damaged party with the Bankruptcy Court within thirty (30) days after the Confirmation Date or such other deadline fixed by Court order. Any Allowed Claim arising from the rejection of any Executory Contract shall be treated as an Unsecured Claim.

2.     *Tenant Leases*

The existing claims of the tenants under the Tenant Leases shall be addressed and paid through the Cure process associated with the Debtors' assumption of the Tenant Leases and assignment thereof to the Successor Owners. The tenants under the Tenant Leases shall not have any continuing obligations to the Debtors following the assumption and assignment of the Tenant Leases to the Successor Owners pursuant to a Property Transfer. Any Claims of the tenants against the Debtors which are not addressed through the Cure process shall be treated in accordance with the terms of the Plan. The Successor Owners (as applicable) shall assume all benefits and obligations of the Debtors as landlord under all assigned Tenant Leases from and after the Effective Date and shall pay any Cure costs that may be due.

## G.     **Preference Claims and Other Causes of Action**

The Debtors waive and release the right to pursue preference claims under section 547 of the Bankruptcy Code. All other Causes of Actions are fully preserved and reserved. All rights pursuant to section 502, 544, 545, and 546 of the Bankruptcy Code and all Avoidance Actions (except those brought pursuant to section 547 of the Bankruptcy Code) shall be preserved, provided, however, that in connection with the Property Transfer, the Debtors shall transfer the Causes of Action, including the Avoidance Actions (other than those brought pursuant to section 547 of the Bankruptcy Code), to the Successor Owners. Payment Of Claims And Objections To Claims.

1.     *Allowed Claims*

Unless a Claimant holding an Allowed Claim against any of the Debtors agrees to a different distribution date or except as otherwise provided herein or as ordered by the Bankruptcy Court, distributions to be made on account of Claims that are Allowed Claims shall be made on the applicable Distribution Date. Except as otherwise specifically provided for in the Plan, interest accruing after the Petition Date shall not be paid on any Claims.

2.     *Objections to Claims*

 The Successor Owners may file objections to Claims for a period of 90 days after the Effective Date, with the right to move the Court for cause for an extension of the date it may file objections to Claims. No partial distributions will be made with respect to a Disputed Claim or a Claim that is contingent or unliquidated. To the extent that a Disputed Claim becomes an Allowed Claim, such Allowed Claims shall be paid promptly by the Successor Owners.

**H.**    **Other Significant Plan Provisions**

*1.*        *Pre-Confirmation Modification*

The Debtors may seek amendments or modifications to the Plan in accordance with section 1127 of the Bankruptcy Code at any time prior to the Confirmation Date.

*2.*        *Post-Confirmation Immaterial Modification*

After the Confirmation Date, the Debtors may seek to remedy any defect or omission or reconcile any inconsistencies in the Plan or in the Confirmation Order, in such manner as may be necessary to carry out the purposes and intent of the Plan.  A Claimant that has accepted this Plan shall be deemed to have accepted this Plan as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim.

*3.*        *Withdrawal or Revocation of the Plan*

The Debtors reserve the right to revoke or withdraw its support for this Plan as to any or all of the Debtors prior to the Confirmation Date and to file subsequent plans of liquidation or reorganization.  If the Debtors revoke or withdraw this Plan as to any or all of the Debtors, or if confirmation or consummation as to any or all of the Debtors does not occur, then, with respect to such Debtors, (a) the Plan shall be null and void in all respects and (b) nothing contained in the Plan (i) shall prejudice in any manner the rights of the Debtors or (ii) constitute an admission of any sort by the Debtors.

*4.*        *Exemption From Transfer Taxes*

The principal purposes of the Plan are to (i) resolve the LoanCore Mortgage Claim by, among other things, executing the Property Transfer to the Successor Owners; and (ii) facilitate a 100% distribution to all Claimants with Allowed Claims (without pre-petition interest or post-petition interest on the Allowed Unsecured Claims), who would otherwise remain unpaid.  On the Effective Date, the Debtors shall transfer the Properties and the Assets to the Successor Owners by executing and delivering the Assignment Documents in a form satisfactory to the Successor Owners.

The Property Transfer will result in the (a) expeditious and orderly transfer of the Properties and the Assets to the Successor Owners without affecting or impacting negatively the rights of tenants in the Properties and (b) full, 100% distribution on all Allowed Claims (without pre-petition interest or post-petition interest on Allowed Unsecured Claims).

Accordingly, the principal purpose of the Plan is not the avoidance of taxes.  It is appropriate, therefore, that Section 14.3 of the Plan provides that, pursuant to section 1146(a) of the Bankruptcy Code: (i) the issuance, transfer, or exchange of notes or equity securities under this Plan; (ii) the creation of any mortgage, deed of trust, lien, pledge, or other security interest including the New Mortgages; (iii) the making or assignment of any contract, lease or sublease; or (iv) the making or delivery of any deed or other instrument of transfer or other consideration under, in the furtherance of, or in connection with this Plan, including, without limitation, the Property

17

Transfer, the Assignment Documents and any other payments and transfers pursuant to this Plan by the Debtors to the Successor Owners and (v) delivery of deeds, bills of sale, or other transfers of tangible property, are exempt from and will not be subject to any stamp tax, or other similar tax or any tax held to be a stamp tax or other similar tax by applicable law.

Pursuant to the Plan, all filing officers (including without limitation, the City Register and/or County Clerk of New York County, City of New York) shall be, and hereby are directed to: (i) accept for recording and record, any and all deeds and other documents which are presented to them for recording, including the Assignment Documents and the New Mortgages, immediately upon presentation thereof, with regard to the transactions effectuated pursuant to this Plan, without the payment of any New York State Real Estate Transfer Tax imposed under Article 31 of the New York State Tax Law, any New York City Real Property Transfer Taxes under section 11-2102 of the New York City Administrative Code, any mortgage recording tax or any other tax within the purview of section 1146(a) of the Bankruptcy Code including with respect to the New Mortgages, and without the requirement of presentation of any affidavit or form with respect to any tax imposed under Article 31 of the New York State Tax Law, any New York City Real Property Transfer Taxes under section 11-2102 of the New York City Administrative Code with respect to the transactions effectuated pursuant to this Plan; and (ii) except as otherwise provided in the Plan and the Confirmation Order, cancel and discharge of record all liens, encumbrances, claims and other adverse interests in or against the Properties.

