UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

In re                                                   Chapter 11

      203 W 107 Street LLC *et al*,[1]              Case No.  20-12960

               Debtors.

---------------------------------------------------------------x

## NOTICE OF HEARING

     PLEASE TAKE NOTICE, that a telephonic hearing through Court-Solutions.com will be held before the Honorable Lisa G Beckerman at the United States Bankruptcy Court, One Bowling Green, New York, New York  10004, on September 22, 2022 at 10:00 a.m., or as soon thereafter as counsel can be heard, to consider the annexed application ("Application") of the above captioned debtors (the "Debtors") for the entry of an order substantially in the form annexed to the Application, authorizing the Debtors to enter into two license agreements with RCG Tower Group I, LLC (the "Licensee"), under which  the Licensee shall, among other things, install and operate rooftop communication sites at certain of the Debtors' properties.

     PLEASE TAKE FURTHER NOTICE, that objections shall be filed with the Clerk of the Bankruptcy Court, One Bowling Green, New York, New York  10004, and served upon the undersigned no later than seven (7) days before the hearing date.

Dated: New York, New York
       August 23, 2022

                       BACKENROTH FRANKEL & KRINSKY, LLP
                       Attorneys for the Debtors


                       By: s/Mark A. Frankel
                          800 Third Avenue
                          New York, New York 10022
                          (212) 593-1100

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: 203 W 107 Street LLC (8429); 210 W 107 Street LLC (3364), 220 W 107 Street LLC (0461), 230 W 107 Street LLC (3686), 124-136 East 117 LLC (6631), 215 East 117 LLC (6961), 231 East 117 LLC (0105), 235 East 117 LLC (8762), 244 East 117 LLC (1142), East 117 Realty LLC (1721) and 1661 PA Realty LLC (5280).

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| | ) Case No. 20-12960 (LGB) |
| 203 W 107 STREET LLC, *et al.*,[2] | ) |
| | ) (Jointly Administered) |
| Debtors. | ) |
| | ) |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO ENTER INTO CERTAIN LICENSE AGREEMENTS AND GRANTING RELATED RELIEF

The debtors and debtors-in-possession (each, a "Debtor" and collectively, the "Debtors")[3] in the above-captioned chapter 11 cases (the "Chapter 11 Cases") submit this motion (the "Motion") requesting entry of an order (the "Proposed Order"), substantially in the form attached hereto as Exhibit A, pursuant to sections 105 and 363 of title 11 of the United States Code (the "Bankruptcy Code"), rule 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 6006-1 of the Local Rules for the United States Bankruptcy Court for the Southern District of New York (the "Local Rules"), authorizing the Debtors to enter into two license agreements (the "License Agreements"), substantially in the form attached hereto as Exhibits B and C, with RCG Tower Group I, LLC (the "Licensee"), under which the Licensee shall, among other things, install and operate rooftop communication sites at the Licensed

---

[2] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: 203 W 107 Street LLC (8429), 210 W 107 Street LLC (3364), 220 W 107 Street LLC (0461), 230 W 107 Street LLC (3686), 124-136 East 117 LLC (6631), 215 East 117 LLC (6961), 231 East 117 LLC (0105), 235 East 117 LLC (8762), 244 East 117 LLC (1142), East 117 Realty LLC (1721) and 1661 PA Realty LLC (5280).

[3] Capitalized terms used but not otherwise defined in the Motion shall have the meanings ascribed to such terms in the *Fourth Amended Joint Plan of Liquidation of the Debtors* [ECF No. 67] (the "Plan").

Properties (as defined below) and granting related relief.  In support of this Motion, the Debtors respectfully submit as follows:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the Southern District of New York, dated February 1, 2012.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

3.      On December 28, 2020 (the "Petition Date"), the Debtors filed voluntary petitions for relief in the United States Bankruptcy Court for the Southern District of New York (the "Court") under chapter 11 of the Bankruptcy Code.

4.      The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Bankruptcy Code section 1107(a) and 1108.

5.      No committees have been appointed in the Chapter 11 Cases and no request for the appointment of a trustee or examiner has been made.

6.      The Debtors own real property located at: (i) 203 West 107th Street, New York, New York, 210 West 107th Street, New York, New York, 220 West 107th Street, New York, New York, and 230 West 107th Street, New York, New York; and (ii) 124-136 East 117th Street, New York, New York, 215 East 117th Street, New York, New York, 231 East 117th Street, New York, New York, 235 East 117th Street, New York, New York, 244 East 117th Street, New York, New York, 316, 322, and 326 East 117th Street, New York, New York, and 1661 Park Avenue New York, New York (collectively, the "Properties").

7.      The Licensee designs, licenses, and deploys integrated multi-site communications networks covering individual neighborhoods or entire metropolitan areas and maintains marketing rights on over 3,000 available rooftop sites in urban markets throughout the United States.  For property owners that are interested in monetizing unused rooftop space, the Licensee oversees the installation and operation of, among other things, cell tower equipment at a property and then markets the site to communications companies.  In exchange for the use of cell tower equipment at a particular property, the communication company pays a monthly fee to the Licensee.  In turn, the Licensee pays the property owner a monthly license fee that is calculated based on the payments made to the Licensee from the communications companies that use the cell towers on the property.

8.      Debtor 244 East 117 Realty LLC and Debtor 1661 PA Realty LLC (each, a "Licensor" and together, the "Licensors") request, among other things, authority to enter into the respective License Agreements with the Licensee for the Licensee to (a) locate, install, and operate antennas and other similar communication systems and equipment and related supporting equipment, including but not limited to cables, emergency generators, structures, and improvements (collectively, the "Equipment") at 244 East 117th Street, New York, New York and 1661 Park Avenue, New York, New York (each, a "Licensed Property" and together, the "Licensed Properties"), respectively, and (b) where requested, having such Licensee's clients and sub-licensees (collectively, the "Licensee's Clients") connect their facilities to the Equipment at the Licensed Properties.

2.      Each Licensor will receive a monthly license fee (the "License Fee") in an amount equal to seventy percent (70%) of the actual revenue collected by the Licensee during the previous month from the Licensee's Clients who have utilized Equipment at the Licensed Properties.  In

4

exchange for the monthly License Fee, each Licensor is obligated to, among other things, provide the Licensee with access to the Licensed Properties for the purposes of inspecting the Licensed Properties, and installing, maintaining, replacing, relocating, removing, modifying, repairing, and operating the Equipment. The rooftop space to be allocated for the Equipment is not being used by Licensors or any of the occupants at the building. Each Licensor anticipates receiving annual revenue of approximately $24,000, although there is no guaranty of income and the Licensors may ultimately receive amounts lower (or higher) than that estimate. Accordingly, the Licensors' decision to enter into the License Agreements is an exercise of sound business judgment, and the Debtors seek Court approval herein for the Licensors to enter into the License Agreements pursuant to Bankruptcy Code section 363(b).

## ARGUMENT

9.    Bankruptcy Code section 363 provides, in relevant part, that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). The Debtors believe that the Licensors' entry into the License Agreements are ordinary course transactions for landlords in the New York City real estate market. However, out of an abundance of caution, the Debtors are requesting Court approval before the License Agreements are executed.

10.    In applying Bankruptcy Code section 363, courts in the Second Circuit have held that the use, sale or lease property of the estate, other than in the ordinary course of business, is authorized when there is an "articulated business justification" for the action to be taken. *See Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *see also In re Chateaugay Corp.*, 973 F.2d 141, 144-45 (2d Cir. 1992) (affirming the

bankruptcy court's approval of an asset sale under section 363(b) by utilizing the "good business reason" standard).

11.    In circumstances "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citing *In re Curlew Valley Associates*, 14 B.R. 506, 513 (Bankr. D. Utah 1981)); *In re Integrated Res.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (explaining that the business judgment rule applies to a debtor's decisions in bankruptcy and that thus "[c]ourts are loath to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence"); *see also In re Glob. Crossing Ltd.*, 295 B.R. 726, 744 (Bankr. S.D.N.Y. 2003) (citation omitted) (noting that courts generally "give great deference to the substance of the directors' decision and will not invalidate the decision, will not examine its reasonableness, and will not substitute its views for those of the board if the latter's decision can be attributed to any rational business purpose"). Accordingly, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under Bankruptcy Code section 363(b)(1). Based on these principles, the Debtors respectfully submit that the Licensors' entry into the License Agreements with the Licensee is a sound exercise of their business judgment.

12.    The Debtors believe that the Licensors' entry into the License Agreements with the Licensee is well within the Debtors' business judgment and an appropriate step in furtherance of their efforts to preserve, maintain, and improve the Properties by increasing net operating income. The Licensors will realize substantial revenue as a result of allowing the Licensee to install and operate the Equipment at the Licensed Properties. In exchange, the Licensors' obligations to the

Licensee are minimal and will not interfere with the Licensors' operations of the building or affect any of the occupying tenants. Accordingly, the Licensors' decision to enter into the License Agreements is an exercise of sound business judgment, and the Licensors should be authorized to enter into the License Agreements pursuant to Bankruptcy Code section 363(b).

<u>**NO PRIOR REQUEST**</u>

13.     No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

<u>**NOTICE**</u>

14.     The Debtors will provide notice of this Motion to: i) the Office of the United States Trustee; ii) the 124-136 East 117th Street Tenants' Association; iii) the Ad Hoc Group of West 107th Street Tenants; iv) the City of New York; v) the New York State Office of the Attorney General; vi) the New York State Division of Housing and Community Renewal; vii) LoanCore Capital Credit REIT LLC; viii) Elmax Builders Supply LLC; ix) YDC, Inc. d/b/a Rezi; and x) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, under the circumstances, no other or further notice is required.

<u>**CONCLUSION**</u>

For the foregoing reasons, the Debtors respectfully request that this Court enter the Proposed Order attached as Exhibit A to the Motion authorizing the Debtors to enter into the License Agreements and to grant such other further relief as is just and proper.