Pursuant to the Plan, all governmental authorities and any other taxing authorities shall be permanently enjoined from the commencement or continuation of any action to collect from the Properties, the Assets, the Debtors, the Successor Owners, the New Mortgage Lender, LoanCore, or their respective Related Persons, any taxes from which the transactions effectuated pursuant to this Plan are exempt, pursuant to and in furtherance of section 1146(a) of the Bankruptcy Code, including but not limited to, New York State Real Estate Transfer Taxes, New York City Real Property Transfer Taxes, and applicable mortgage recording tax, and any penalties, interest, or additions to any tax related thereto.

Pursuant to the Plan, the City Register and/or County Clerk of New York County office shall record the deed of each Property, and other similar conveyance documents required to be delivered under this Plan without the payment of any stamp tax, transfer tax, or similar tax, and without the presentation of affidavits, instruments, or returns otherwise required for recording or filing pursuant to section 1146(a) of the Bankruptcy Code

5.      *Severability*

Except for the releases in paragraph 10.4, if any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, solely at the request of the Debtors with the consent of LoanCore, will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired

or invalidated by such holding, alteration, or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

6.    *Bar Date for Administrative Expense Claims*

Unless otherwise ordered by the Bankruptcy Court, requests for the payment of Administrative Expense Claims (other than non-tort obligations incurred in the ordinary course of business) must be filed with the Bankruptcy Court and served on Successor Owners and its counsel at the address for notices listed in Section 14.9 of the Plan no later than the Administrative Expense Claims Bar Date.  Any Person that is required to file and serve a request for payment of an Administrative Expense Claim and fails to timely file and serve such request, shall be forever barred, estopped and enjoined from asserting such Administrative Expense Claim or participating in distributions under this Plan on account thereof.  Objections to requests for payment of an Administrative Expense Claim must be filed with the Bankruptcy Court and served on, the Debtors, Debtors' counsel, LoanCore, the Successor Owners, and  counsel to LoanCore and the Successor Owners at the addresses for notices listed in Section 14.9 of the Plan no later than ninety (90) days after the Effective Date..

7.    *Bar Date for Professional Fee Claims*

Final fee applications for expenses authorized pursuant to section 330 of the Bankruptcy Code shall be filed with the Bankruptcy Court and served on all parties in interest within fifteen (15) days of the Effective Date.  The Successor Owners shall pay the amount of the Allowed Professional Fee Claims.

8.    *Notices*

Any notices required or permitted to be provided under the Plan shall be in writing and served by either (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery or (c) reputable overnight courier service, freight prepaid, to be addressed as follows:

<u>Notice to the Debtors</u>

203 W 107 Street LLC, 210 W 107 Street LLC, 220 W 107 Street LLC, 230 W 107 Street LLC, 124-136 East 117 LLC , 215 East 117 LLC, 231 East 117 LLC, 235 East 117 LLC, 244 East 117 LLC, East 117 Realty LLC, and 1661 PA Realty LLC (5280
1 Battery Park Plaza, Suite 3100
New York, New York 10004
Attention: Ephraim Diamond, as Chief Restructuring Officer
Email: ephraim@arbelcapital.com

with a copy to

19

Backenroth Frankel & Krinsky, LLP
Attention: Mark A. Frankel.
800 Third Avenue, 11th Floor
New York, New York 10022
Email: mfrankel@bfklaw.com

*Proposed Counsel to the Debtors and Debtors in Possession*

and

Notice to the Guarantor

Sukenik, Segal & Graff, P.C.
Attention: David C. Segal
450 Seventh Avenue, 42nd floor
New York, New York  10123
212-725-9300
Email: davidsegal@ssglaw.com

*Counsel to the Guarantor*

and

Notice to LoanCore and the Successor Owners

LoanCore Capital Credit REIT LLC
c/o LoanCore Capital
55 Railroad Avenue, Suite 100
Greenwich, Connecticut  06830
Attention:  Brett Kaplan
Facsimile No.:  (203) 861-600
E-mail:  BKaplan@LoanCore.com

with a copy to

LoanCore Capital Credit REIT LLC
c/o LoanCore Capital
55 Railroad Avenue, Suite 100
Greenwich, Connecticut  06830
Attention:  Notices
E-mail:  notices@loancore.com

with a copy to

20

Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, New York 10019-9710
Attention:  Stephen Gliatta, Esq. and Benjamin Mintz, Esq.
Email: steve.gliatta@arnoldporter.com and Benjamin.Mintz@arnoldporter.com

*Counsel to LoanCore and the Successor Owners*

## I.   <u>Confirmation And Effectiveness of The Plan</u>

*1.   Condition to Confirmation*

The Bankruptcy Court shall have entered a Confirmation Order in form and substance satisfactory to the Debtors and LoanCore.

*2.   Conditions To Effective Date*

This Plan shall not become effective and the Effective Date shall not occur unless and until the Debtors and LoanCore are satisfied that:

a.   The Confirmation Order has become a Final Order;

b.   the aggregate amount of: (i) Administrative Expense Claims (other than Professional Fee Claims and U.S. Trustee fees); (ii) Priority Non-Tax Claims; (iii) Priority Tax Claims; (iv) Cure costs, and (v) Unsecured Claims shall not exceed $1,500,000.00;

c.   all documents and agreements necessary to implement the Plan on the Effective Date shall have been executed and delivered in form and substance satisfactory to LoanCore and all other actions required to be taken in connection with the Effective Date shall have occurred;

d.   for each Debtor, the Debtors shall have delivered to LoanCore monthly financial statements for January 1, 2020 through and including the date the Property Management Agreements are executed installing the Property Managers to manage the Properties; and

e.   to the extent in their possession, for each Debtor, the Debtors and the Guarantor shall have delivered to LoanCore any financial and/or operating information addressing rental payment arrears, current rental payment delinquencies, and all other rent collection information from October 1, 2020 through and including the date the Property Management Agreements are executed installing the Property Manager to manage the Properties.