Dated: August 23, 2022
     New York, New York         /s/ *Mark Frankel*
                                  Mark Frankel
                                  Backenroth Frankel & Krinsky LLP
                                  800 Third Avenue, 11th Floor
                                  New York, NY 10022
                                  (212) 593-1100
                                  Email: mfrankel@bfklaw.com

## Exhibit A

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| | ) |
| | ) Case No. 20-12960 (LGB) |
| 203 W 107 STREET LLC, *et al.*,[1] | ) |
| | ) (Jointly Administered) |
| Debtors. | ) |
| | ) |

### ORDER AUTHORIZING THE DEBTORS TO ENTER INTO CERTAIN LICENSE AGREEMENTS AND GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the Debtors requesting entry of an order, pursuant to sections 105 and 363 of title 11 of the United States Code (the "Bankruptcy Code"), rule 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 6006-1 of the Local Rules for the United States Bankruptcy Court for the Southern District of New York (the "Local Rules"), authorizing the Debtors to enter into two license agreements (the "License Agreements"), substantially in the form attached to the Motion as Exhibits B and C, with RCG Tower Group I, LLC (the "Licensee"), under which the Licensee shall, among other things, install and operate rooftop communication sites at the Licensed Properties and granting related relief; and the Court having considered the Motion and determined the relief requested therein is in the best interests of the Debtors' Estates; and after due deliberation and good cause appearing therefor, it is hereby:

**ORDERED** that the Motion is granted; and it is further

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: 203 W 107 Street LLC (8429), 210 W 107 Street LLC (3364), 220 W 107 Street LLC (0461), 230 W 107 Street LLC (3686), 124-136 East 117 LLC (6631), 215 East 117 LLC (6961), 231 East 117 LLC (0105), 235 East 117 LLC (8762), 244 East 117 LLC (1142), East 117 Realty LLC (1721) and 1661 PA Realty LLC (5280).

[2] Capitalized terms used but not otherwise defined in this Final Order shall have the meanings ascribed to such terms in the Motion.

**ORDERED** that, pursuant to Bankruptcy Code section 363(b)(1), the Licensors are hereby authorized, but not directed, to enter into the License Agreements attached to the Motion as Exhibits B and C; and it is further

**ORDERED** that the Debtors are authorized an empowered to take all actions necessary to implement the relief granted in this Order; and it is further

**ORDERED** that the Court shall retain jurisdiction with respect to any matters, claims, rights, or disputes arising from or related to the Motion or implementation of this Order.

Dated: September __, 2022

_____
The Honorable Lisa G. Beckerman

2

## **Exhibit B**

**License Agreement for Debtor 1661 PA Realty LLC**

License Agreement

THIS LICENSE AGREEMENT (the "Agreement") entered into on this _____ day of_____, 2022 by and between 1661 PA Realty LLC, a Limited Liability Company, ("Licensor") having an address at c/o Bronstein Properties, LLC, 108-18 Queens Blvd, Suite 302, Forest Hills, NY 11375 and RCG Tower Group I, LLC a New York Limited Liability Company ("Licensee") having an address at 1051 Port Washington Blvd #605 Port Washington, New York 11050.

WHEREAS, Licensor is the owner of the building known as and located at 1661-1663 PARK AVENUE, MANHATTAN 10035 [Boro: 1 Block: 1645 Lot: 1] (the "Building"); and

WHEREAS, Licensee desires to license from Licensor a portion of the Building as further described in Exhibit A attached hereto ("Licensed Premises") and associated rights as further described herein for the purpose of sublicensing the Licensed Premises to Licensee's clients or sub-licensees ("Licensee's Clients"), all for the purposes of: (a) locating, installing and operating antennas and other similar communication systems and equipment and related supporting equipment, including but not limited to cables, emergency generators, structures and improvements (collectively, the "Equipment"), and (b) where requested, having such Licensee's Clients connect its facilities to Building occupants.

NOW THEREFORE, in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt of which is hereby acknowledged, Licensor and Licensee mutually covenant and agree as follows:

1.      LICENSE.  Licensor hereby grants to Licensee for the purpose of sublicensing to Licensee's Clients: (a) a non-exclusive license for the installation, construction, maintenance, replacement, and operation of Equipment at the Licensed Premises; and (b) a non-exclusive license to use conduits, shafts, raceways and other similar spaces at and in the Building to service the Equipment and connect the same to the Licensed Premises and/or to tenants in the Buildings.

2.      TERM.  The initial term of this Agreement shall commence on the date hereof and shall terminate on the earlier of: (a) the last day of the month following the month in which occurs the fifth (5th) anniversary of the date that the Equipment is first installed in the Licensed Premises (the "Initial Installation Date"), (b) thirty (30) days following the Licensor's receipt of notice that Licensee is terminating this Agreement, or (c) as otherwise provided for in this Agreement.  So long as Licensee is not in default of any of the provisions of this Agreement, beyond any notice, grace and cure period, Licensee shall have the right to extend this Agreement for four (4) additional five (5) year terms (collectively with the initial term, the "Term") upon the same terms and conditions, except as specifically set forth herein.  This Agreement shall automatically continue for such successive terms unless Licensee sends a written notice to Licensor of its intention not to extend the term, such notice to be given no later than thirty (30) days prior to the expiration date of the term.

3.      COMPENSATION.  During the Term of this Agreement Licensee shall pay to Licensor on the fifth (5th) day of each month, a license fee (the "License Fee") in an amount equal to seventy percent (70%) of the actual revenue collected by Licensee during the previous month from Licensee's Clients who have installed and/or operated Equipment at the Licensed Premises pursuant to separate agreements between Licensee and Licensee's Clients ("Revenue").  Licensee shall also provide to Licensor a monthly report, certified to be true and correct by Licensee, which shall include a list of the Licensee's Clients which have, during the previous month, installed and/or operated Equipment at the Licensed Premises and the Revenue collected by Licensee from each such Licensee's Client during that previous month.  Except as otherwise specifically provided for herein, the License Fee shall represent compensation in full to Licensor under the terms of this Agreement and Licensor shall not bring any claim, action or proceeding for any unpaid bills or expenses against Licensee or Licensee's Clients beyond the applicable statute of limitations from the date a bill therefor is received by Licensor. For purposes of calculating the Licensee Fee, Revenue shall exclude any payments received from Licensee's Client as reimbursement for pass-through charges such as electricity, taxes,  or the like.  Additionally, actual reasonable out-of-pocket expenses incurred by Licensee in collecting arrears and enforcing the terms of such agreements shall be deducted from Revenue for the purposes of calculating the License Fee. Once in every twelve months, Licensor shall have the right at its expense to audit Licensee's records relating to the License Fees paid to Licensor pursuant to this Agreement. Notwithstanding the foregoing, in the event that the License Fee paid to

1

Licensor as provided herein is less than $1520 per month, Licensor's percent of Revenue shall increase to up to 90% as may be necessary for the License Fee paid to Licensor to be up to $1520 per month.

4.    <u>LICENSOR TERMINATION RIGHT.</u>  In the event that Licensee has not entered into a sub-license agreement with a Licensee's Client within six (6) months following the date of this Agreement, then upon thirty (30) days prior written notice to Licensee ("Licensor's Termination Notice"), Licensor may terminate this Agreement.

5.    <u>INSTALLATION.</u>  Prior to the initial installation of the Equipment and any Material Modifications thereto (as defined below) by Licensee's Clients, Licensor shall be provided with information detailing the location and Equipment to be installed.  No such work with respect to the initial installation or Material Modifications shall commence without Licensor's written approval, which approval shall not be unreasonably withheld or unduly delayed, however Licensee's Clients shall be permitted to make modifications or additions to such installation that are not Material Modifications without further approvals from Licensor.  "Material Modifications"  shall mean (a) the installation of new Equipment outside of the Licensed Premises,  (b) modifications or additions that materially increase the obligations of Licensor, (c) modifications or additions that materially increase the weight or wind load, (d) modifications or additions that increase the number of Sub-Licensee's antennas from that specified in Exhibit B, or (e) modifications or additions that require additional building penetrations. Licensor shall cooperate with Licensee and Licensee's Clients with respect to the installation, operation or maintenance of the Equipment and with the submitting of any governmental or quasi-governmental applications, permits, filings, approvals, etc., which cooperation shall include without limitation, the execution of any such document that may require Licensor's signature. Licensor shall maintain the Building and comply with all applicable laws, rules and regulations to the extent necessary for Licensee and/or Licensee's Clients to operate at the Building.  , Licensee shall have the right to post (i) a placard at the Licensed Premises giving notice of its right to use the Premises as specified hereunder which shall be subject to Licensor's approval and (ii) signage outside of the Premises as may be required by applicable law.

6.    <u>UTILITIES AND EASEMENTS</u>.  Licensee's Clients may at its sole expense and to the extent available, utilize existing utility easements benefiting the Building and utilize and, with Licensor's approval, make reasonable modifications to the Building's utility distribution systems to accommodate the requirements of the Equipment. If the utility service for the operation of any Equipment is furnished by Licensor, Licensee will reimburse Licensor for such usage  pursuant to a sub-meter (which may be read remotely), which shall be deemed to be part of the Equipment for the purposes of this Agreement. Alternatively, Licensee's Clients shall have the right to make arrangements with the utility company to have a separate service (billed to and paid directly by Licensee or Licensee's Clients) installed upon the Licensed Premises.

7.    <u>INTERFERENCE.</u> If Equipment installed by Licensee's Clients causes any material interference to Licensor's (including Licensor's other licensees and/or tenants of the Building) communications equipment or Building systems existing and located at the Building prior to the installation of Licensee's or Licensee's Clients' Equipment, then Licensee will provide and/or cause Licensee's Clients to provide expertise and equipment to eliminate such interference.  If the interference cannot be eliminated by ordinary means, then Licensee shall cause Licensee's Clients to remove or cease operating any such offending Equipment (except that Licensee's Clients shall have the right to operate the Equipment for intermittent testing), all at its sole cost and expense.  If Licensor or any tenants/other licensees of Licensor in or on the Building install improvements or equipment after the date that a Licensee's Client installs certain Equipment, which improvements or equipment causes interference to such Licensee's Client's Equipment, then Licensor agrees to resolve the interference problem or remove or cease operating the offending improvements or equipment.