Each of the conditions set forth in Sections 11.1, 11.2(a), and 11.2(c) of the Plan may be waived in whole or in part solely by the Debtors and LoanCore without the need for notice or a hearing (other than any condition the waiver of which is proscribed by law).  Each of the conditions set forth in Sections 11.2(b) and 11.2(d)-(e) of the Plan may be waived in whole or in part by LoanCore in its sole discretion without the need for notice or a hearing.

21

3.      *Consequence if Confirmation Order is Vacated*

If the Confirmation Order is vacated, the Plan shall be null and void in all respects.

4.      *Effect of Plan Confirmation and the Effective Date*

**a.      Releases by Releasing Creditors.   .Except as otherwise expressly provided in this Plan or the Confirmation Order, on the Effective Date and effective simultaneously with the effectiveness of the Plan, the Releasing Creditors shall be deemed to have unconditionally released the Debtors, LoanCore, the Successor Owners, the New Mortgage Lender, the Property Managers, the Affiliated Property Manager, and their respective Related Persons of and from any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event or other occurrence taking place or existing on or before the Effective Date that are in connection with the Debtors or any of them, or their respective assets, property and Estates, the Bankruptcy Case or the Plan, or Disclosure Statement; provided, however, that nothing in Section 10.2 of the Plan shall release the Successor Owners from their obligations under this Plan including in respect of the payment of Allowed Claims, obligations arising under the Tenant Leases from and after the Effective Date and in respect of the Cure, and obligations relating to the New Mortgages.**

**b.      Release by LoanCore, the Successor Owners, and the New Mortgage Lender of Debtors, Mezzanine Borrowers, Guarantor, and Affiliated Property Manager. Except as otherwise expressly provided in the Plan or the Confirmation Order, on the Effective Date and effective simultaneously with the effectiveness of this Plan, each of LoanCore, each Successor Owner, and the New Mortgage Lender shall be deemed to have unconditionally released the Debtors, the Mezzanine Borrowers, the Guarantor, the Affiliated Property Manager,  and their respective Related Persons of and from any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action (including, but not limited to, the Avoidance Actions) and liabilities of any nature whatsoever, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event or other occurrence taking place or existing on or before the Effective Date that are in connection with the Debtors, the Mezzanine Borrowers, the Guarantor, the Affiliated Property Manager or any of them, or their respective assets, property and Estates, the Bankruptcy Case or the Plan, or Disclosure Statement.  For the avoidance of doubt, nothing contained in Section 10.5 of the Plan shall in any way be construed to relieve the Debtors, the Mezzanine Borrowers, or the Guarantor from their post-Effective Date specific performance obligations to LoanCore under the Restructuring Support Agreement, but in no event shall a claim be made for damages.**

22

c.    **Release by Debtors, Mezzanine Borrowers, Guarantor, and Affiliated Property Manager of LoanCore, the Successor Owners, and the New Mortgage Lender.** Except as otherwise expressly provided in the Plan or the Confirmation Order, on the Effective Date and effective simultaneously with the effectiveness of this Plan, each of the Debtors, the Mezzanine Borrowers, the Guarantor, the Affiliated Property Manager, and their respective Related Persons shall be deemed to have unconditionally released LoanCore, each Successor Owner, the New Mortgage Lender, and their respective Related Persons of and from any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event or other occurrence taking place or existing on or before the Effective Date that are in connection with LoanCore and Successor Owners or any of them, or their respective assets, property and Estates, the Bankruptcy Case or the Plan, or Disclosure Statement; provided, however, that nothing in Section 10.6 of the Plan shall release each Successor Owner from its obligations under the Plan including in respect of the payment of Allowed Claims, obligations arising under the Tenant Leases from and after the Effective Date and in respect of the Cure, and obligations relating to the New Mortgages.

d.    **Release by Mezzanine Borrowers, Guarantor, and Affiliated Property Manager of Debtors.** Except as otherwise expressly provided in this Plan or the Confirmation Order, on the Effective Date and effective simultaneously with the effectiveness of this Plan, each of the Mezzanine Borrowers, the Guarantor, the Affiliated Property Manager, and their and each Debtor's respective Related Persons shall be deemed to have unconditionally released the Debtors and their respective Related Persons of and from any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event or other occurrence taking place or existing on or before the Effective Date that are in connection with the Debtors or any of them, or their respective assets, property and Estates, the Bankruptcy Case or the Plan, or Disclosure Statement. Further, no claims of the Mezzanine Borrowers, the Guarantor, the Affiliated Property Manager, or their and each Debtor's respective Related Persons shall be entitled to any distribution or payment under the Plan.

e.    **Exculpation.** To the fullest extent permitted under applicable law, as of and following the Effective Date, the Debtors, the Property Managers, the Affiliated Property Manager, and each of their Related Persons (to the extent a claim arises from actions taken by such Related Person in its capacity as a Related Person of such Entity) shall not incur any liability to any Person for any act or omission in connection with, relating to, or arising out of the Bankruptcy Case, including this Plan, pursuit of confirmation of any plans of reorganization or liquidation, including this Plan, the administration, consummation and implementation of the Plan or the property to be distributed under the Plan or the Disclosure Statement. Any of the Debtors, the Property Managers, the Affiliated Property Manager, and each of their Related Persons shall be entitled to rely upon the advice

23

of counsel and financial advisors with respect to their duties and responsibilities under, or in connection with, the Bankruptcy Case, the Plan, and the administration thereof.

   **f.**  **Injunction.**  **Other than such liabilities and obligations provided under the Plan, (a) the rights afforded herein and the treatment of all Claims and Interests herein shall be in exchange for and in complete satisfaction and release of all Claims and Interests of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, against the Debtors, or any of the Debtors' Related Persons or any of their assets and properties, (b) on the Distribution Date, all such Claims against the Debtors and each of the Debtors' Related Persons shall be satisfied and released in full, and (c) all Persons shall be precluded from asserting and shall be permanently enjoined from commencing or continuing in any manner any action or proceeding (whether directly, indirectly, derivatively, or otherwise) against the Debtors, the Successor Owners, LoanCore, the New Mortgage Lender, the Property Managers, the Affiliated Property Manager, or any of their respective Related Persons or their assets or properties, including the Properties and Assets, based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date; provided, however, that noting in Section 10.3 of the Plan shall enjoin or otherwise limit any claims against the Successor Owners in respect of their obligations under this Plan including in respect of the payment of Allowed Claims, obligations arising under the Tenant Leases from and after the Effective Date and in respect of the Cure, and obligations relating to the New Mortgages.**

## J. Confirmation Of The Plan

   At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of Section 1129 of the Bankruptcy Code have been satisfied to enter an order confirming the Plan.