8.    <u>QUIET ENJOYMENT.</u>  Licensor covenants and agrees that upon Licensee's observing and performing all the terms of this Agreement, Licensee and Licensee's Clients may peacefully and quietly enjoy the Licensed Premises as described herein.

9.    <u>ACCESS/WORK.</u>  Licensor authorizes Licensee, Licensee's Clients and their related parties (including officers,

2

agents, assigns, employees and contractors) access to the Licensed Premises Monday through Friday from 9:00 am to 5:00 pm for the purposes of inspecting the Licensed Premises, and installing, maintaining, replacing, relocating, removing, modifying, repairing and operating the Equipment.  Any non-emergency after-hours access will be at the reasonable discretion of Licensor.  All non-emergency access shall be on not less than 24 hours' notice. In the event of emergencies (including but not limited to when Equipment is not operational), Licensee, Licensee's Clients and their related parties shall have 24/7 access to the Licensed Premises upon telephonic notice to the building superintendent, property manager or office after-hours answering service at _____ or Licensor shall provide keys to Licensee and Licensee's Clients for such access.  All sub-licenses with Licensee's Clients shall require that any such work by Licensee's Clients shall be done without cost or liability to Licensor and shall be done in a good and workmanlike manner and in compliance with all applicable laws, regulations and building rules (provided that Licensor provides such building rules to Licensee's Clients).  Licensor agrees to use commercially reasonable efforts to give Licensee notice of any maintenance or repair, that might adversely affect Licensee's Client.

10.     OWNERSHIP.  Any Equipment installed from time to time by Licensee's Clients upon the Licensed Premises shall remain the personal property of such Licensee's Clients and shall not be deemed fixtures of the Building. Licensee and Licensee's Clients shall have the exclusive right to use such Equipment.  Licensor hereby waives any and all lien rights it may have, statutory or otherwise, concerning the Equipment or any portion thereof, and upon Licensee's request, Licensor shall provide Licensee with a written waiver of such lien pursuant to a form reasonably satisfactory to Licensor and Licensee.  The provisions of this section shall survive the expiration or earlier termination of this Agreement.

11.     INSURANCE.

a.      Prior to the installation of any Equipment on the Licensed Premises, Licensee and Licensee's Client shall furnish a Certificate of Insurance to Licensor, naming Licensor as an additional insured, with respect to its use of the Licensed Premises pursuant to this Agreement for Commercial General Liability insurance covering bodily injury and property damage liability in not less than the following amounts:

| | |
|---|---|
| Bodily Injury; Property Damage, each occurrence: | $1,000,000.00 |
| Excess Liability (Umbrella Form) each occurrence and annual aggregate | $2,000,000.00 |

The above limits can be provided by the combination of General Liability coverage and Umbrella Liability coverage.

b.      Licensor shall maintain, at Licensor's sole cost and expense, Commercial General Liability insurance covering bodily injury and property damage liability of not less than $1,000,000 per occurrence and $2,000,000 aggregate, naming Licensee as an additional insured.

12.     INDEMNIFICATION AND LIMITATION OF LIABILITY.  Notwithstanding anything contained in this Agreement to the contrary, neither party shall be liable to the other party for any special, incidental, consequential or punitive damages, including, but not limited to lost profits, and Licensor's and Licensee's respective shareholders, partners, members, managers, directors, officers, employees, affiliates and agents shall not be personally liable for any damages relating hereto.  Provided that Licensee's Client has executed an agreement containing an indemnity provision in favor of Licensor, Licensor also agrees that it shall look first to Licensee's Client for the recovery of any damages, costs or expenses, including without limitation those that may arise from such Licensee's Client's actions or inactions and/or from the installation, construction, operation, maintenance, repair, removal or existence of such Licensee's Client's equipment at the Building and/or Licensed Premises, and Licensee's liability for any damages, costs or expenses to Licensor shall not exceed $50,000.  In no event shall Licensee's liability for any damages, costs or expenses exceed the amounts recovered from any applicable insurance policies, provided however, that such limitation shall not apply to Licensee's Clients.  The provisions of this section shall survive termination of this Agreement insofar as claims filed prior to the expiration of any applicable statute of limitations. Licensee shall also include in its sublicense agreements with Licensee's Clients provisions requiring

3

such Licensee's Clients to execute an indemnification and insurance agreement in a form substantially similar to that attached hereto as Exhibit C.

13.    <u>DEFAULT</u>.  In the event of a default under this Agreement and in the event such default is not cured within thirty-five (35) days from the date of the written notice from the non-defaulting party to the defaulting party, the non-defaulting party shall have the right to terminate this Agreement provided, however, that if the default is of such a nature that cannot be reasonably cured in such thirty-five (35) day period and if the defaulting party is diligently proceeding with curing such default, the time for curing such default shall be extended for a period of time as may be reasonably necessary to complete such cure.

14.    <u>MECHANIC'S LIENS</u>.  Licensee shall remove, bond over or discharge within forty-five (45) days after receipt of written notice thereof from Licensor, any lien on the Building as a result of any work performed at the Licensed Premises by Licensee and/or Licensee's Clients.

15.    <u>REMOVAL OF EQUIPMENT</u>.  Within sixty (60) days following the termination or expiration of this Agreement, Licensee shall remove and/or require Licensee's Clients to remove all Equipment installed by Licensee or Licensee's Client (except any cabling related Equipment that may have been installed within enclosed pathways in the Building, which Licensee and/or Licensee's Clients may remove in their sole discretion) from the Licensed Premises.  Such removal of Equipment shall be done in a good and workmanlike manner without cost to Licensor and Licensee shall repair and/or require Licensee's Clients to repair any damage caused to the Building as a result of such removal, reasonable wear and tear excepted.  Any such cabling related Equipment that may be left in the Building shall become the sole property of Licensor.  This paragraph and the obligation to remove all Equipment installed in the Building shall survive termination of the Agreement.

16.    <u>LICENSEE'S CLIENTS</u>.  During any term of this Agreement and continuing for a period of one (1) year following the expiration or termination of this Agreement (except following any such termination resulting solely from an uncured default by Licensee and such default is unrelated to any actions or inactions of Licensee's Clients), Licensor shall not directly or indirectly negotiate or enter into any agreements with Licensee's Clients relating to the licensing of space on the Building for the purposes described in this Agreement, provided that such Licensee's Clients have executed agreements with Licensee with respect to the Building. Should a Licensee's Client approach Licensor directly or indirectly regarding the licensing of space on the Building, then Licensor will refer such party directly to Licensee.

17.    <u>FORCE MAJEURE</u>.  No party shall be responsible for delays or failures in performance or any harm resulting from acts beyond the control of such party.  Such acts shall include, but not be limited to, acts of God, strikes, lockouts, riots, acts of war, epidemics, governmental regulations superimposed after the fact, fire, communication line failures, power failures, earthquakes or other disasters.

18.    <u>NO BROKER</u>.  Licensor and Licensee represent and warrant to each other that it has not dealt with any broker or other finder in the negotiation of this Agreement and does hereby agree to indemnify and hold harmless from and against any and all claims of or liability to any broker or finder, all costs related thereto (including reasonable attorneys fees) by reason of the execution and delivery of this Agreement.  The provisions of this Section shall survive the termination or expiration of this Agreement.

19.    <u>ENTIRE AGREEMENT, WAIVER, AMENDMENTS, SEVERABILITY, HEADINGS</u>.  This Agreement and all exhibits and amendments attached hereto contain the entire agreement between the parties and supersedes all prior agreements, arrangements, negotiations and understandings between the parties.  No waiver of any term, provision, or condition of this Agreement, whether by conduct or otherwise, in any one or more instances, shall be deemed to be or shall constitute a waiver and no waiver shall be binding unless executed in writing by the party making the waiver. The unenforceability, invalidity or illegality of any provision of this Agreement shall not render the other provisions unenforceable, invalid or illegal.  No amendment or modification of this Agreement shall be binding or enforceable unless executed in writing by both parties. The descriptive headings of the several paragraphs of this Agreement are inserted for convenience and ease of reference only and do not constitute part of this Agreement.

20.    <u>SUCCESSORS AND ASSIGNS.</u>  This Agreement shall inure to the benefit of, and shall be binding upon the parties hereto and their respective heirs, administrators, executors, successors, and assigns.

21.    <u>GOVERNING LAW.</u>  This Agreement shall be governed by and construed in accordance with the laws of the state in which the Building is located, without regard to conflicts of law.  The parties agree that in any action or proceeding brought on or in connection with this Agreement, the state or federal court located in the jurisdiction which the Building is located shall have jurisdiction of any action or proceeding.  In the interpretation of this Agreement, the parties hereto agree that there shall be no presumption in favor of one party over the other based upon which party drafted such agreement.

22.    <u>JURY WAIVER.</u>  The parties hereto hereby waive, to the extent permitted by law, the right to a jury trial in any action or legal proceeding between the parties or their respective heirs, administrators, executors, successors, and assigns arising out of this Agreement.

23.    <u>NOTICES.</u>  Any notice, demand, request or other instrument which may be or is required to be given under this Agreement shall be in writing and mailed by United States Certified or Registered Mail, postage prepaid, or by a recognized overnight courier, such as Federal Express, and shall be addressed to the parties at the addresses first referenced above. Either party may designate such other address for notices as shall be given by prior written notice.  Any notice given hereunder shall be effective on the earlier to occur if by certified mail: (x) three (3) days after the giving of the same, and (y) actual receipt of the notice or the first refusal of receipt of said notice; or, if by overnight courier, on the next business day after the party deposits such notice with such overnight courier.