   The Debtors believes that the Plan satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code, that the Debtors have complied or will have complied with all of the requirements of chapter 11, and the Debtors have made the proposals contained in the Plan in good faith.

## K. Best Interests Test

   Even if a plan is accepted by the holders of each class of Claims and Interests, the Bankruptcy Code requires the Bankruptcy Court to determine that the Plan is in the best interests of all holders of Claims or Interests that are Impaired by the Plan and that have not accepted the Plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires the Bankruptcy Court to find either that all members of an Impaired Class of Claims or Interests have accepted the Plan or that the Plan will provide a Claimant who has not accepted the Plan with a recovery of property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Claimant would recover if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  To calculate the probable distribution to holders of each impaired class of claims and interests if the Debtors were liquidated under chapter 7 of the Bankruptcy Code, the Bankruptcy Court must determine first the aggregate dollar amount that would be generated from the Debtors' Assets if its chapter 11 case was

converted to a chapter 7 case under the Bankruptcy Code.  This "liquidation value" would consist primarily of the proceeds from a forced sale of the Debtors' assets by a chapter 7 trustee.  As explained in Article IV below, if liquidation were to occur, the LoanCore Mortgage Claim would receive 100% of the liquidation proceeds under chapter 7 of the Bankruptcy Code (net of chapter 7 expenses) and no other Claimants would receive any distribution.  By contrast, the Plan proposed by the Debtors proposes to pay all Allowed Claims in full in cash (without pre-petition interest or post-petition interest on the Allowed Unsecured Claims) on the Effective Date.

**L.**     **Confirmation Over The Objection of An Impaired Class**

The Bankruptcy Court may still confirm the Plan at the request of the Debtors if, as to each impaired class which has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable." The Debtors may invoke the provisions of section 1129(b) of the Bankruptcy Code ("Section 1129(b)") to any Impaired Class that does not accept the Plan.  Claimants are receiving distributions equal to 100% of their Allowed Claims (without pre-petition interest or post-petition interest on the Allowed Unsecured Claims) and accordingly the requirements of Section 1129(b) are satisfied.

## IV.     LIQUIDATION ANALYSIS

If the Debtors' chapter 11 cases were converted to cases under chapter 7 of the Bankruptcy Code, the Properties and Assets will be liquidated and proceeds of such liquidation distributed in accordance with the priorities established by the Bankruptcy Code.  In such a scenario, the Debtors expect that no creditor will be entitled to <u>any</u> distribution on its Claims aside from a partial distribution on the LoanCore Mortgage Claim.  LoanCore holds a Secured Claim over all of the Debtors' Assets entitled to first priority under the Bankruptcy Code.  LoanCore and the Debtors agree as to the value of the Debtors' Properties, each understanding the value of the Properties is less than the amount of the LoanCore Mortgage Claim of an amount not less than $203,075,766.48. Accordingly, even without regard to trustee expenses in a bankruptcy case pursuant to chapter 7 of the Bankruptcy Code, and the time it would take to market and sell the Properties and Assets, a liquidation of the Debtors' Properties under chapter 7 cases under the Bankruptcy Code would yield no distribution for any other Creditor.

## V.     RISK FACTORS TO BE CONSIDERED

Holders of Claims against the Debtors should read and consider carefully the information set forth below, as well as the other information set forth in the Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference), prior to voting to accept or reject the Plan.  This information, however, should not be regarded as the only risks involved in connection with the Plan and/or its implementation.

**Risk of Confirmation**.  The Bankruptcy Court, which sits as a court of equity, may exercise substantial discretion.  As discussed above, section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, that the value of distributions to dissenting creditors and shareholders not be less than the value of distributions such creditors and shareholders would receive if the Debtors were liquidated under chapter 7 of

25

the Bankruptcy Code.  Although the Debtors believe that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court would reach the same conclusion.

**Risk of Effective Date**.  The Debtors believe that each of the conditions to the Effective Date set forth in Section 11.2 of the Plan will be satisfied reasonably soon after the Confirmation Date.  However, there can be no assurance as to such timing or as to whether it will occur.

## VI.   CERTAIN TAX CONSEQUENCES

Confirmation of the Plan may have federal income tax consequences for the holders of Claims and Interests.  The Debtors have not obtained and do not intend to request a ruling from the Internal Revenue Service, nor have the Debtors obtained an opinion of counsel with respect to any tax matters.  Any federal income tax matters raised by confirmation of the Plan are governed by the Internal Revenue Code and the regulations promulgated thereunder. Holders of Claims and Interests are urged to consult their own counsel and tax advisors as to consequences to them, under federal and applicable state, local, and foreign tax laws, of the Plan. The following is intended to be a summary only and not a substitute for careful tax planning with a tax professional. The federal, state, and local tax consequences of the Plan may be complex in some circumstances and, in some cases, uncertain. Accordingly, each holder of a Claim or Interest is strongly urged to consult with his or her own tax advisor regarding the federal, state, and local tax consequences of the Plan, including, but not limited to the receipt of Cash under the Plan.  An unsecured Creditor that receives Cash in satisfaction of its Claim may recognize gain or loss, with respect to the principal amount of its Claim, equal to the difference between (y) the unsecured Creditor's basis in the Claim (other than the portion of the Claim, if any, attributable to accrued interest), and (z) the balance of the Cash received after any allocation to accrued interest.  The character of the gain or loss as capital gain or loss, or ordinary income or loss, will generally be determined by whether the Claim is a capital asset in the creditor's hands.  The income or loss generally will be ordinary, regardless of whether the creditor's Claim is a capital asset in its hands.  **DUE TO A LACK OF DEFINITIVE JUDICIAL OR ADMINISTRATIVE AUTHORITY AND INTERPRETATION, SUBSTANTIAL UNCERTAINTIES EXIST WITH RESPECT TO VARIOUS TAX CONSEQUENCES OF THE PLAN.  CLAIMANTS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS AS TO SPECIFIC TAX CONSEQUENCES (FEDERAL, STATE, AND LOCAL) OF THE PLAN.**