24.    <u>DEMOLITION AND RELOCATION.</u>

a.    Following the eleventh (11th) anniversary of the Initial Installation Date,  in the event Licensor wishes to demolish or substantially redevelop the Licensed Premises, and the location of the Equipment is not compatible with such demolition or substantial redevelopment, and such demolition or substantial redevelopment cannot be reasonably accommodated by sub-section (b) below, then in Licensor's reasonable discretion and on not less than one hundred eighty (180) days written notice to Licensee, Licensee's Clients shall vacate such affected portion of the Licensed Premises provided that Licensor has all required building permits to engage in such demolition or substantial redevelopment and all other similarly situated rooftop communications tenants or occupants of the Building are also so required to vacate their premises at the Building to accommodate such demolition or substantial renovation,

b.    On not less than one hundred twenty (120) days' notice to Licensee, or such shorter period as may be reasonably required in the event of an emergency, Licensor shall have the right once in every six (6) year period to require a Licensee's Clients' to relocate (or temporarily remove and reinstall) some or all of its Equipment at such Licensee's Clients' sole cost and expense and any additional relocations or temporary removal and reinstallations that Licensor may require of such License's Client during such six (6) year period shall be at Licensor's sole cost and expense. Licensor shall undertake commercially reasonable efforts to minimize disruption of the Equipment or the operation thereof. A disruption of the Equipment shall include adversely affecting the operation of the Equipment or materially degrading the quality of transmission of the Equipment, including without limitation, as a result of loss or obstruction of any line of sight to any Licensee's Client's other equipment not located at the Building. If a relocation is being made to accommodate a third-party licensee or communications company, then the relocation shall be made at Licensor's sole cost and expense.

25.    DESTRUCTION OR <u>CONDEMNATION</u>.  If the Licensed Premises is damaged, destroyed or condemned, and alternate sites for the Licensed Premises are not reasonably available, and such damage, destruction or condemnation prohibits Licensee and/or Licensee's Clients from using the Licensed Premises as herein provided, Licensee or Licensor may elect to terminate this Agreement as of the date of the damage, destruction or condemnation by giving notice no more than thirty (30) days following the date of such damage, destruction or condemnation. If neither party elects to terminate this Agreement, or if the damage, destruction or condemnation does not give rise to a right to terminate this

Agreement, this Agreement shall continue in full force. In the event of any condemnation of the Building, Licensee and Licensee's Clients may on their own behalf make a claim in any condemnation proceeding involving the Licensed Premises for losses related to the Equipment, its relocation costs and its damages and losses; provided, no such claim shall reduce the award payable to Licensor.

26.    INTENTIONALLY DELETED.

27.    ESTOPPEL, NON-DISTURBANCE AND ATTORNMENT.

a.    From time to time during the Term, each Party agrees, upon not less than fifteen (15) days prior written notice from the other Party, to execute, acknowledge and deliver to such Party a written estoppel certificate (the "Estoppel") certifying that as of the date of the certification: (i) the Agreement is a valid and enforceable Agreement and is in full force and effect; (ii) that the requesting Party is not in default under any of the terms, conditions, or covenants of the Agreement beyond any applicable cure period or, if applicable, specifying any default by such Party hereunder; (iii) the commencement and expiration dates of the then-current term hereof together with any remaining Renewal Term(s); (iv) the amount of the then-current fees payable under the Agreement; and (v) a true and correct copy of the Agreement and all amendments thereto shall be attached to the Estoppel.

b.    Licensee shall agree to subordinate to any mortgage, deed of trust and/or superior agreement encumbering the Building in existence now or in the future (collectively, "Superior Instrument"); provided, however, that Licensor shall obtain for Licensee from the holder of such Superior Instrument a non-disturbance and attornment agreement ("SNDA") in a form reasonably satisfactory to Licensee, which agreement shall provide that, as long as Licensee is not in default of any of its material obligations under this Agreement beyond any applicable cure period, its rights as Licensee hereunder shall not be terminated and its access to and possession of the Licensed Premises shall not be disturbed by the holder of such Superior Instrument, or by any proceedings on the debt which any such Superior Instrument secures, and that any sale at foreclosure shall be subject to this Agreement.  In addition to the foregoing, upon request by Licensee, Licensor shall use commercially reasonable efforts to obtain for Licensee and/or Licensee's Clients, as the case may be, from the holder of any Superior Instrument an SNDA as otherwise described above, provided, however, that Licensor shall not be responsible for any reasonable charges imposed by the entity issuing such SNDA.

28    THIRD PARTY APPROVALS.  This Agreement may be subject to approval by Licensor's mortgagee, or other third parties.  By its signature below, Licensor represents it has obtained any such approvals as may be required.

29.    LICENSOR APPROVAL OF PLANS.  Licensee shall not enter into sub-license agreements with sub-licensees other than with Dish Wireless LLC, or its affiliates, successors, assigns or replacements ("Dish") without Licensor's reasonable approval, not to be unreasonable withheld conditioned or delayed. In furtherance of the foregoing and notwithstanding anything contained herein to the contrary, Licensor hereby approves Licensee entering into a sub-license agreement with Dish containing (i) an initial term of +/-5 years from the fee commencement date plus not more than (4) four additional 5-year renewal terms, (ii) initial monthly payments by Dish of $2,600 and an annual escalation of not less than 2.5%, (iii) a fee commencement date of not later than twelve (12) months from execution of the sub-license agreement and (iv) all subject to and including such terms and conditions as reasonably agreed to by the parties thereto. Pursuant to paragraph 5 hereof, Licensor hereby approves Dish Wireless LLC's plans and specifications for its initial installation of Equipment ("Dish Plans") as contained in Exhibit B hereto.

IN WITNESS WHEREOF, the parties hereto have signed this instrument as of the date first written above.

6

LICENSOR:      1661 PA Realty LLC                    LICENSEE: RCG Tower Group I, LLC

_____        By:      _____

By:      _____        By:      _____
         Name:                                                Name:
         Title:                                               Title:

7

EXHIBIT A – Licensed Premises

(a)   To be agreed upon portions of the roof, exterior, parapets and bulkheads of the Building;

(b)   Conduits and pathways within and into the Building as may be necessary for Licensee's Clients to serve its Equipment and/or to interconnect with tenants of the Building.

(c)   An area in the Building to be agreed upon to be known as the "Equipment Room."

(d)   The areas shown in Exhibit B hereto for the placement of Dish's Equipment and/or designated as the Licensed Premises.

EXHIBIT B – Dish Plans

*See following pages*



PARK AVENUE

E. 117TH STREET

PARTIAL BUILDING ROOFTOP PLAN

**NOTES**

1. CONTRACTOR SHALL MAINTAIN A 10'-0" MINIMUM SEPARATION BETWEEN ALL PROPOSED ANTENNAS AND TRANSMITTING ANTENNAS AND EXISTING GPS UNITS.

2. CONTRACTOR TO VERIFY WITH DISH WIRELESS EDA. THE LOCATION OF THE POWER AND FIBER SOURCE PRIOR TO CONSTRUCTION.

3. UTILITY ROUTING MAY VARY, CONTRACTOR TO VERIFY LOCATION OF THE POWER AND FIBER SOURCE PRIOR TO CONSTRUCTION.

4. FILTER AND/OR ORU TO BE INSTALLED UNDER ALL DISH WIRELESS EQUIPMENT THAT IS RESTING ON OR AFFIXED TO ROOF MEMBRANE.

**CONDUIT LEGEND**

*EXISTING/PROPOSED UTILITY TAP POINTS ARE LOCATED AT BASEMENT LEVEL WITHIN EXISTING BUILDING

**CONDUIT LOCATION**

| TYPE | CONDUIT LOCATION | | UTILITY NOTES |
|------|------------------|--|---------------|
|      | BASEMENT VERTICAL | ROOFTOP HORIZONTAL | |
| ELECTRIC | 35 | 70 | 40 | 145 |
| TELCO | 35 | 70 | 40 | 145 |
| GROUND | 40 | 70 | 45 | 155 |

**CABLE LENGTH CHART — APPROX. (FT)**

| | SECTOR | | | |
|--|--------|--|--|--|
| | ALPHA | BETA | GAMMA | TOTAL |
| LENGTH (FT) | 15 | 75 | 120 | 210 |

**PRELIMINARY DOCUMENTS**

NOT TO BE USED FOR CONSTRUCTION

A SAXON DESIGN GROUP

d✦sh wireless.

5701 SOUTH SANTA FE DRIVE
LITTLETON, CO 80120

DISH WIRELESS PROJECT INFORMATION

NYNYC0117-B
1663 PARK AVENUE
NEW YORK, NY 10035

AAE PROJECT NUMBER
2000.075

| REV | DATE | DESCRIPTION |
|-----|------|-------------|
| A | 05-06-22 | INITIAL SUBMISSION |

SHEET TITLE
BUILDING ROOFTOP PLAN

SHEET NUMBER
LE1





BUILDING WEST ELEVATION

(2) PROPOSED DISH WIRELESS ANTENNAS
TOP @ 75'-4" AGL (ALPHA SECTOR)

(2) PROPOSED DISH WIRELESS ANTENNAS
RAD CENTER @ 71'-4" AGL (ALPHA SECTOR)

(2) PROPOSED DISH WIRELESS ANTENNAS
TOP @ 75'-4" AGL (BETA SECTOR)

(2) PROPOSED DISH WIRELESS ANTENNAS
RAD CENTER @ 71'-4" AGL (BETA SECTOR)

(2) PROPOSED DISH WIRELESS ANTENNAS
RAD CENTER @ 71'-4" AGL (GAMMA SECTOR)

(2) PROPOSED DISH WIRELESS ANTENNAS
RAD CENTER @ 71'-4" AGL (BETA SECTOR)

APPROXIMATE LOCATION OF PROPOSED
DISH WIRELESS ELECTRIC AND CONDUIT
IN BASEMENT (BEYOND)

PROPOSED DISH WIRELESS ELECTRIC
CONDUITS AND GROUND (UTILITY
FAÇADE, (BEYOND)

8'-0"
MAX

6'-0"
MAX

6'-0"
MAX

8'-8" TOP OF EQUIPMENT ARL
(12'-0" MAX)

PROPOSED DISH WIRELESS (2) PANEL
ANTENNAS (TYP OF 2 PER SECTOR, (6) TOTAL)

PROPOSED DISH WIRELESS (6) EQUIPMENT CABINET
MOUNTED ON NEW 4'-4" UNISTRUT STEEL PLATFORM
(1) CABLES TUBE, (1) PANEL AND (1) DISCONNECT
ON NEW UNISTRUT FRAME MOUNTED TO PLATFORM
RAILING

PROPOSED DISH WIRELESS (2) ELECTRIC,
TELCO AND GROUND ALONG BASEMENT
CEILING, (BEYOND)

PROPOSED DISH WIRELESS UTILITY
CONDUITS ROUTED ALONG BASEMENT
CEILING (TYP)

APPROXIMATE LOCATION OF PROPOSED
DISH WIRELESS GROUND "OAK" POINT
AT 0'-0" AGL

APPROXIMATE LOCATION OF PROPOSED
DISH WIRELESS TELCO BACKBOARD IN
BASEMENT LEVEL, (BEYOND)

APPROXIMATE LOCATION OF PROPOSED
WATER MAIN IN BASEMENT (BEYOND)

EXISTING BUILDING CHIMNEY
88'-0" AGL

EXISTING BUILDING HIGH PARAPET
68'-4" AGL

EXISTING BUILDING LOW PARAPET
66'-4" AGL

EXISTING BUILDING ROOF
65'-0" AGL

0'-0" AGL

## NOTES

1. CONTRACTOR SHALL FIELD VERIFY ALL DIMENSIONS.

2. CONTRACTOR SHALL MAINTAIN A 10'-0" MINIMUM
SEPARATION BETWEEN THE PROPOSED DISH LTE
TRANSMITTING ANTENNAS AND EXISTING GPS UNITS.