## VII.   RETENTION OF JURISDICTION

The Bankruptcy Court will retain exclusive jurisdiction over all matters arising under, arising in or out of, or relating to the Debtors' Bankruptcy Case and this Plan to the fullest extent permitted by law, including, but not limited to, among other things, jurisdiction to:

    i. allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim, the resolution of any objections to the allowance or priority of Claims or Interests, and the determination of any Cure amount;

ii. resolve any matters related to the rejection of any Executory Contract and to hear, determine, and, if necessary, liquidate any Claims arising therefrom;

iii. hear and determine all applications for compensation and reimbursement of expenses of professionals under section 330, 331, 363, 503(b), 1103 and 1129(c)(9) of the Bankruptcy Code;

iv. ensure that distributions to Claimants holding Allowed Claims are accomplished pursuant to the provisions of this Plan;

v. decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

vi. enter such orders as may be necessary or appropriate to implement, enforce, or consummate the provisions of this Plan and all contracts, instruments, releases and other agreements or documents created in connection with this Plan, the Disclosure Statement or the Confirmation Order;

vii. resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation, or enforcement of this Plan or any contract, instrument, release or other agreement or document that is executed or created pursuant to this Plan, or any entity's rights arising from or obligations incurred in connection with this Plan or such documents;

viii. consider any modification of the Plan under section 1127 of the Bankruptcy Code or approve any modification of the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with this Plan or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, this Plan, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with this Plan or the Confirmation Order, or enter any order in aid of the Confirmation Order pursuant to section 1142 of the Bankruptcy Code, in such manner as may be necessary or appropriate to consummate this Plan;

ix. issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation, implementation or enforcement of this Plan or the Confirmation Order;

x. hear and determine all Causes of Action to the full extent permitted under 28 U.S.C. §1334 and 28 U.S.C. §157;

xi. enter an order concluding and terminating the Bankruptcy Case;

xii. enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Bankruptcy Case; and

xiii. hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under the Bankruptcy Code.

## VIII.   <u>VOTING INSTRUCTIONS AND PROCEDURES</u>

Pursuant to section 1126(f) of the Bankruptcy Code, Claims in Classes 1 and 3 are unimpaired under the Plan and deemed to accept the Plan, and holders of such Claims are not entitled to vote on the Plan except as to whether to provide the releases in Section 10.2 of the Plan and discussed in Article III above.   Interests in Class 5 are impaired and deemed to reject the Plan and not entitled to vote on the Plan except as to whether to provide the releases in Section 10.2 of the Plan and generally discussed in Article III above.   Holders of Claims in Classes 2 and 4 will vote on whether to accept the Plan and whether to provide the releases in Section 10.2 of the Plan and generally discussed in Article III above.

The following materials, among others, constitute the solicitation package for the Plan:

1. this Disclosure Statement with all exhibits, including the Plan, and any other supplements or amendments to these documents;

2. the appropriate ballot and applicable voting instructions; and

3. a cover letter describing the contents of the solicitation package.

The Debtors shall serve a copy of this Disclosure Statement with all exhibits, including the Plan and appropriate ballot, on all holders of Claims and Interests.

After carefully reviewing the Plan, this Disclosure Statement and the detailed instructions accompanying your Ballot, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed ballot. Please complete and sign your original ballot and return it (i) by the voting deadline to Backenroth Frankel & Krinsky, LLP, proposed counsel for the Debtors, at the address listed below.   **THE VOTING DEADLINE IS _____ AT _____ P.M. (PREVAILING EASTERN TIME)**. In voting to accept or reject the Plan, you must use only the Ballot sent to you with this Disclosure Statement.   **IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT AND RECEIVED NO LATER THAN THE VOTING DEADLINE BY THE ATTORNEYS FOR THE DEBTORS AT THE FOLLOWING ADDRESS:**

Backenroth Frankel & Krinsky, LLP
Attention: Mark A. Frankel.
800 Third Avenue, 11th Floor
New York, New York 10022

28

If you have any questions about (i) the procedure for voting your Claim or with respect to the packet of materials that you have received or (ii) the amount of your Claim, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any appendices or exhibits to such documents, please contact:

<div align="center">

Backenroth Frankel & Krinsky, LLP
Attention: Mark A. Frankel.
800 Third Avenue, 11th Floor
New York, New York 10022
Email: mfrankel@bfklaw.com

</div>

## IX.    <u>CONCLUSION</u>

The Debtors urge Claimants to vote to accept the Plan and to evidence such acceptance by returning their ballots so that they will be received no later than _____ p.m. on_____.

Dated:    New York, New York
          December 28, 2020

<div align="center">

BACKENROTH FRANKEL & KRINSKY LLP

</div>

By:    <u>/s/</u>_____
       Mark A. Frankel
       800 Third Avenue, 11th Floor
       New York, New York 10022
       Tel: (212) 593-1100
       Fac: (212) 644-0544

<div align="center">

29

</div>

Exhibit A



203 W 107 Street LLC
210 W 107 Street LLC
220 W 107 Street LLC
230 W 107 Street LLC
(Delaware Limited Liability Company)
West 107 Mezz LLC
DE limited liability company
(100% sole member)
West 107 Realty Holdings LLC
A NY Limited Liability Company
(100% sole member)

Exhibit B

East 117 Realty
LLC,
100%
EIN: 38-___1721

235 East 117
LLC
100%
EIN: 81-___8762

244 East 117
LLC
100%
EIN: 81-___1142

124-136
East 117 LLC
(100%)
EIN: 81-___5631

215 East 117 LLC
100%
EIN: 81-___6961

231 East 117 LLC
100%
EIN: 81-___0105

1661 PA Realty
LLC,
100%
EIN: 81-___5280

EEG HGI LLC,
a DE entity
100%
EIN: 82-___6465

**EXHIBIT D TO THE RESTRUCTURING SUPPORT AGREEMENT**

**<u>Intentionally Omitted</u>**

**EXHIBIT E TO THE RESTRUCTURING SUPPORT AGREEMENT**

**<u>Anticipated Budget</u>**

(attached hereto)