A SAXON DESIGN GROUP

SAXON DESIGN GROUP LLC
OFFICE # 303.993.0293 · FAX # 303.993.0183

d⋮sh
wireless.

5701 SOUTH SANTA FE DRIVE
LITTLETON, CO 80120

NOT TO BE USED
FOR CONSTRUCTION

IT IS A VIOLATION OF LAW FOR ANY PERSON,
UNLESS THEY ARE ACTING UNDER THE DIRECTION
OF A LICENSED PROFESSIONAL ENGINEER,
TO ALTER THIS DOCUMENT.

| | |
|---|---|
| DRAWN BY: | CHECKED BY: | APPROVED BY: |
| MOC: | | |
| RFDS REV #: | | |

| REV | DATE | DESCRIPTION |
|---|---|---|
| A | 08-08-22 | 90% SUBMISSION |
| | | |
| | | |
| | | |

SUBMITTALS
**PRELIMINARY
DOCUMENTS**

DISH WIRELESS PROJECT INFORMATION
NYNYC01171B
1663 PARK AVENUE
NEW YORK, NY 10035

AAE PROJECT NUMBER:
2000.075

SHEET TITLE
ROOFTOP
ELEVATION

SHEET NUMBER:
LE3

Exhibit C
INSURANCE AND INDEMNIFICATION AGREEMENT

Whereas _____ (the "Contractor") will be performing certain work at _____ (the "Building") , pursuant to a sub-license agreement (the "Sub-License Agreement") between DISH Wireless LLC and RCG Tower Group I, LLC ("RCG"). Except as provided herein, all terms in this agreement shall be as defined in the Sub-License Agreement. As to all such work, Contractor agrees as follows:

**INDEMNIFICATION**

To the fullest extent permitted by law, Contractor agrees to indemnify, defend and hold harmless RCG Tower Group, LLC, RCG Tower Management, LLC and RCG Tower Group I, (together "RCG"), _____ (the "Owner"), RCG and Owner's shareholders, partners, members, managers, directors, officers employees, affiliates and agents, and _____ (the Owner's "Managing Agent") from any and all claims, suits, damages, liabilities, professional fees, including attorneys' fees, costs, court costs, expenses and disbursements related to death, personal injuries or property damage (including loss of use thereof) arising out of or in connection with the performance of the work of the Contractor, its agents, servants, subcontractors or employees, or the use by Contractor, its agents, servants, subcontractors or employees, of facilities owned by Owner. This agreement to indemnify specifically contemplates full indemnity in the event of liability imposed against RCG, the Owner and/or Managing Agent without negligence and solely by reason of statute, operation of law or otherwise, and partial indemnity in the event of any actual negligence on the part of RCG (with respect to the indemnification of RCG), or the Owner and/or Managing Agent (with respect to the indemnification of the Owner and/or Managing Agent) either causing or contributing to the underlying claim. In that event, indemnification will be limited to any liability imposed over and above that percentage attributable to actual fault, whether by statute, by operation of law or otherwise.

INSURANCE PROCUREMENT

Contractor shall obtain and maintain at all times while performing work at the Building, at its sole cost and expense, the following insurance (a) workers compensation insurance with statutory limits and employer's liability coverage (but not less than $500,000); (b) commercial general liability insurance with no restrictions or limitations for claims arising out of Section 240 of the New York State Labor Law with a minimum limit of $2,000,000 per occurrence and $3,000,000 in the aggregate, which insurance shall cover the following: premises and operations liability, products/completed operations, broad form property damage, broad form contractual liability, personal injury and independent contractor's liability; (c) automobile liability insurance covering owned, hired and non-owned vehicles, with a minimum limit of liability of $1,000,000; and (d) umbrella liability insurance with a limit of $5,000,000 per occurrence. Contractor shall, by specific endorsements to its policies, cause RCG, the Owner (including ownership entities), Managing Agent. other entities as reasonably required under the Master License Agreement (as such term is defined in the Sub-License Agreement), and any other entity to which Owner is contractually obligated to include as an additional insured, (collectively, the "Additional Insureds") to be named as Additional Insureds and with endorsements providing waivers of subrogation in favor of the Additional Insureds as may be required under the Sub License Agreement. Contractor shall, by specific endorsement to its commercial general liability and automobile liability policies, cause the coverage afforded to the Additional Insureds thereunder to be primary to and not concurrent with other valid and collectible insurance available to the Additional Insureds. Contractor shall, by specific endorsement to its umbrella/excess liability policy, cause the coverage afforded to the Additional Insureds thereunder to be first tier umbrella/excess coverage above the primary coverage afforded to the Additional Insureds and not concurrent with or excess to other valid and collectible insurance available to the Additional Insureds.

The undersigned confirms they have the authority to execute this document and that such will be binding upon Contractor.

10

Contractor

Signature: _____

Name: _____

Title: _____

Dated: _____

## Exhibit C

**License Agreement for Debtor 244 East 117 LLC**

License Agreement

THIS LICENSE AGREEMENT (the "Agreement") entered into on this _____day of_____, 2022 by and between 244 EAST 117 LLC, a Limited Liability Company**,** ("Licensor") having an address at c/o Bronstein Properties, LLC, 108-18 Queens Blvd, Suite 302, Forest Hills, NY 11375 and RCG Tower Group I, LLC a New York Limited Liability Company ("Licensee") having an address at 1051 Port Washington Blvd #605 Port Washington, New York 11050.

WHEREAS, Licensor is the owner of the building known as and located at 244 EAST 117 STREET MANHATTAN, NY 10035 [Boro: 1 Block: 1666 Lot: 28] (the "Building"); and

WHEREAS, Licensee desires to license from Licensor a portion of the Building as further described in Exhibit A attached hereto ("Licensed Premises") and associated rights as further described herein for the purpose of sublicensing the Licensed Premises to Licensee's clients or sub-licensees ("Licensee's Clients"), all for the purposes of: (a) locating, installing and operating antennas and other similar communication systems and equipment and related supporting equipment, including but not limited to cables, emergency generators, structures and improvements (collectively, the "Equipment"), and (b) where requested, having such Licensee's Clients connect its facilities to Building occupants.

NOW THEREFORE, in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt of which is hereby acknowledged, Licensor and Licensee mutually covenant and agree as follows:

1.      LICENSE.  Licensor hereby grants to Licensee for the purpose of sublicensing to Licensee's Clients: (a) a non-exclusive license for the installation, construction, maintenance, replacement, and operation of Equipment at the Licensed Premises; and (b) a non-exclusive license to use conduits, shafts, raceways and other similar spaces at and in the Building to service the Equipment and connect the same to the Licensed Premises and/or to tenants in the Buildings.

2.      TERM.  The initial term of this Agreement shall commence on the date hereof and shall terminate on the earlier of: (a) the last day of the month following the month in which occurs the fifth (5th) anniversary of the date that the Equipment is first installed in the Licensed Premises (the "Initial Installation Date"), (b) thirty (30) days following the Licensor's receipt of notice that Licensee is terminating this Agreement, or (c) as otherwise provided for in this Agreement.  So long as Licensee is not in default of any of the provisions of this Agreement, beyond any notice, grace and cure period, Licensee shall have the right to extend this Agreement for four (4) additional five (5) year terms (collectively with the initial term, the "Term") upon the same terms and conditions, except as specifically set forth herein.  This Agreement shall automatically continue for such successive terms unless Licensee sends a written notice to Licensor of its intention not to extend the term, such notice to be given no later than thirty (30) days prior to the expiration date of the term.

3.      COMPENSATION.  During the Term of this Agreement Licensee shall pay to Licensor on the fifth (5th) day of each month, a license fee (the "License Fee") in an amount equal to seventy percent (70%) of the actual revenue collected by Licensee during the previous month from Licensee's Clients who have installed and/or operated Equipment at the Licensed Premises pursuant to separate agreements between Licensee and Licensee's Clients ("Revenue").  Licensee shall also provide to Licensor a monthly report, certified to be true and correct by Licensee, which shall include a list of the Licensee's Clients which have, during the previous month, installed and/or operated Equipment at the Licensed Premises and the Revenue collected by Licensee from each such Licensee's Client during that previous month.  Except as otherwise specifically provided for herein, the License Fee shall represent compensation in full to Licensor under the terms of this Agreement and Licensor shall not bring any claim, action or proceeding for any unpaid bills or expenses against Licensee or Licensee's Clients beyond the applicable statute of limitations from the date a bill therefor is received by Licensor. For purposes of calculating the Licensee Fee, Revenue shall exclude any payments received from Licensee's Client as reimbursement for pass-through charges such as electricity, taxes, or the like.  Additionally, actual reasonable out-of-pocket expenses incurred by Licensee in collecting arrears and enforcing the terms of such agreements shall be deducted from Revenue for the purposes of calculating the License Fee. Once in every twelve months, Licensor shall have the right at its expense to audit Licensee's records relating to the License Fees paid to Licensor pursuant to this Agreement. Notwithstanding the foregoing, in the event that the License Fee paid to

1

Licensor as provided herein is less than $1520 per month, Licensor's percent of Revenue shall increase to up to 90% as may be necessary for the License Fee paid to Licensor to be up to $1520 per month.