| | | | | | | |
|---|---|---|---|---|---|---|
| **East 117th Street Portfolio 5 Month Operating Budget** | | | | | | |
| **Includes: 124, 215, 231, 235, 244, 316, 322 & 326 East 117th Street and 1661 Park Avenue** | | | | | | |
| **Month** | **January** | **February** | **March** | **April** | **May** | **5-mo Total** |
| **Income** | | | | | | |
| **Rental Income** | | | | | | |
| Fair Market Rent[1] | 194,108 | 194,108 | 194,108 | 194,108 | 194,108 | 970,539 |
| Concessions | (1,542) | (1,542) | (1,542) | (1,542) | (1,542) | (7,711) |
| Stabilized Rent[1] | 296,207 | 296,207 | 296,207 | 296,207 | 296,207 | 1,481,034 |
| Preferential Rent Adjustment[2] | (40,888) | (40,888) | (40,888) | (40,888) | (40,888) | (204,440) |
| Rent Adjustment/Reduction | (263) | (263) | (263) | (263) | (263) | (1,317) |
| SCRIE/DRIE | (1,112) | (1,112) | (1,112) | (1,112) | (1,112) | (5,560) |
| **Gross Potential Rental Income** | **446,509** | **446,509** | **446,509** | **446,509** | **446,509** | **2,232,546** |
| **Commercial Income** | | | | | | |
| Commercial Rent | 9,075 | 9,075 | 9,075 | 9,075 | 9,075 | 45,375 |
| Antenna Income | 882 | 882 | 882 | 882 | 882 | 4,412 |
| Laundry Income | 67 | 67 | 67 | 67 | 67 | 336 |
| **Total Commercial Income** | **10,025** | **10,025** | **10,025** | **10,025** | **10,025** | **50,123** |
| **Gross Potential Income** | **456,534** | **456,534** | **456,534** | **456,534** | **456,534** | **2,282,669** |
| **Other Income** | | | | | | |
| Fuel Charge | 37 | 37 | 37 | 37 | 37 | 187 |
| **Total Other Income** | **37** | **37** | **37** | **37** | **37** | **187** |
| **Vacancy & Credit Loss** | | | | | | |
| Credit Allowance[3] | (13,393) | (13,393) | (13,393) | (13,393) | (13,393) | (66,966) |
| General Vacancy Allowance | - | - | - | - | - | - |
| **Total Vacancy & Credit Loss** | **(13,393)** | **(13,393)** | **(13,393)** | **(13,393)** | **(13,393)** | **(66,966)** |
| **Effective Gross Income** | **443,178** | **443,178** | **443,178** | **443,178** | **443,178** | **2,215,890** |
| **Expenses** | | | | | | |
| **General & Administrative Expenses** | | | | | | |
| Other General & Administrative | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 20,000 |
| Leasing Commissions[4] | - | 3,467 | 3,467 | 3,467 | 3,467 | 13,867 |
| **Total General & Administrative Expenses** | **4,000** | **7,467** | **7,467** | **7,467** | **7,467** | **33,867** |
| **Management Fees** | | | | | | |
| Property Management Fees | 24,999 | 24,999 | 24,999 | 24,999 | 24,999 | 124,995 |
| **Total Management Fees** | **24,999** | **24,999** | **24,999** | **24,999** | **24,999** | **124,995** |
| **Professional Fees - Operating** | | | | | | |
| Legal Fees - L&T[4] | - | 5,067 | 5,067 | 5,067 | 5,067 | 20,267 |
| Other Legal & Professional Fees | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 10,000 |
| **Total Professional Fees - Operating** | **2,000** | **7,067** | **7,067** | **7,067** | **7,067** | **30,267** |
| **Taxes And Insurance** | | | | | | |
| Insurance | 13,067 | 13,067 | 13,067 | 13,067 | 13,067 | 65,333 |
| Real Estate Property Taxes[5] | 744,634 | - | - | - | - | 744,634 |
| **Total Taxes And Insurance** | **757,701** | **13,067** | **13,067** | **13,067** | **13,067** | **809,967** |
| **Repairs & Maintenance** | | | | | | |

| Month | | | | | | |
|---|---|---|---|---|---|---|
| **East 117th Street Portfolio Monthly Operating Budget** | | | | | | |
| **Includes: 124, 215, 231, 235, 244, 316, 322 & 326 East 117th Street and 1661 Park Avenue** | | | | | | |
| **Month** | **January** | **February** | **March** | **April** | **May** | **5-mo Total** |
| General R&M[6] | 30,899 | 30,899 | 30,899 | 30,899 | 30,899 | 154,497 |
| HPD Violation Work | 11,825 | 11,825 | 11,825 | 11,825 | 11,825 | 59,125 |
| DOB Violation Work | 5,874 | 5,874 | 5,874 | 5,874 | 5,874 | 29,372 |
| **Total Repairs & Maintenance** | **48,599** | **48,599** | **48,599** | **48,599** | **48,599** | **242,993** |
| | | | | | | |
| **Other Expenses** | | | | | | |
| ECB Fines | 26,451 | 26,451 | 26,451 | 26,451 | 26,451 | 132,253 |
| Compliance Fines | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 10,415 |
| **Total Other Expenses** | **28,534** | **28,534** | **28,534** | **28,534** | **28,534** | **142,668** |
| | | | | | | |
| **Payroll** | | | | | | |
| Payroll | 22,627 | 22,627 | 22,627 | 22,627 | 22,627 | 113,134 |
| **Total Payroll** | **22,627** | **22,627** | **22,627** | **22,627** | **22,627** | **113,134** |
| | | | | | | |
| **Utilities** | | | | | | |
| Fuel[7] | 30,933 | 30,933 | 30,933 | 30,933 | 30,933 | 154,667 |
| Light & Power | 6,933 | 6,933 | 6,933 | 6,933 | 6,933 | 34,667 |
| Water & Sewer | 26,114 | 26,114 | 26,114 | 26,114 | 26,114 | 130,570 |
| **Total Utilities** | **63,981** | **63,981** | **63,981** | **63,981** | **63,981** | **319,903** |
| | | | | | | |
| **Total Expenses** | **952,439** | **216,339** | **216,339** | **216,339** | **216,339** | **1,829,813** |
| | | | | | | |
| **Net Operating Income** | **(495,906)** | **240,195** | **240,195** | **240,195** | **240,195** | **452,856** |
| | | | | | | |
| **Bankruptcy Expenses** | | | | | | |
| Debtor's Counsel | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 25,000 |
| Lender's Counsel | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 37,500 |
| Other Bankruptcy Expenses | 12,019 | - | - | - | - | 12,019 |
| **Total Bankruptcy Expenses** | **24,519** | **12,500** | **12,500** | **12,500** | **12,500** | **74,519** |
| | | | | | | |
| **Capital Expenditure** | | | | | | |
| Unit Renovations | - | - | - | - | - | - |
| Common Area Renovations | - | - | - | - | - | - |
| Sidewalk Work | - | - | - | - | - | - |
| Facade/Bridge Work | - | - | - | - | - | - |
| **Total Capital Expenditure** | **-** | **-** | **-** | **-** | **-** | **-** |
| | | | | | | |
| **Net Cash Flow** | **(520,425)** | **227,695** | **227,695** | **227,695** | **227,695** | **378,337** |