4.  _LICENSOR TERMINATION RIGHT._  In the event that Licensee has not entered into a sub-license agreement with a Licensee's Client within six (6) months following the date of this Agreement, then upon thirty (30) days prior written notice to Licensee ("Licensor's Termination Notice"), Licensor may terminate this Agreement.

5.  _INSTALLATION._  Prior to the initial installation of the Equipment and any Material Modifications thereto (as defined below) by Licensee's Clients, Licensor shall be provided with information detailing the location and Equipment to be installed.  No such work with respect to the initial installation or Material Modifications shall commence without Licensor's written approval, which approval shall not be unreasonably withheld or unduly delayed, however Licensee's Clients shall be permitted to make modifications or additions to such installation that are not Material Modifications without further approvals from Licensor.  "Material Modifications"  shall mean (a) the installation of new Equipment outside of the Licensed Premises,  (b) modifications or additions that materially increase the obligations of Licensor, (c) modifications or additions that materially increase the weight or wind load, (d) modifications or additions that increase the number of Sub-Licensee's antennas from that specified in Exhibit B, or (e) modifications or additions that require additional building penetrations. Licensor shall cooperate with Licensee and Licensee's Clients with respect to the installation, operation or maintenance of the Equipment and with the submitting of any governmental or quasi-governmental applications, permits, filings, approvals, etc., which cooperation shall include without limitation, the execution of any such document that may require Licensor's signature. Licensor shall maintain the Building and comply with all applicable laws, rules and regulations to the extent necessary for Licensee and/or Licensee's Clients to operate at the Building.  , Licensee shall have the right to post (i) a placard at the Licensed Premises giving notice of its right to use the Premises as specified hereunder which shall be subject to Licensor's approval and (ii) signage outside of the Premises as may be required by applicable law.

6.  _UTILITIES AND EASEMENTS_.  Licensee's Clients may at its sole expense and to the extent available, utilize existing utility easements benefiting the Building and utilize and, with Licensor's approval, make reasonable modifications to the Building's utility distribution systems to accommodate the requirements of the Equipment. If the utility service for the operation of any Equipment is furnished by Licensor, Licensee will reimburse Licensor for such usage  pursuant to a sub-meter (which may be read remotely), which shall be deemed to be part of the Equipment for the purposes of this Agreement. Alternatively, Licensee's Clients shall have the right to make arrangements with the utility company to have a separate service (billed to and paid directly by Licensee or Licensee's Clients) installed upon the Licensed Premises.

7.  _INTERFERENCE._ If Equipment installed by Licensee's Clients causes any material interference to Licensor's (including Licensor's other licensees and/or tenants of the Building) communications equipment or Building systems existing and located at the Building prior to the installation of Licensee's or Licensee's Clients' Equipment, then Licensee will provide and/or cause Licensee's Clients to provide expertise and equipment to eliminate such interference.  If the interference cannot be eliminated by ordinary means, then Licensee shall cause Licensee's Clients to remove or cease operating any such offending Equipment (except that Licensee's Clients shall have the right to operate the Equipment for intermittent testing), all at its sole cost and expense.  If Licensor or any tenants/other licensees of Licensor in or on the Building install improvements or equipment after the date that a Licensee's Client installs certain Equipment, which improvements or equipment causes interference to such Licensee's Client's Equipment, then Licensor agrees to resolve the interference problem or remove or cease operating the offending improvements or equipment.

8.  _QUIET ENJOYMENT_.  Licensor covenants and agrees that upon Licensee's observing and performing all the terms of this Agreement, Licensee and Licensee's Clients may peacefully and quietly enjoy the Licensed Premises as described herein.

9.  _ACCESS/WORK._  Licensor authorizes Licensee, Licensee's Clients and their related parties (including officers,

2

agents, assigns, employees and contractors) access to the Licensed Premises Monday through Friday from 9:00 am to 5:00 pm for the purposes of inspecting the Licensed Premises, and installing, maintaining, replacing, relocating, removing, modifying, repairing and operating the Equipment. Any non-emergency after-hours access will be at the reasonable discretion of Licensor. All non-emergency access shall be on not less than 24 hours' notice. In the event of emergencies (including but not limited to when Equipment is not operational), Licensee, Licensee's Clients and their related parties shall have 24/7 access to the Licensed Premises upon telephonic notice to the building superintendent, property manager or office after-hours answering service at _____ or Licensor shall provide keys to Licensee and Licensee's Clients for such access. All sub-licenses with Licensee's Clients shall require that any such work by Licensee's Clients shall be done without cost or liability to Licensor and shall be done in a good and workmanlike manner and in compliance with all applicable laws, regulations and building rules (provided that Licensor provides such building rules to Licensee's Clients). Licensor agrees to use commercially reasonable efforts to give Licensee notice of any maintenance or repair, that might adversely affect Licensee's Client.

10.　　OWNERSHIP. Any Equipment installed from time to time by Licensee's Clients upon the Licensed Premises shall remain the personal property of such Licensee's Clients and shall not be deemed fixtures of the Building. Licensee and Licensee's Clients shall have the exclusive right to use such Equipment. Licensor hereby waives any and all lien rights it may have, statutory or otherwise, concerning the Equipment or any portion thereof, and upon Licensee's request, Licensor shall provide Licensee with a written waiver of such lien pursuant to a form reasonably satisfactory to Licensor and Licensee. The provisions of this section shall survive the expiration or earlier termination of this Agreement.

11.　　INSURANCE.

a.　　Prior to the installation of any Equipment on the Licensed Premises, Licensee and Licensee's Client shall furnish a Certificate of Insurance to Licensor, naming Licensor as an additional insured, with respect to its use of the Licensed Premises pursuant to this Agreement for Commercial General Liability insurance covering bodily injury and property damage liability in not less than the following amounts:

| | |
|---|---|
| Bodily Injury; Property Damage, each occurrence: | $1,000,000.00 |
| Excess Liability (Umbrella Form) each occurrence and annual aggregate | $2,000,000.00 |

The above limits can be provided by the combination of General Liability coverage and Umbrella Liability coverage.

b.　　Licensor shall maintain, at Licensor's sole cost and expense, Commercial General Liability insurance covering bodily injury and property damage liability of not less than $1,000,000 per occurrence and $2,000,000 aggregate, naming Licensee as an additional insured.

12.　　INDEMNIFICATION AND LIMITATION OF LIABILITY. Notwithstanding anything contained in this Agreement to the contrary, neither party shall be liable to the other party for any special, incidental, consequential or punitive damages, including, but not limited to lost profits, and Licensor's and Licensee's respective shareholders, partners, members, managers, directors, officers, employees, affiliates and agents shall not be personally liable for any damages relating hereto. Provided that Licensee's Client has executed an agreement containing an indemnity provision in favor of Licensor, Licensor also agrees that it shall look first to Licensee's Client for the recovery of any damages, costs or expenses, including without limitation those that may arise from such Licensee's Client's actions or inactions and/or from the installation, construction, operation, maintenance, repair, removal or existence of such Licensee's Client's equipment at the Building and/or Licensed Premises, and Licensee's liability for any damages, costs or expenses to Licensor shall not exceed $50,000. In no event shall Licensee's liability for any damages, costs or expenses exceed the amounts recovered from any applicable insurance policies, provided however, that such limitation shall not apply to Licensee's Clients. The provisions of this section shall survive termination of this Agreement insofar as claims filed prior to the expiration of any applicable statute of limitations. Licensee shall also include in its sublicense agreements with Licensee's Clients provisions requiring

3

such Licensee's Clients to execute an indemnification and insurance agreement in a form substantially similar to that attached hereto as Exhibit C.

13.  DEFAULT.  In the event of a default under this Agreement and in the event such default is not cured within thirty-five (35) days from the date of the written notice from the non-defaulting party to the defaulting party, the non-defaulting party shall have the right to terminate this Agreement provided, however, that if the default is of such a nature that cannot be reasonably cured in such thirty-five (35) day period and if the defaulting party is diligently proceeding with curing such default, the time for curing such default shall be extended for a period of time as may be reasonably necessary to complete such cure.

14.  MECHANIC'S LIENS.  Licensee shall remove, bond over or discharge within forty-five (45) days after receipt of written notice thereof from Licensor, any lien on the Building as a result of any work performed at the Licensed Premises by Licensee and/or Licensee's Clients.

15.  REMOVAL OF EQUIPMENT.  Within sixty (60) days following the termination or expiration of this Agreement, Licensee shall remove and/or require Licensee's Clients to remove all Equipment installed by Licensee or Licensee's Client (except any cabling related Equipment that may have been installed within enclosed pathways in the Building, which Licensee and/or Licensee's Clients may remove in their sole discretion) from the Licensed Premises.  Such removal of Equipment shall be done in a good and workmanlike manner without cost to Licensor and Licensee shall repair and/or require Licensee's Clients to repair any damage caused to the Building as a result of such removal, reasonable wear and tear excepted.  Any such cabling related Equipment that may be left in the Building shall become the sole property of Licensor.  This paragraph and the obligation to remove all Equipment installed in the Building shall survive termination of the Agreement.

16.  LICENSEE'S CLIENTS.  During any term of this Agreement and continuing for a period of one (1) year following the expiration or termination of this Agreement (except following any such termination resulting solely from an uncured default by Licensee and such default is unrelated to any actions or inactions of Licensee's Clients), Licensor shall not directly or indirectly negotiate or enter into any agreements with Licensee's Clients relating to the licensing of space on the Building for the purposes described in this Agreement, provided that such Licensee's Clients have executed agreements with Licensee with respect to the Building. Should a Licensee's Client approach Licensor directly or indirectly regarding the licensing of space on the Building, then Licensor will refer such party directly to Licensee.