| Account Balances | Estimated Beginning Cash Balance | January | February | March | April | May | Ending Cash Balance |
|---|---|---|---|---|---|---|---|
| Operating Account | - | - | - | - | - | - | - |
| Reserve Accounts[8] | 3,520,042 | 2,999,617 | 3,227,312 | 3,455,007 | 3,682,702 | 3,910,398 | 3,910,398 |
| Tax Escrow Account | - | - | - | - | - | - | - |
| Insurance Escrow Account | - | - | - | - | - | - | - |
| Third Party Rent Escrow Account | - | - | - | - | - | - | - |
| **Total Account Balances** | **3,520,042** | **2,999,617** | **3,227,312** | **3,455,007** | **3,682,702** | **3,910,398** | **3,910,398** |

**Notes**

1) Assumes any lease that expires will renew at existing rate.

2) A preferential rent is a rent which an owner agrees to charge that is lower than the legal regulated rent that the owner could lawfully collect. This adjustment reduces the rent that is collected from rent stabilized units.

3) The COVID-19 pandemic has had a significant impact on rent collection across New York City. Credit allowance of 3.00% of gross potential income to reflect tenant non-payments.

**East 117th Street Portfolio Monthly Operating Budget**
**Includes: 124, 215, 231, 235, 244, 316, 322 & 326 East 117th Street and 1661 Park Avenue**

| Month | January | February | March | April | May | 5-mo Total |
|---|---|---|---|---|---|---|

4) Leasing commissions for apartment rentals are contingent upon leasing activity.  This activity is not expected to begin until February 2021.  Legal fees are for arrears collections.

5) Real Estate Taxes per NYC Department of Finance property tax bill as of 6/6/2020.

6) General R&M includes (HVAC contract and maintenance, exterminating, elevator contract and maintenance, doors and glass, supplies, misc. interior, plumbing , appliances, locksmith, landscaping, masonry repair, floor & ceiling repair etc.)

7) Fuel: No historical RPIE information available for 235 E 117 Street, 2021 budget based on 231 E 117 value of $1,160/unit.

8) Per servicer email as of 10/28/2020.

**As of 12/1/2020**

| West 107th Street Portfolio 5 Month Operating Budget<br>Includes: 203, 210, 220, & 230 West 107th Street | | | | | | |
|---|---|---|---|---|---|---|
| **Month** | **January** | **February** | **March** | **April** | **May** | **5-mo Total** |
| **Income** | | | | | | |
| **Rental Income**[1] | | | | | | |
| Fair Market Rent[2] | 142,118 | 142,118 | 142,118 | 142,118 | 142,118 | 710,592 |
| Concessions | (1,660) | (1,660) | (1,660) | (1,660) | (1,660) | (8,300) |
| Stabilized Rent | 142,068 | 142,068 | 142,068 | 142,068 | 142,068 | 710,338 |
| Preferential Rent Adjustment | (5,230) | (5,230) | (5,230) | (5,230) | (5,230) | (26,151) |
| SCRIE/DRIE | (4,248) | (4,248) | (4,248) | (4,248) | (4,248) | (21,240) |
| Rent Strike Adjustment | (46,148) | (46,148) | (46,148) | (46,148) | (46,148) | (230,739) |
| **Gross Potential Rental Income** | **226,900** | **226,900** | **226,900** | **226,900** | **226,900** | **1,134,499** |
| **Commercial Income** | | | | | | |
| Laundry Income | 1,425 | 1,425 | 1,425 | 1,425 | 1,425 | 7,125 |
| **Total Commercial Income** | **1,425** | **1,425** | **1,425** | **1,425** | **1,425** | **7,125** |
| **Gross Potential Income** | **228,325** | **228,325** | **228,325** | **228,325** | **228,325** | **1,141,624** |
| **Other Income** | | | | | | |
| Storage Income | 1,500 | 2,000 | 2,000 | 2,000 | 2,000 | 9,500 |
| Fuel Charge | 155 | 155 | 155 | 155 | 155 | 775 |
| **Total Other Income** | **1,655** | **2,155** | **2,155** | **2,155** | **2,155** | **10,275** |
| **Vacancy & Credit Loss** | | | | | | |
| Credit Loss[3] | (4,566) | (4,566) | (4,566) | (4,566) | (4,566) | (22,832) |
| General Vacancy Allowance | - | - | - | - | - | - |
| **Total Vacancy & Credit Loss** | **(4,566)** | **(4,566)** | **(4,566)** | **(4,566)** | **(4,566)** | **(22,832)** |
| **Effective Gross Income** | **225,413** | **225,913** | **225,913** | **225,913** | **225,913** | **1,129,067** |
| **Expenses**[4] | | | | | | |
| **General & Administrative Expenses** | | | | | | |
| Bank Fees | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 5,000 |
| Software Subscriptions | 2,150 | 2,150 | 2,150 | 2,150 | 2,150 | 10,750 |
| Permits & Fees | 100 | 100 | 100 | 100 | 100 | 500 |
| Shipping & Postage | 645 | 645 | 645 | 645 | 645 | 3,225 |
| Office Supplies | - | - | - | - | - | - |
| **Total General & Administrative Expenses** | **3,895** | **3,895** | **3,895** | **3,895** | **3,895** | **19,475** |
| **Professional Fees - Operating** | | | | | | |
| Professional Fees | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 10,000 |
| Legal Fees - L&T | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 10,000 |
| Accounting & Tax Expense | - | - | 10,000 | - | - | 10,000 |
| **Total Professional Fees - Operating** | **4,000** | **4,000** | **14,000** | **4,000** | **4,000** | **30,000** |
| **Taxes And Insurance** | | | | | | |
| Insurance - Property & Liability[5] | - | - | 216,000 | - | - | 216,000 |
| Insurance - Umbrella | 700 | 700 | 700 | 700 | 700 | 3,500 |
| Real Estate Property Taxes[6] | 984,187 | - | - | - | - | 984,187 |
| **Total Taxes And Insurance** | **984,887** | **700** | **216,700** | **700** | **700** | **1,203,687** |
| **Repairs & Maintenance** | | | | | | |