17.  FORCE MAJEURE.  No party shall be responsible for delays or failures in performance or any harm resulting from acts beyond the control of such party.  Such acts shall include, but not be limited to, acts of God, strikes, lockouts, riots, acts of war, epidemics, governmental regulations superimposed after the fact, fire, communication line failures, power failures, earthquakes or other disasters.

18.  NO BROKER.  Licensor and Licensee represent and warrant to each other that it has not dealt with any broker or other finder in the negotiation of this Agreement and does hereby agree to indemnify and hold harmless from and against any and all claims of or liability to any broker or finder, all costs related thereto (including reasonable attorneys fees) by reason of the execution and delivery of this Agreement.  The provisions of this Section shall survive the termination or expiration of this Agreement.

19.  ENTIRE AGREEMENT, WAIVER, AMENDMENTS, SEVERABILITY, HEADINGS.  This Agreement and all exhibits and amendments attached hereto contain the entire agreement between the parties and supersedes all prior agreements, arrangements, negotiations and understandings between the parties.  No waiver of any term, provision, or condition of this Agreement, whether by conduct or otherwise, in any one or more instances, shall be deemed to be or shall constitute a waiver and no waiver shall be binding unless executed in writing by the party making the waiver. The unenforceability, invalidity or illegality of any provision of this Agreement shall not render the other provisions unenforceable, invalid or illegal.  No amendment or modification of this Agreement shall be binding or enforceable unless executed in writing by both parties. The descriptive headings of the several paragraphs of this Agreement are inserted for convenience and ease of reference only and do not constitute part of this Agreement.

20.    <u>SUCCESSORS AND ASSIGNS.</u>  This Agreement shall inure to the benefit of, and shall be binding upon the parties hereto and their respective heirs, administrators, executors, successors, and assigns.

21.    <u>GOVERNING LAW.</u>  This Agreement shall be governed by and construed in accordance with the laws of the state in which the Building is located, without regard to conflicts of law.  The parties agree that in any action or proceeding brought on or in connection with this Agreement, the state or federal court located in the jurisdiction which the Building is located shall have jurisdiction of any action or proceeding.  In the interpretation of this Agreement, the parties hereto agree that there shall be no presumption in favor of one party over the other based upon which party drafted such agreement.

22.    <u>JURY WAIVER.</u>  The parties hereto hereby waive, to the extent permitted by law, the right to a jury trial in any action or legal proceeding between the parties or their respective heirs, administrators, executors, successors, and assigns arising out of this Agreement.

23.    <u>NOTICES.</u>  Any notice, demand, request or other instrument which may be or is required to be given under this Agreement shall be in writing and mailed by United States Certified or Registered Mail, postage prepaid, or by a recognized overnight courier, such as Federal Express, and shall be addressed to the parties at the addresses first referenced above. Either party may designate such other address for notices as shall be given by prior written notice.  Any notice given hereunder shall be effective on the earlier to occur if by certified mail: (x) three (3) days after the giving of the same, and (y) actual receipt of the notice or the first refusal of receipt of said notice; or, if by overnight courier, on the next business day after the party deposits such notice with such overnight courier.

24.    <u>DEMOLITION AND RELOCATION.</u>

a.     Following the eleventh (11th) anniversary of the Initial Installation Date,  in the event Licensor wishes to demolish or substantially redevelop the Licensed Premises, and the location of the Equipment is not compatible with such demolition or substantial redevelopment, and such demolition or substantial redevelopment cannot be reasonably accommodated by sub-section (b) below, then in Licensor's reasonable discretion and on not less than one hundred eighty (180) days written notice to Licensee, Licensee's Clients shall vacate such affected portion of the Licensed Premises provided that Licensor has all required building permits to engage in such demolition or substantial redevelopment and all other similarly situated rooftop communications tenants or occupants of the Building are also so required to vacate their premises at the Building to accommodate such demolition or substantial renovation,

b.     On not less than one hundred twenty (120) days' notice to Licensee, or such shorter period as may be reasonably required in the event of an emergency, Licensor shall have the right once in every six (6) year period to require a Licensee's Clients' to relocate (or temporarily remove and reinstall) some or all of its Equipment at such Licensee's Clients' sole cost and expense and any additional relocations or temporary removal and reinstallations that Licensor may require of such License's Client during such six (6) year period shall be at Licensor's sole cost and expense. Licensor shall undertake commercially reasonable efforts to minimize disruption of the Equipment or the operation thereof. A disruption of the Equipment shall include adversely affecting the operation of the Equipment or materially degrading the quality of transmission of the Equipment, including without limitation, as a result of loss or obstruction of any line of sight to any Licensee's Client's other equipment not located at the Building. If a relocation is being made to accommodate a third-party licensee or communications company, then the relocation shall be made at Licensor's sole cost and expense.

25.    DESTRUCTION OR <u>CONDEMNATION</u>.  If the Licensed Premises is damaged, destroyed or condemned, and alternate sites for the Licensed Premises are not reasonably available, and such damage, destruction or condemnation prohibits Licensee and/or Licensee's Clients from using the Licensed Premises as herein provided, Licensee or Licensor may elect to terminate this Agreement as of the date of the damage, destruction or condemnation by giving notice no more than thirty (30) days following the date of such damage, destruction or condemnation. If neither party elects to terminate this Agreement, or if the damage, destruction or condemnation does not give rise to a right to terminate this

Agreement, this Agreement shall continue in full force. In the event of any condemnation of the Building, Licensee and Licensee's Clients may on their own behalf make a claim in any condemnation proceeding involving the Licensed Premises for losses related to the Equipment, its relocation costs and its damages and losses; provided, no such claim shall reduce the award payable to Licensor.

26.    INTENTIONALLY DELETED.

27.    ESTOPPEL, NON-DISTURBANCE AND ATTORNMENT.

a.    From time to time during the Term, each Party agrees, upon not less than fifteen (15) days prior written notice from the other Party, to execute, acknowledge and deliver to such Party a written estoppel certificate (the "Estoppel") certifying that as of the date of the certification: (i) the Agreement is a valid and enforceable Agreement and is in full force and effect; (ii) that the requesting Party is not in default under any of the terms, conditions, or covenants of the Agreement beyond any applicable cure period or, if applicable, specifying any default by such Party hereunder; (iii) the commencement and expiration dates of the then-current term hereof together with any remaining Renewal Term(s); (iv) the amount of the then-current fees payable under the Agreement; and (v) a true and correct copy of the Agreement and all amendments thereto shall be attached to the Estoppel.

b.    Licensee shall agree to subordinate to any mortgage, deed of trust and/or superior agreement encumbering the Building in existence now or in the future (collectively, "Superior Instrument"); provided, however, that Licensor shall obtain for Licensee from the holder of such Superior Instrument a non-disturbance and attornment agreement ("SNDA") in a form reasonably satisfactory to Licensee, which agreement shall provide that, as long as Licensee is not in default of any of its material obligations under this Agreement beyond any applicable cure period, its rights as Licensee hereunder shall not be terminated and its access to and possession of the Licensed Premises shall not be disturbed by the holder of such Superior Instrument, or by any proceedings on the debt which any such Superior Instrument secures, and that any sale at foreclosure shall be subject to this Agreement.  In addition to the foregoing, upon request by Licensee, Licensor shall use commercially reasonable efforts to obtain for Licensee and/or Licensee's Clients, as the case may be, from the holder of any Superior Instrument an SNDA as otherwise described above, provided, however, that Licensor shall not be responsible for any reasonable charges imposed by the entity issuing such SNDA.

28    THIRD PARTY APPROVALS.  This Agreement may be subject to approval by Licensor's mortgagee, or other third parties.  By its signature below, Licensor represents it has obtained any such approvals as may be required.

29.    LICENSOR APPROVAL OF PLANS.  Licensee shall not enter into sub-license agreements with sub-licensees other than with Dish Wireless LLC, or its affiliates, successors, assigns or replacements ("Dish") without Licensor's reasonable approval, not to be unreasonable withheld conditioned or delayed. In furtherance of the foregoing and notwithstanding anything contained herein to the contrary, Licensor hereby approves Licensee entering into a sub-license agreement with Dish containing (i) an initial term of +/-5 years from the fee commencement date plus not more than (4) four additional 5-year renewal terms, (ii) initial monthly payments by Dish of $2,600 and an annual escalation of not less than 2.5%, (iii) a fee commencement date of not later than twelve (12) months from execution of the sub-license agreement and (iv) all subject to and including such terms and conditions as reasonably agreed to by the parties thereto. Pursuant to paragraph 5 hereof, Licensor hereby approves Dish Wireless LLC's plans and specifications for its initial installation of Equipment ("Dish Plans") as contained in Exhibit B hereto.

IN WITNESS WHEREOF, the parties hereto have signed this instrument as of the date first written above.

6

LICENSOR: 244 EAST 117 LLC                          LICENSEE: RCG Tower Group I, LLC

_____          By:    RCG Tower Group, LLC_____


By:    _____      By:    _____
       Name:                                             Name:
       Title:                                            Title:

EXHIBIT A – Licensed Premises

(a)  To be agreed upon portions of the roof, exterior, parapets and bulkheads of the Building;

(b)  Conduits and pathways within and into the Building as may be necessary for Licensee's Clients to serve its Equipment and/or to interconnect with tenants of the Building.

(c)  An area in the Building to be agreed upon to be known as the "Equipment Room."

(d)  The areas shown in Exhibit B hereto for the placement of Dish's Equipment and/or designated as the Licensed Premises.

EXHIBIT B – Dish Plans


*See following pages*



**NOTES**

1. CONTRACTOR SHALL FIELD VERIFY ALL DIMENSIONS.

2. CONTRACTOR SHALL MAINTAIN A 10'-0" MINIMUM SEPARATION BETWEEN THE PROPOSED GPS UNIT, TRANSMITTING ANTENNAS AND EXISTING GPS UNITS.