| West 107th Street Portfolio 5-Month Operating Budget<br>Includes: 203, 210, 220, & 230 West 107th Street | | | | | | |
|---|---|---|---|---|---|---|
| **Month** | **January** | **February** | **March** | **April** | **May** | **5-mo Total** |
| General R&M[7] | 30,000 | 20,000 | 20,000 | 20,000 | 20,000 | 110,000 |
| **Total Repairs & Maintenance** | **30,000** | **20,000** | **20,000** | **20,000** | **20,000** | **110,000** |
| | | | | | | |
| **Management Fees** | | | | | | |
| Property Management Fees[8] | 11,271 | 11,296 | 11,296 | 11,296 | 11,296 | 56,453 |
| **Total Management Fees** | **11,271** | **11,296** | **11,296** | **11,296** | **11,296** | **56,453** |
| | | | | | | |
| **Other Expenses** | | | | | | |
| Permits & Fees | 500 | 500 | 500 | 500 | 500 | 2,500 |
| Violation Construction & Repairs | 10,000 | - | - | - | - | 10,000 |
| Violation Fines/Fees | 500 | 500 | - | - | - | 1,000 |
| **Total Other Expenses** | **11,000** | **1,000** | **500** | **500** | **500** | **13,500** |
| | | | | | | |
| **Payroll[9]** | | | | | | |
| Payroll - Taxes | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 6,000 |
| Payroll - Super/Janitorial | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 75,000 |
| Payroll - Workers Comp | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 7,500 |
| Payroll - Processing Fees | 500 | 500 | 500 | 500 | 500 | 2,500 |
| **Total Payroll** | **18,200** | **18,200** | **18,200** | **18,200** | **18,200** | **91,000** |
| | | | | | | |
| **Utilities** | | | | | | |
| Utilities - Telephone, Cable, and Data | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 9,000 |
| Utilities - Telephone, Cable, and Data | 350 | 350 | 350 | 350 | 350 | 1,750 |
| Electricity | 4,250 | 4,250 | 4,250 | 4,250 | 4,250 | 21,250 |
| Oil - Heat | 50,000 | 50,000 | 50,000 | 35,000 | 35,000 | 220,000 |
| Gas - Heat | 200 | 200 | 200 | 200 | 200 | 1,000 |
| Water & Sewer | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 80,000 |
| **Total Utilities** | **72,600** | **72,600** | **72,600** | **57,600** | **57,600** | **333,000** |
| | | | | | | |
| **Total Expenses** | **1,135,852** | **131,691** | **357,191** | **116,191** | **116,191** | **1,857,115** |
| | | | | | | |
| **Net Operating Income** | **(907,527)** | **96,634** | **(128,866)** | **112,134** | **112,134** | **(715,491)** |
| | | | | | | |
| **Bankruptcy Expenses** | | | | | | |
| Debtor's Counsel | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 25,000 |
| Lender's Counsel | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 37,500 |
| Other Bankruptcy Expenses | 6,868 | - | - | - | - | 6,868 |
| **Total Bankruptcy Expenses** | **19,368** | **12,500** | **12,500** | **12,500** | **12,500** | **69,368** |
| | | | | | | |
| **Capital Expenditure** | | | | | | |
| Unit Renovations | - | - | - | - | - | - |
| Common Area Renovations | - | - | - | - | - | - |
| **Total Capital Expenditure** | **-** | **-** | **-** | **-** | **-** | **-** |
| | | | | | | |
| **Net Cash Flow** | **(926,895)** | **84,134** | **(141,366)** | **99,634** | **99,634** | **(784,859)** |

| **Account Balances** | Estimated<br>Beginning<br>Cash Balance | January | February | March | April | May | Ending Cash<br>Balance |
|---|---|---|---|---|---|---|---|
| Operating Account | - | - | - | - | - | - | - |
| Reserve Accounts | 1,029,643 | 102,748 | 186,882 | 45,516 | 145,150 | 244,784 | 244,784 |
| Tax Escrow Account | - | - | - | - | - | - | - |
| Insurance Escrow Account | - | - | - | - | - | - | - |
| Third Party Rent Escrow Account | - | - | - | - | - | - | - |
| **Total Account Balances** | **1,029,643** | **102,748** | **186,882** | **45,516** | **145,150** | **244,784** | **244,784** |

| West 107th Street Portfolio - 5 Month Operating Budget | | | | | | |
| Includes: 203, 210, 220, & 230 West 107th Street | | | | | | |
| Month | January | February | March | April | May | 5-mo Total |

**Notes**

1) Rental Income based on existing rent roll with no assumption of revenue from new leases.

2) Fair Market categorization is based off of the 2019 DHCR.

3) The COVID-19 pandemic has had a significant impact on rent collection across New York City. Credit allowance of 2.00% of gross potential income to reflect tenant non-payments.

4) Operating Expenses based upon historical operating results for this portfolio and operating expenses for other similar properties.

5) Insurance expense is projected at $216,000 paid annually upon the expiry date of existing policy in March.

6) NYC Real estate taxes assumed to be paid on or before January 2, 2021. Amounts are based upon current assessed values and current tax rates. Projection assumes no monthly escrow payments for real estate taxes.

7) Repairs & Maintenance assumed to be front loaded as a result of deferred maintenance.

8) Management Fee is based upon Tri-Hill property management agreement (5.00% of Effective Gross Income).

9) Payroll is based upon 4 existing employees paid at current compensation levels.

**As of 12/1/2020**