3. CONTRACTOR TO VERIFY WITH DISH WIRELESS C.M. THE LOCATION OF THE POWER AND FIBER SOURCE PRIOR TO CONSTRUCTION.

4. POWER AND GROUND CONDUITS ROUTED FROM BASEMENT TO ROOF ALONG EXTERIOR OF BUILDING.

5. NO FIBER ON SITE. FIBER NEEDS TO BE PULLED FROM STREET AND UTILITY CONSULT WILL BE REQUIRED

6. NOT ALL EXISTING FEATURES SHOWN FOR CLARITY.

7. PROBE WILL BE REQUIRED IN ORDER TO FINALIZE STRUCTURAL DESIGN FOR ANTENNA SECTORS AND EQUIPMENT MOUNTING.

---

# dish
## wireless™

5701 SOUTH SANTA FE DRIVE
LITTLETON, CO 80120

---

## AZIMUTH
### ENGINEERING P.C.

695 ROUTE 46 WEST, SUITE 300
FAIRFIELD, NJ 07004

---

IT IS A VIOLATION OF LAW FOR ANY PERSON, UNLESS THEY ARE ACTING UNDER THE DIRECTION OF A LICENSED PROFESSIONAL ENGINEER, TO ALTER THIS DOCUMENT.

| DRAWN BY: | CHECKED BY: | APPROVED BY: |
|---|---|---|
| VE | JWS | JKM |

RFDS REV #:  ———

## LEASE EXHIBIT

### SUBMITTALS

| REV | DATE | DESCRIPTION |
|---|---|---|
| A | 03/23/2022 | ISSUED FOR REVIEW |
| | | |
| | | |
| | | |
| | | |

### CARRIER
**DISH WIRELESS**

APPLICATION NUMBER
**NYNYC01222B**

DISH WIRELESS, LLC.
PROJECT INFORMATION

NYNYC01222B
244 E 117TH STREET,
NEW YORK, NY 10029

SHEET TITLE
**ROOF PLAN**

SHEET NUMBER
**LE-1**

---

PROPOSED DISH WIRELESS GPS ANTENNA

PROPOSED DISH WIRELESS EQUIPMENT CABINET ON PROPOSED PLATFORM

PROPOSED DISH WIRELESS EQUIPMENT PLATFORM

PROPOSED DISH WIRELESS TELCO BOX

PROPOSED DISH WIRELESS PPC

PROPOSED DISH Wireless L.L.C. RRH'S (TYP OF 4 PER SECTOR, TOTAL 12) MOUNTED TO PROPOSED ANTENNA MOUNT

PROPOSED DISH Wireless L.L.C. BETA SECTOR ANTENNA (TYP OF 2 PER SECTOR, TOTAL 6) MOUNTED TO PROPOSED PIPE MOUNT

PROPOSED DISH Wireless L.L.C OVP (TYP OF 1 PER SECTOR, TOTAL 3) MOUNTED TO PROPOSED ANTENNA MOUNT

PROPOSED DISH Wireless L.L.C CABLE TRAY (1'-0" WIDE, 10" A.R.L.)

BETA SECTOR 200°

EXISTING PIPE VENT (TYP)

PROPOSED FIBER, POWER & GROUND CONDUITS ROUTED ALONG ROOF ON SLEEPERS TO PROPOSED EQUIPMENT

PROPOSED DISH Wireless L.L.C. GAMMA SECTOR ANTENNA (TYP OF 2 PER SECTOR, TOTAL 6) MOUNTED TO PROPOSED PIPE MOUNT

PROPOSED DISH Wireless L.L.C. OVP (TYP OF 1 PER SECTOR, TOTAL 3) MOUNTED TO PROPOSED ANTENNA MOUNT

PROPOSED DISH Wireless L.L.C. RRH'S (TYP OF 4 PER SECTOR, TOTAL 12) MOUNTED TO PROPOSED ANTENNA MOUNT

GAMMA SECTOR 350°

SLOPE

EXISTING FIRE ESCAPE LADDER (TYP)

EXISTING BULKHEAD

EXISTING PIPE VENT (TYP)

EXISTING SATELLITE DISH (TYP.)

EXISTING SATELLITE DISH

FIBER

PROPOSED VERTICAL RUN FOR FIBER, POWER & GROUND ROUTED ALONG EXTERIOR OF BUILDING

APPROXIMATE LOCATION OF FIBER DEMARC IN BASEMENT AFTER FIBER IS BROUGHT IN FROM STREET

EXISTING CHIMNEY

PROPOSED DISH Wireless L.L.C. RRH'S (TYP OF 4 PER SECTOR, TOTAL 12) MOUNTED TO PROPOSED ANTENNA MOUNT

ALPHA SECTOR 60°

PROPOSED DISH Wireless L.L.C. OVP (TYP OF 1 PER SECTOR, TOTAL 3) MOUNTED TO PROPOSED ANTENNA MOUNT

PROPOSED DISH Wireless L.L.C. ALPHA SECTOR ANTENNA (TYP OF 2 PER SECTOR, TOTAL 6) MOUNTED TO PROPOSED PIPE MOUNT

WATER MAIN

APPROXIMATE LOCATION OF WATER MAIN IN BASEMENT

APPROXIMATE LOCATION OF POWER IN BASEMENT

POWER

BOILER ROOM

E 117TH STREET

LE-2

ROOF PLAN

6'  4'  2'  0       5'          10'
3/16"=1'-0"

1



EAST ELEVATION

**dish** wireless™

5701 SOUTH SANTA FE DRIVE
LITTLETON, CO 80120

**AZIMUTH**
ENGINEERING P.C.

695 ROUTE 46 WEST, SUITE 300
FAIRFIELD, NJ 07004

IT IS A VIOLATION OF LAW FOR ANY PERSON,
UNLESS THEY ARE ACTING UNDER THE DIRECTION
OF A LICENSED PROFESSIONAL ENGINEER,
TO ALTER THIS DOCUMENT.

| DRAWN BY: | CHECKED BY: | APPROVED BY: |
|---|---|---|
| VE | JWS | JKM |

RFDS REV #:  ‑‑‑

## LEASE EXHIBIT

| SUBMITTALS | | |
|---|---|---|
| REV | DATE | DESCRIPTION |
| A | 03/23/2022 | ISSUED FOR REVIEW |
| | | |
| | | |
| | | |

CARRIER
**DISH WIRELESS**

APPLICATION NUMBER
NYNYC01222B

DISH WIRELESS, LLC.
PROJECT INFORMATION

NYNYC01222B
244 E 117TH STREET,
NEW YORK, NY 10029

SHEET TITLE
ELEVATION

SHEET NUMBER
**LE-2**

6'  4'  2'  0      5'      10'
3/16"=1'-0"

1

Exhibit C
INSURANCE AND INDEMNIFICATION AGREEMENT

Whereas _____ (the "Contractor") will be performing certain work at _____ (the "Building") , pursuant to a sub-license agreement (the "Sub-License Agreement") between DISH Wireless LLC and RCG Tower Group I, LLC ("RCG"). Except as provided herein, all terms in this agreement shall be as defined in the Sub-License Agreement. As to all such work, Contractor agrees as follows:

**INDEMNIFICATION**

To the fullest extent permitted by law, Contractor agrees to indemnify, defend and hold harmless RCG Tower Group, LLC, RCG Tower Management, LLC and RCG Tower Group I, (together "RCG"), _____ (the "Owner"), RCG and Owner's shareholders, partners, members, managers, directors, officers employees, affiliates and agents, and _____ (the Owner's "Managing Agent") from any and all claims, suits, damages, liabilities, professional fees, including attorneys' fees, costs, court costs, expenses and disbursements related to death, personal injuries or property damage (including loss of use thereof) arising out of or in connection with the performance of the work of the Contractor, its agents, servants, subcontractors or employees, or the use by Contractor, its agents, servants, subcontractors or employees, of facilities owned by Owner. This agreement to indemnify specifically contemplates full indemnity in the event of liability imposed against RCG, the Owner and/or Managing Agent without negligence and solely by reason of statute, operation of law or otherwise, and partial indemnity in the event of any actual negligence on the part of RCG (with respect to the indemnification of RCG), or the Owner and/or Managing Agent (with respect to the indemnification of the Owner and/or Managing Agent) either causing or contributing to the underlying claim. In that event, indemnification will be limited to any liability imposed over and above that percentage attributable to actual fault, whether by statute, by operation of law or otherwise.

INSURANCE PROCUREMENT

Contractor shall obtain and maintain at all times while performing work at the Building, at its sole cost and expense, the following insurance (a) workers compensation insurance with statutory limits and employer's liability coverage (but not less than $500,000); (b) commercial general liability insurance with no restrictions or limitations for claims arising out of Section 240 of the New York State Labor Law with a minimum limit of $2,000,000 per occurrence and $3,000,000 in the aggregate, which insurance shall cover the following: premises and operations liability, products/completed operations, broad form property damage, broad form contractual liability, personal injury and independent contractor's liability; (c) automobile liability insurance covering owned, hired and non-owned vehicles, with a minimum limit of liability of $1,000,000; and (d) umbrella liability insurance with a limit of $5,000,000 per occurrence. Contractor shall, by specific endorsements to its policies, cause RCG, the Owner (including ownership entities), Managing Agent. other entities as reasonably required under the Master License Agreement (as such term is defined in the Sub-License Agreement), and any other entity to which Owner is contractually obligated to include as an additional insured, (collectively, the "Additional Insureds") to be named as Additional Insureds and with endorsements providing waivers of subrogation in favor of the Additional Insureds as may be required under the Sub License Agreement. Contractor shall, by specific endorsement to its commercial general liability and automobile liability policies, cause the coverage afforded to the Additional Insureds thereunder to be primary to and not concurrent with other valid and collectible insurance available to the Additional Insureds. Contractor shall, by specific endorsement to its umbrella/excess liability policy, cause the coverage afforded to the Additional Insureds thereunder to be first tier umbrella/excess coverage above the primary coverage afforded to the Additional Insureds and not concurrent with or excess to other valid and collectible insurance available to the Additional Insureds.

The undersigned confirms they have the authority to execute this document and that such will be binding upon Contractor.

Contractor

Signature: _____

Name: _____

Title: _____

Dated:  _____